**IN THE UNITED STATES DISTRICT COURT FOR**
**THE WESTERN DISTRICT OF TENNESSEE**

**BREWER BODY SHOP, LLC**
**AAA COLLISION CENTER, LLC**
**ICON COLLISION SERVICES, LLC**                                      **PLAINTIFFS**


**VS.**                                               **CAUSE NO. _____**


**STATE FARM MUTUAL AUTOMOBILE**
    **INSURANCE COMPANY,**
**STATE FARM FIRE AND CASUALTY COMPANY,**
**TENNESSEE FARMERS MUTUAL INSURANCE COMPANY**
**PROGRESSIVE HAWAII INSURANCE COMPANY,**
**ALLSTATE PROPERTY AND CASUALTY COMPANY,**
**ALLSTATE INSURANCE COMPANY,**
**ALLSTATE INDEMNITY COMPANY,**
**NATIONWIDE PROPERTY AND CASUALTY INSURANCE**
    **COMPANY,**
**NATIONWIDE MUTUAL INSURANCE COMPANY,**
**GEICO GENERAL INSURANCE COMPANY,**
**GEICO INDEMNITY COMPANY,**
**UNITED SERVICES AUTOMOBILE ASSOCIATION,**
**USAA CASUALTY INSURANCE COMPANY,**
**SAFECO INSURANCE COMPANY OF ILLINOIS,**
**DIRECT GENERAL INSURANCE COMPANY**
    **OF MISSISSIPPI,**
**SHELTER MUTUAL INSURANCE COMPANY**
**SHELTER GENERAL INSURANCE COMPANY,**
**LIBERTY MUTUAL FIRE INSURANCE COMPANY,**
**TRAVELERS PROPERTY CASUALTY INSURANCE COMPANY,**
**TRAVELERS INDEMNITY COMPANY,**
**TRAVELERS CASUALTY COMPANY OF CONNECTICUT,**
**HARTFORD FIRE INSURANCE COMPANY**
**HARTFORD CASUALTY INSURANCE COMPANY**
**HARTFORD PROPERTY AND CASUALTY**
    **INSURANCE COMPANY (THE HARTFORD)**
**HARTFORD INSURANCE COMPANY OF THE MIDWEST**
**AUTO-OWNERS INSURANCE COMPANY**
**STATE AUTO PROPERTY AND CASUALTY INSURANCE COMPANY**
**STATE AUTOMOBILE MUTUAL INSURANCE COMPANY**
**FIRST ACCEPTANCE INSURANCE COMPANY OF TENNESSEE, INC.,**

**PENNSYLVANIA NATIONAL MUTUAL**
      **CASUALTY INSURANCE COMPANY**                   **DEFENDANTS**

---

<u>**COMPLAINT**</u>

<u>**JURY TRIAL DEMANDED**</u>

---

COME NOW, the above-captioned Plaintiffs, pursuant to the Federal Rules of Civil Procedure and other applicable authority and file this, their Complaint against the above-captioned Defendants, and in support thereof, state the following:

<u>**PARTIES**</u>

1.      Plaintiff Brewer Body Shop, LLC, is a Tennessee limited liability company registered to do business and is doing business at 171 N. Watkins Street, Memphis, Tennessee 38104.

2.      Plaintiff AAA Collision Center, LLC, is a Tennessee limited liability company registered to do business and is doing business at 6397 Summer Gale Drive, Bartlett, Tennessee 38134.

3.      Plaintiff ICON Collision Services, LLC, is a Tennessee limited liability company registered to do business and is doing business at 2160 Spicer Cover, Memphis, Tennessee 38134.

4.      Defendant State Farm Mutual Automobile Insurance Company is a mutual company registered with the Tennessee Department of Insurance to do business within the state of Tennessee whose headquarters is located at One State Farm Plaza, Bloomington, Illinois 61710.

5.     Defendant State Farm Fire and Casualty Company is an insurance company registered with the Tennessee Department of Insurance to do business within the state of Tennessee whose headquarters is located at One State Farm Plaza, Bloomington, Illinois 61710.

6.     Tennessee Farmers Mutual Insurance Company is a mutual company registered with the Tennessee Department of Insurance to do business within the State of Tennessee whose headquarters is located at 147 Bear Creek Pike, Columbia, Tennessee 38401.

7.     Defendant Progressive Hawaii Insurance Corporation is an insurance corporation registered with the Tennessee Department of Insurance to do business within the state of Tennessee whose headquarters is located at 6300 Wilson Mills Road W33, Mayfield Village, Ohio 44143.

8.     Defendants Allstate Property and Casualty Insurance Company is an insurance company registered with Tennessee Department of Insurance to do business within the state of Tennessee and whose headquarters is located at 2775 Sanders Road, Northbrook, Illinois 60062.

9.     Defendant Allstate Insurance Company is an insurance company registered with Tennessee Department of Insurance to do business within the state of Tennessee and whose headquarters is located at 2775 Sanders Road, Northbrook, Illinois 60062.

10.     Defendant Allstate Indemnity Company is an insurance company registered with Tennessee Department of Insurance to do business within the state of Tennessee and whose headquarters is located at 2775 Sanders Road, Northbrook, Illinois 60062.

11.     Defendant Nationwide Property and Casualty Insurance Company is an insurance company registered with the Tennessee Department of Insurance to and is do business within the state of Tennessee whose corporate headquarters is located at One West Nationwide Boulevard, Columbus, Ohio 43215.

12.     Defendant Nationwide Mutual Insurance Company is a mutual insurance company registered with the Tennessee Department of Insurance to and is doing business within the state of Tennessee corporate headquarters is located at One West Nationwide Boulevard, Columbus, Ohio 43215.

13.     Defendant GEICO General Insurance Company is an insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the state of Tennessee whose corporate headquarters is located at 5260 Western Avenue, Chevy Chase, Maryland 20815.

14.     Defendant GEICO Indemnity Company is an insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the state of Tennessee whose corporate headquarters is located at 5260 Western Avenue, Chevy Chase, Maryland 20815.

15.     Defendant United Services Automobile Association is an insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the state of Tennessee whose corporate headquarters is located 9800 Fredericksburg Road, San Antonio, TX 78288.

16.     Defendant USAA Casualty Insurance Company is an insurance company registered with the Tennessee Department of Insurance to do business in and is doing business within the state of Tennessee whose corporate headquarters is located 9800 Fredericksburg Road, San Antonio, TX 78288.

17.     Defendant Safeco Insurance Company of Illinois is an insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the state of Tennessee whose corporate headquarters is located at 175 Berkeley Street, Boston, Massachusetts.

18.     Defendant Shelter Mutual Insurance Company is a mutual insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the state of Tennessee whose corporate headquarters is located at 1817 W. Broadway Columbia, Missouri 65218.

19.     Defendant Shelter General Insurance Company is an insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the state of Tennessee whose corporate headquarters is located at 1817 West Broadway, Columbia, Missouri 65218.

20.     Defendant Direct General Insurance Company is an insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the state of Tennessee whose corporate headquarters is located at 1281 Murfreesboro Road, Nashville, Tennessee 37217.

21.     Defendant Liberty Mutual Fire Insurance Company is an insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the state of Tennessee whose corporate headquarters is located at 175 Berkeley Street, Boston, Massachusetts.

22.     Defendant Travelers Property Casualty Insurance Company is an insurance company registered with the Tennessee Department of Insurance to do business and is doing business within

the State of Tennessee, who corporate headquarters is located at One Tower Square, Hartford, Connecticut 06183.

23.    Defendant Travelers Indemnity Company is an insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the State of Tennessee, who corporate headquarters is located at One Tower Square, Hartford, Connecticut 06183.

24.    Defendant Travelers Casualty Company of Connecticut is an insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the State of Tennessee, who corporate headquarters is located at One Tower Square, Hartford, Connecticut 06183.

25.    Defendant Travelers Indemnity Company of America is an insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the State of Tennessee, who corporate headquarters is located at One Tower Square, Hartford, Connecticut 06183.

26.    Defendant Hartford Fire Insurance Company is an insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the State of Tennessee and whose corporate headquarters is located at One Hartford Plaza, Hartford, Connecticut 06155.

27.    Defendant Hartford Casualty Insurance Company is an insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the State of Tennessee and whose corporate headquarters is located at One Hartford Plaza, Hartford, Connecticut 06155.

28.    Defendant Hartford Property and Casualty Insurance Company (the Hartford)  is an insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the State of Tennessee and whose corporate headquarters is located at One Hartford Plaza, Hartford, Connecticut 06155.

29.    Defendant Hartford Insurance Company of the Midwest  is an insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the State of Tennessee and whose corporate headquarters is located at One Hartford Plaza, Hartford, Connecticut 06155.

30.    Auto-Owners Insurance Company is an  insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the State of Tennessee and whose corporate headquarters is located at 6101 Anacapri Boulevard, Lansing, Michigan 48917.

31.    State Auto Property and Casualty Insurance Company  is an  insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the State of Tennessee and whose corporate headquarters is located at 518 East Broad Street, Columbus, Ohio 43215.

32.    State Automobile Mutual Insurance Company is an  insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the State of Tennessee and whose corporate headquarters is located at 518 East Broad Street, Columbus, Ohio 43215.

33.    First Acceptance Insurance Company of Tennessee, Inc., is a corporation registered with the Tennessee Department of Insurance to do business and is doing business within the State of

Tennessee and whose corporate headquarters is located at 3813 Green Hills Village Drive, Nashville,

Tennessee 37215.

34.     Pennsylvania National Mutual Casualty Insurance Company is an insurance company registered with the Tennessee Department of Insurance to do business and is doing business within the State of Tennessee and whose corporate headquarters is located at Two North Second Street, Harrisburg, Pennsylvania 17101.

## JURISDICTION AND VENUE

35.     Original jurisdiction and venues exists in this Court pursuant to 28 U.S.C. § 1331, as the Plaintiffs assert causes of action arising under the United States Constitution, and/or laws and treaties of the United States; and 28 U.S.C. § 1391(b)(2), as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim(s) occurred.

## FACTS

36.     Each individual Plaintiff is in the business of recovery and/or repair of motor vehicles

involved in collisions.

37.     Each individual Defendant is an insurer providing automobile policies to consumers

throughout the state of Tennessee.

38.     Each individual Plaintiff has done business at various times over the course of years

with the Defendants' policyholders and claimants by providing to these policyholders and claimants

motor vehicle collision repair service. Each Defendant is individually responsible for payment for

those repairs for their respective policyholders and claimants.

39.     Over the course of several years, the Defendants have engaged in an ongoing,

concerted and intentional course of action and conduct with State Farm acting as the spearhead to

improperly and illegally control and depress automobile damage repair costs to the detriment of the

Plaintiffs and the substantial profit of the Defendants.

40.     One of the methods by which the Defendants exert control over Plaintiffs' businesses is by way of entering program agreements with the individual Plaintiffs. Although each Defendant's program agreements have unique titles, such agreements are known generally and generically within the collision repair industry as direct repair program agreements ("DRPs").

41.     DRPs were presented to the Plaintiffs as a mutually beneficial opportunity. In exchange for providing certain concessions of price, priority and similar matters, the individual Defendants would list the body shop as a preferred provider.

42.     However, the concessions demanded by the individual Defendants in exchange for remaining on the direct repair program were not balanced by the purported benefits. The Defendants, particularly State Farm, have utilized these agreements to exert control over the Plaintiffs' businesses in a variety of manners, well beyond that of an ordinary business agreement.

43.     Defendants, particularly State Farm, have engaged in an ongoing pattern and practice of coercion and implied threats to the pecuniary health of the individual Plaintiff businesses in order to force compliance with unreasonable and onerous concessions. Failure to comply results in either removal from the program (s) combined with improper "steering" of customers away from the Plaintiff's business, or simply punishment to decrease the number of customers utilizing the Plaintiffs services.

44.     According to the Company Market Share Report, as of December 31, 2012, State Farm has captured 24.4% of the private passenger automobile insurance business within the market area of the state of Tennessee. The market share for its closest competitor, Tennessee Farmers, is very nearly but half of State Farm's market share at 16.94%. The next closest competitor, Allstate, holds only a quarter of the market share of State Farm, 6.89%.

45.     Of the remaining companies/groups which report earning premiums within the market area of the state of Tennessee for private passenger automobile insurance, the averaged market share for each is 0.87%   See copy of Company Market Share Report-2012 attached hereto as Exhibit "1."

46.     Based upon the most recent information available, it is clearly apparent State Farm holds the unchallenged dominant position within the automobile insurance industry in the Tennessee market.

47.     Collectively, the Defendants control well **over 90%** of the private passenger auto insurance market within the State of Tennessee.

48.     The vast majority of the Plaintiffs' business is generated by customers for whom the Defendants are responsible to pay repair costs.  The insurance-paying customers account for between seventy and ninety-five percent of each shop's revenue.  Overall, courts have acknowledged the significant role played by insurance companies in funding automobile collision repairs, as well as the ability and market power to exert substantial influence and control over where consumers will take a wrecked car for repairs.  See, e.g., *Allstate Ins. Co. v. Abbott*, 2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2006)(aff'd, *Allstate Ins. Co. v. Abbott*, 2007 U.S. App. LEXIS 18336 (5th Cir. 2007).

49.     As a general proposition, each DRP contains a general statement that the body shop will charge the respective insurance company no more for any particular repair than is the going rate in the market area.

50.     In order to establish the "market rate," State Farm utilizes what it terms "surveys." The geographical boundaries of the market area to be "surveyed" to establish the "market rate" are wholly within the control and direction of State Farm.

51.     Under the terms of its DRP, State Farm is not required to disclose any of the methods by which it establishes either the market area, the market rate, nor any other factual bases for its determination of the "market rate." The agreement contains no provisions for independent and neutral verification of the data utilized, nor any oversight not directly within the control and direction of State Farm.  The shops are simply required to blindly accept State Farm's pronouncements regarding these matters.

52.     Previously this "survey" was conducted by sending written documents to the individual shops.  The owner or designated representative of the shop would fill out the survey and return it to State Farm. In recent years, this process has been transferred to an electronic forum, State Farm's Business to Business portal, whereby the shops go online to complete the "survey."

53.     State Farm does not perform a survey in the traditional sense, where information is obtained and results produced, establishing a baseline of all the shops' information.  With respect to labor rates, as an example, State Farm's methodology does not represent what the majority of shops in a given area charge, quite the contrary.  State Farm's methodology lists the shops in a given market (as determined by State Farm) with the highest rates submitted at the top of the list and descending to the least expensive hourly rates at the bottom.

54.     State Farm then lists how many technicians a shop employs or the number of work bays available, whichever is lesser.  Those are then totaled and State Farm employs it's "half plus one" method.  If, for example, a State-Farm-determined market area has a total of fifty (50) technicians or work bays, State Farm's "half plus one" math equals twenty six (26).  With that number, starting at the bottom of the shop list, State Farm counts each shops' technicians or work

bays until the "half plus one" number is reached, twenty six in this example, and whatever that shop's rate happens to be is declared the market rate.

55.     There could, arguably, be some validity to this method, if it accounted for the variance in shop size, skill of technicians and other quality variables, which it does not.  However, the greatest problem with this method is that State Farm can and does alter the labor rates input by the shops, decreasing those arbitrarily deemed too high–or higher than State Farm wishes to pay.

56.     By altering the rates entered, particularly those of the larger shops, those with the most technicians and/or work bays, State Farm manipulates the results to achieve a wholly artificial "market rate."  The results are therefore not that of an actual survey reflecting the designated market area but created from whole cloth by State Farm.

57.     Furthermore, State Farm attempts to prohibit the shops from discussing with each other the information each has entered into the survey, asserting any discussion may constitute illegal price fixing.  State Farm selects the geographical boundaries of the "survey," and State Farm retains the right to alter the "survey" results and does so.  All without disclosure or oversight.

58.     Another electronic page on State Farm's business portal is known as the Dashboard/Scorecard. An example of State Farm's Dashboard is attached hereto for descriptive purposes as Exhibit "2."

59.     The Dashboard has substantive impact on several levels.  It serves as the record of an individual shop's survey responses.  It also provides a "report card" and rating of the individual shop based primarily upon three criteria: quality, efficiency and competitiveness.

60.     Within the quality criterion, the shop's reported customer satisfaction, customer complaints, and quality issues identified by an audit are scored.

61.     The efficiency criterion evaluates repair cycle time, number of days a vehicle is in the shop, utilizing information input by the shops on the car's drop-off and pickup dates.

62.     The competitiveness criterion analyzes the average estimate for each State Farm repair, the cost of parts, whether a vehicle is repaired or replacement parts are utilized, the number of hours required to complete repair and similar matters.  An example of a State Farm score card is included within Exhibit "2," second page.

63.     In rating an individual shop, a total score of 1000 is possible. However, State Farm is under no obligation to disclose the weight or total number of points possible given to each factor included in reaching the score, particularly those factors included under the competitiveness criterion. In fact, State Farm has refused to disclose its method of determining competitiveness even to its own team leaders.

64.     Due to this opacity, State Farm maintains complete and unsupervised authority to determine an individual shop's rating. It is therefore possible for a shop to have no customer complaints, high customer satisfaction, no issues identified on an audit, complete compliance with all repair cycle time and efficiency requirements and yet still have a low rating.  It is also possible for a shop to have multiple customer complaints, poor customer satisfaction, numerous issues identified on audit and complete failure to meet efficiency expectations and yet have a very high rating.

65.     The Dashboard rating is very important as a shop's rating determines its position on the list of preferred providers.  When a customer logs on to the State Farm web site seeking a repair shop, those shops with the highest ratings are displayed first.  A shop with a low rating will be at the bottom of the list, often pages and pages down, making it difficult for a potential customer to find it.

If a customer calls State Farm, the representative provides the preferred shops beginning with those holding the highest rating.

## Suppression of Labor Rates

66.    Among the questions asked by the "survey" is the individual shop's hourly labor rate. This information is supposed to be provided by the shop and to accurately reflect that shop's labor rate to allow State Farm to reach a "market rate." The actual method of determining a "market rate" is described above.

67.    If the labor rate information received is unilaterally deemed unacceptable by State Farm, a State Farm representative will contact the shop and demand the labor rate be lowered to an amount State Farm wishes to pay.

68.    If the body shop advises a labor rate increase is required, State Farm representatives will inform the body shop they are the only shop in the area who has raised its rates, therefore the higher rate does not conform with the "market rate" and is thus a violation of the direct repair program agreement.

69.    At various points in time, State Farm has utilized this method of depressing labor rates, telling each shop they are the only one to demand a higher labor rate when, in fact, multiple shops have attempted to raise their labor rates and advised State Farm of such.

70.    Should a shop persist in its efforts to raise its labor rate, State Farm will take one or more of several "corrective" measures: it will go into the individual shop's survey responses and alter the labor rate listed without the knowledge or consent of the shop and use this lowered rate to justify its determination of the "market rate." It will threaten to remove the shop from the direct repair program to coerce compliance. It will remove the shop from the direct repair program.

71.     The net effect of this tactic is to allow State Farm to manipulate the "market rate" and artificially suppress the labor rate for the relevant geographic area, an area which, again, is defined solely by State Farm and is not subject to either neutral verification or even disclosure.

72.     The remaining Defendants, intentionally and by agreement and/or conscious parallel behavior, specifically advised the Plaintiffs they will pay no more than State Farm pays for labor. These Defendants have not conducted any surveys of their own in which the Plaintiffs have participated to determine market rates.  These Defendants have agreed to join forces with State Farm, the dominant market holder, and each other to coerce the Plaintiffs into accepting the artificially created less-than-market labor rates through intimidation and threats to the Plaintiff's financial ability to remain operating.

## Suppression of Repair and Material Costs

73.     Through various methods, the Defendants have, independently and in concert, instituted numerous methods of coercing the Plaintiffs into accepting less than actual and/or market costs for materials and supplies expended in completing repairs.

74.      Some of these methods include but are not limited to: refusal to compensate the shops for replacement parts when repair is possible though strongly not recommended based upon the shop's professional opinion; utilizing used and/or recycled parts rather than new parts, even when new parts are available and a new part would be the best and highest quality repair to the vehicle; requiring discounts and/or concessions be provided, even when doing so requires the shop to operate at a loss; de facto compulsory utilization of parts procurement programs.

75.     In addition to the above, the Defendants have repeatedly and intentionally failed to abide by industry standards for auto repairs. Three leading collision repair estimating databases are in ordinary usage within the auto body collision repair industry:

a)     ADP;
b)     CCC; and
c)     Mitchell.

76.     These databases provide software and average costs associated with particularized types of repairs to create estimates.  The estimates generated by these databases include the ordinary and customary repairs, repair time (labor) and materials necessary to return a vehicle to its pre-accident condition.  These databases and the estimates they generate are accepted within the industry as reliable starting points, subject to the shop's expert opinions and the necessarily present variability between the "best-case scenario"[1] presented by the procedure databases and the actual needs of a particular repair.

77.     Over the course of years, the Defendants have admitted the accepted position of the estimating databases within the industry, but have nonetheless engaged in a course of conduct of refusing to make full payment for procedures and materials. In many instances the Defendants will refuse to allow the body shop to perform required procedures and processes, thereby requiring the Plaintiffs to perform less-than-quality work or suffer a financial loss.

---

[1]The database procedure pages set forth the anticipated repairs, repair times and materials for repair of an undamaged vehicle using original manufacturer equipment which are specifically designed to fit that particular vehicle.  Wrecked cars are obviously not undamaged and original manufacturer parts are not always used, particularly with repairs for which State Farm and the other Defendants are responsible for payment, which can substantially affect repair procedures required, repair times and necessary materials.

78.     A non-exhaustive list of procedures and processes the Defendants refuse to pay and/or pay in full is attached hereto as Exhibit "3."

79.     At the same time, Defendants selectively rely upon and assert the definitive nature of these databases when doing so is to their respective financial advantage.  For example, when a particular repair requires twenty hours of labor to complete but the database estimate notes fifteen hours of labor is standard for that type of repair, Defendant will cite the database estimate and pay for only fifteen hours of labor time.

80.     With respect to materials, while it is inarguable that materials must be expended to repair automobile collisions, the Defendants simply refuse to pay for them, asserting materials are part of the cost of doing business.  This is the Defendants' position even when the authoritative databases specifically state that such materials are <u>not</u> included in the repair procedure pages.

81.     The only partial exception to this practice is paint.  While paint costs are factored into the amount the Defendants will pay, it is calculated via a formula which compensates the shops for only half the actual cost on average.  The Defendants' method of calculating paint payment does not take into account the type of paint needed/used, the requirement that paint be mixed to match the existing color of the vehicle, the actual amount of paint required to complete the job, the type of vehicle involved or any other factor.  Defendants pay only based upon arbitrary caps, self-established and unrelated to actual costs to the Plaintiffs.

82.     This continued refusal and/or failure to compensate Plaintiffs for ordinary and customary repairs and materials costs places Plaintiffs in the untenable position of either performing incomplete and/or substandard repairs and thus breaching their obligation to automobile owners to

return vehicles to pre-accident condition, or performing labor and expending materials without proper compensation and thereby jeopardizing continuing viability of the business enterprise.

83.     It was these very concerns that prompted a meeting between shops in Mississippi, Tim Bartlett, State Farm Estimatix team leader, John Findley, Estimatix section manager, Steve Simkins, State Farm counsel for Mississippi and Alabama, and members of the Mississippi Department of Insurance in April, 2013. At this meeting, the members of the automobile collision repair industry expressed their dissatisfaction and concerns with the very practice of refusing to compensate fully and fairly for repairs that were performed and State Farm's inconsistent application of the database estimating software, i.e., utilizing database estimates only when it is in State Farm's financial best interests to do so.

84.     State Farm representative Tim Bartlett acknowledged (before witnesses) that repairs and subsequent payment for those repairs should be consistent with the estimates prepared through the database software. Mr. Bartlett assured those present, and the Department of Insurance representative that it would begin abiding by those database estimates and stated it would raise the matter at its insurance industry meetings, held locally approximately once a month.

85.     Also at that meeting, Mr. Simpkins asked if insurance representatives might be permitted to attend the meetings of the Mississippi Automobile Collision Society. The association representative present for the meeting, John Mosley, invited State Farm to attend those Association meetings if State Farm would permit members of the Association to attend the insurance meetings. Mr. Simkins refused.

86.     Despite the assurances given the body shop representatives and the Department of Insurance at this meeting, State Farm failed to perform as promised. While these activities occurred

in Mississippi and are not binding upon matters before this Court, they are illustrative of the lengths the current Defendants are willing to go to. In Tennessee, State Farm, and the other Defendants in collusion with State Farm, refuse to make payment and/or full payment for necessary and proper repairs, labor and materials.

87.     Defendant State Farm also imposes restrictions upon the Plaintiffs' ability to obtain and utilize quality replacement parts and materials.  As part of its DRP agreement, State Farm asserts it has the unilateral authority to enter into separate agreements with manufacturers, distributors or suppliers of automotive parts, supplies or materials.

88.     Despite the fact that the shops have no involvement in the negotiation of those separate agreements, they are de facto required to abide by the pricing agreements reached, even if they do not make purchases with those vendors.  Although presented as an option to participate, the optional language is rendered nugatory by additional language which requires the shops to accept as payment only that amount for which the parts and/or materials could have been obtained through those agreements.  Participation or lack thereof is therefore completely meaningless and the optional language is illusory.

89.     Moreover, shops are required to "stack" this purportedly optional usage of separate agreements with other discounts required elsewhere within the agreement.  Thus, the limitation on payment, refusal to compensate for nearly all materials and the compelled discounts end in a shop operating at or near a loss for each repair.

90.     Though led by State Farm as the dominant market share holder, all Defendants have agreed to and/or consciously parallel the compensation ceilings established by State Farm solely for their own profit.

### **Steering**

91.     The Defendants regularly and routinely engage in "steering" in order to punish noncompliant shops.  Defendants will "steer" insures and/or claimants to favored, compliant shops through misrepresentation, insinuation, and casting aspersions upon the business integrity and quality of disfavored repair centers.

92.     Examples of this practice include advising that a particular chosen shop is not on the preferred provider list, advising that quality issues have arisen with that particular shop, that complaints have been received about that particular shop from other consumers, that the shop charges more than any other shop in the area and these additional costs will have to be paid by the consumer, that repairs at the disfavored shop will take much longer than at other, preferred shops and the consumer will be responsible for rental car fees beyond a certain date, and that the Defendant cannot guarantee the work of that shop as it can at other shops.

93.     These statements have been made about certain Plaintiffs without any attempt to ascertain the truth thereof. Not only that, some of the ills recited which implicitly criticize the shops are wholly attributable to the insurer itself.  For instance, the statement that repairs will take longer at a disfavored shop−consumers are not told the length of time to complete repairs is not a function of the repair shop's efficiency but a delay in beginning repairs due to the insurer's decision to delay sending an appraiser to evaluate the damage. This is a decision completely and wholly within the control of the Defendants.  Asserting the shops charge more is often not a function of what the shop actually charges but the Defendants' refusal to pay, also a factor wholly and completely within the control of the respective Defendant.  Yet both are conveyed to the public as problems with the shop.

94.     The most egregious of these statements, that the Defendant cannot guarantee the work of the shop, is particularly misleading as <u>none</u> of the Defendants offer a guarantee for repair work. Instead, the Defendants require the body shops to provide a limited lifetime guarantee on work performed.  In the event additional work is required, the body shop is required to do so without any additional payment, or to indemnify the insurer for costs if work is performed at another shop.

95.     Thus, while it may be a facially truthful statement that an insurer cannot guarantee the work of a particular shop, the clearly understood inference is that it can and will guarantee the work of another, favored shop, which is simply not true.

### Intentional Nature of Defendants' Conduct

96.     In 1963, a consent decree was entered in *United States vs. Association of Casualty and Surety Companies*, et al, Docket No. 3106, upon complaint filed in the Southern District of New York.  The allegations of that complaint included violations of Sections 1 and 3 of the Sherman Act, also known as the Sherman Antitrust Act.  A copy of this Decree is attached hereto as Exhibit "4."

97.     Specific actions supporting those allegations included: (1) requiring repair rather than replacement of damaged parts; (2) replacing damaged parts with used rather than new parts; (3) obtaining discounts on new replacement parts; (4) establishing strict labor time allowances;  (5) suppressing the hourly labor rate; (6) channeling auto repairs to those repair shops which would abide by the insurer estimates and boycotting those which refused.  The complaint further alleged a conspiracy and combination in unreasonable restraint of trade and commerce for these practices.

98.     The Consent Decree order provided the following relief: (1) enjoined the defendants from placing into effect any plan, program or practice which has the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do

business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

99.     Whether or not any current Defendant is legally bound by this Decree, the actions described in the present cause fall squarely within those prohibited by the Decree.  The Decree has been "on the books" for fifty years and is well-known within the insurance industry.

100.     Being known, it can only be said that Defendants were fully aware their actions, plans, programs, and combinations and/or conspiracy to effectuate the same have been willful, intentional and conducted with complete and reckless disregard for the rights of the Plaintiffs.

## CLAIMS FOR RELIEF

### COUNT ONE:
### QUANTUM MERIT/ UNJUST ENRICHMENT

101.     Quantum MERIT rests upon the equitable principle that a party is not allowed to enrich itself at the expense of another. More specifically, the law implies a promise to pay a reasonable amount for the labor and materials furnished, even absent a specific contract therefore.

102.     A quasi-contract, or constructive contract, is based on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. In this respect, the terms "unjust enrichment" and "restitution" are modern designations for the doctrine of "quasi-

contracts" and the basis for an action for unjust enrichment lies in a promise, which is implied in law, that one will pay to the person entitled thereto which in equity and good conscience is his.

103.    It is an obligation created by law, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money under circumstances that in equity and good conscience ought not be retained and which in justice and fairness belongs to another.

104.    In the present case, Defendants' insures and claimants entrusted the Plaintiffs with the full and complete repair of their vehicles, the cost of which it is incumbent upon the Defendants to pay.  An obligation was thus created to provide payment to Plaintiffs for their work and expended materials.

105.    Plaintiffs have performed valuable services and expended material resources with the reasonable expectation of payment\compensation for those services and materials. This is their business. Performing said services and expending material resources benefitted Defendants and Defendant's insured/claimants for whom Defendants are required to provide payment for repairs.

106.    It was and has always been foreseeable the Plaintiffs were not performing labor or providing services and materials without expectation of full payment. However, Defendants have simply taken the position that payment may not be made unless they choose to provide it, regardless of any other factor or consideration and have thus enriched themselves at the expense of Plaintiffs.

107.    Plaintiffs are equitably entitled to receive payment for the materials and services rendered.

**COUNT TWO:**
**QUASI-ESTOPPEL**

108.    Quasi-estoppel is an equitable principle. This doctrine is applied to preclude contradictory positions by preventing a person from asserting to another's disadvantage, a right inconsistent with the position previously taken.

109.    The Defendants have relied upon and asserted the validity\authority of the databases, supra, when it has been to their respective advantage. State Farm and the other Defendants have refused to compensate and\or fully compensate Plaintiffs for materials expended and work performed, including labor and labor rates, upon reliance of these very same guides, claiming they are unnecessary to complete the work at hand.

110.    Defendants' inconsistent and contradictory application of, or refusal to abide by, the guidelines of the industry databases has created an atmosphere of doubt, uncertainty and distrust, all to the severe detriment of Plaintiffs while, at the same time, seeking to obtain every improper advantage for Defendants themselves.

111.    Plaintiffs therefore seek to have the Defendants stopped from denying the applicability and reasonableness of the baseline procedures and costs set forth in the industry databases henceforth and make full payment for the necessary reasonable costs of repairs made for the benefit of Defendants' insures and claimants.

## COUNT THREE:
## VIOLATION OF TENNESSEE CODE SECTION47-18-104(b)(8)

112.    Tennessee Code Section 47-18-104(b)(8) states that it shall constitute an unfair trade practice   to disparage the goods, services or business of another by false or misleading representations of fact. Such actions are unlawful. *Id.*

113.    The Defendants have repeatedly and willfully violated this statute through their repeated campaign of misrepresentation of facts, failure to verify facts damaging or tending to cause damage to the Plaintiffs business reputations before conveying the same to members of the public, implications of poor quality work, poor quality efficiency, poor business ethics and practices, and unreliability.

114.    At the time such verbal and/or written statements were made, Defendants were fully aware that some statements misleading facts (e.g., that repairs would take longer at a particular shop without disclosing any delay in commencing repairs was attributable directly to the defendant insurer, and that a particular shop's work could not be guaranteed and/or warranted when the defendant insurer was fully aware it did not guarantee and/or warrant the work of <u>any</u> repair shop), while other statements impugning the quality, efficiency, honesty and/or integrity of the shop were made without any effort to establish the truth of content (e.g., that complaints had been made about the quality of the repairs, and/or that the shop charged more than the other shops in the area). The effect of these false and misleading statements was to steer customers and/or potential customers away from Plaintiffs' business and towards shops who were compliant with Defendants' price and compensation ceilings.

115.    These false and misleading representations of fact constitute a violation of Tennessee law, Section 47-18-104(b)(8), for which the Plaintiffs are entitled to appropriate damages.

**COUNT FOUR:**
**TORTUOUS INTERFERENCE WITH BUSINESS RELATIONS**

116.    TORTUOUS interference with business relations occurs when a defendant intentionally and improperly interferes with another's prospective contractual relation and is subject

to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

117.    The Defendants have repeatedly engaged in malicious actions and a course of conduct designed to interfere with and injure the Plaintiffs' business relations and prospective business relations. The Defendants have repeatedly steered and attempted to steer customers away from the Plaintiffs' respective businesses through their repeated campaign of misrepresentation of facts, failure to verify facts damaging or tending to cause damage to the Plaintiffs business reputations before conveying the same to members of the public, implications of poor quality work, poor quality efficiency, poor business ethics and practices, and unreliability.

118.    Defendants performed these actions by relaying the false and/or misleading statements to insures and/or claimants who called Defendants and identified Plaintiffs as their choice of repair facility.  Upon information and belief, at least one Defendant, mailed letters to insures and claimants containing the same or similar false and/or misleading statements regarding Plaintiffs and implicitly urging the potential customers of Plaintiffs to take their business elsewhere.

119 .   The purpose of these actions was twofold: to punish the Plaintiffs who complained about or refused to submit to the various oppressive and unilateral price ceilings the Defendants were enforcing upon them, and to direct potential customers of the Plaintiffs to other vendors who would comply with the maximum price ceilings unilaterally imposed by the Defendants.

120.    The Plaintiffs have been damaged by the Defendants malicious and intentional actions. Plaintiffs are therefore entitled to compensation for these damages.

**COUNT FIVE:**
**CONVERSION**

121.    Conversion is the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights.

122.    Plaintiffs have performed necessary work and expended appropriate labor and materials for which Defendants have refused to make payment and\or full payment, even after demand for same.

123.    Defendants' action constitute a conversion of Plaintiffs' property.

124.    Defendants are therefore wrongfully in possession of monies which should have been expended to pay repair bills of their policyholders and claimants and which rightfully belongs to Plaintiffs as a result Plaintiffs performing necessary reasonable and customary repairs to vehicles.

**COUNT SIX:**
**VIOLATIONS OF THE SHERMAN ACT–PRICE-FIXING**

125.    The Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade. 15 U.S.C. §1. Such agreements are illegal if (1) their purpose or effect is to create an unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.

126.    Through parallel actions, and\or explicit agreement, the Defendants have formed and engaged in a vertical conspiracy or combination to impose maximum price limits upon the Plaintiffs for their products and services.

127.    The United States Supreme Court has noted that agreements to fix maximum prices, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment. *Kifer-Stewart Co.* V*s. Joseph E. Seagram and Sons, Inc.*, 340 U.S. 211 (1951).

128.     The Defendants and co-conspirators have engaged in combination and conspiracy in unreasonable restraint of trade and commerce in the automobile damage repair industry.

129.     The aforesaid combination and/or conspiracy has consisted of a continuing agreement in concert of action among the Defendants and co-conspirators to control and suppress automobile damage repair costs, automobile material repair costs through coercion and intimidation of these shops.

130.     Evidence of this conspiracy or combination include, but is not limited to, admission before witnesses that members of the insurance industry meet regularly to discuss such matters in and amongst themselves but refuse to allow members of the auto collision repair industry to attend those meetings, explicit statements by Defendants that they will conform to State Farm's unilaterally imposed payment structure, admitting the baseline application of the industry database but failing to conform to that minimum standard, followed by the uniformity of action by all Defendants.

131.     The aforesaid offenses have had, among others, the effect of eliminating competition within the automobile damage repair industry, elimination of some shops from a substantial segment of the automobile damage repair industry for refusing or attempting to refuse the Defendants' arbitrary price ceilings, and subjecting repair shops to collective control and supervision of prices by the Defendants and co-conspirators.

132.     Neither the Plaintiffs, nor other members of the auto collision repair industry, are able to engage in competitive business practices as the Defendants have effectively and explicitly determined what their business practices will be.

133.    The Defendants actions individually and certainly collectively have violated federal law and directly caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief herein prayed for is granted.

## COUNT SEVEN:
## VIOLATION OF THE SHERMAN ACT–BOYCOTT

134.    The United States Supreme Court has repeatedly held that boycotts constitute a violation of the Sherman Act, 15 U. S. C. §1. "Boycott" has been defined within the antitrust law context as "pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).

135.    The Defendants have engaged, and continue to engage, in boycott and boycotting activity through their repeated actions of steering customers away from the Plaintiffs through allegations and intimations of poor quality work, of poor efficiency in performing work, of questionable business practices, of overcharging, impugning integrity, and similar actions so as to withhold and\or enlist others to withhold patronage from the Plaintiffs.

136.    This boycott was specifically designed to pressure, intimidate, and/ or coerce the Plaintiffs into complying with the maximum-price limitations unilaterally conceived by Defendant State Farm and agreed to collusively by the other Defendants.

137.    It is irrelevant for purposes of the Sherman antitrust boycott activity that the Plaintiffs and Defendants are not direct competitors within the same industry. The United States Supreme Court has directly addressed this issue in *St. Paul Fire and Marine Insurance Company*, supra,

stating, "[Backwaters and the ultimate target need not be in a competitive relationship with each other." 438 U.S. at 543.

138.    The enlistment of third parties as a means of compelling capitulation by the boycotted group has long been viewed as conduct supporting a finding of unlawful boycott. *Id*.

139.    In the present matter, the Defendants have engaged in not only a boycott, but have regularly, routinely and purposefully enlisted the aid of unwitting third parties in carrying out their boycott through their intentional acts of steering those customers away from the Plaintiffs.

140.    Defendants' boycott was created and carried out with the sole purpose and intent of financially coercing and threatening the Plaintiffs into complying with the Defendants price caps.

141.    The Defendants actions are violation of federal law and have directly caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief requested herein is granted.

## PRAYER FOR RELIEF

142.    Plaintiffs incorporate and restate by reference herein all allegations set forth above.

143.    As a result of the Defendants' actions, Plaintiffs have been substantially harmed and will continue to suffer unless the relief requested herein is granted.  The Plaintiffs therefore pray for the following relief:

A.    Compensatory damages for all non-payment and underpayment for work completed on behalf of the Defendants' insures and claimants as determined by a jury.

B.    Compensation for the lost revenue through artificial suppression of labor rates as determined by a jury.

C.    Damages sufficient to compensate Plaintiffs for lost business opportunities as determined by a jury.

D.   Treble damages, reasonable attorneys' fees and costs  for violations of the Sherman Act, as required under 15 U.S.C. § 15.

E.   Injunctive relief prohibiting the Defendants from further engaging in any of the following:

   (1)   Placing into effect any plan, program or practice which has the purpose or effect of:

      (a)   directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any Plaintiff automotive repair shop with respect to the repair of damage to automobiles.

      (b)   fixing, establishing or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automobiles or for replacement parts or labor in connection therewith whether by coercion, boycott or intimidation, or by the use of flat rate or parts manuals or otherwise.

   (2)   Placing into effect any plan, program or practice which explicitly requires or has the purpose or effect of requiring Plaintiffs to participate in any parts procurement program.

   (3)   Providing untruthful and/or unverified information to customers or third persons regarding the quality, cost, efficiency or reputation of any Plaintiff ("steering").

   (4)   Prohibiting Defendant State Farm from altering or amending any Plaintiff response to its market labor rate "survey" without the express written permission of the affected Plaintiff.

F.   Punitive and/or exemplary damages sufficient to punish Defendants for their intentional acts and deter each Defendant and similar entities from pursuing this improper conduct in the future.

G.   Pre- and post-judgment interest.

H.   Any additional relief the Court deems just and appropriate.

**CONCLUSION**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demands a judgment against Defendants in an amount sufficient to fully compensate Plaintiff for damages incurred as a result of Defendant's conduct with appropriate pre- and post-judgment interest, equitable relief as set forth above, punitive damages, attorneys' fees, expenses, costs and any other relief the Court deems the Plaintiffs entitled.

Respectfully submitted, this the 22nd day of APRIL 2014.

**BREWER BODY SHOP, LLC**
**AAA COLLISION CENTER, LLC**
**ICON COLLISION SERVICES, LLC**


BY: _/s/ Halbert E. Dockins, Jr._____
     HALBERT E. DOCKINS, JR. (TN BAR 22374)

OF COUNSEL:

Dockins Tunnage & Banks, PLC
6520 Dogwood View Parkway, Ste B
Jackson, MS 39213
Telephone:     601.713.2223