**IN THE UNITED STATES DISTRICT COURT FOR**

**THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION**

| | |
|---|---|
| BREWER BODY SHOP, LLC., *et al.*, | * |
| | * |
| PLAINTIFFS, | * |
| | * MDL Docket No. 2557 |
| v. | * |
| | * Case No. 14-cv-6002-GAP-TBS |
| STATE FARM MUTUAL AUTOMOBILE | * |
| INSURANCE COMPANY, *et al.*, | * ORIGINALLY FILED IN THE |
| | * WESTERN DISTRICT OF |
| DEFENDANTS. | * TENNESSEE |
| | * |

**MOVING DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6), the Defendants

listed in Exhibit A ("Moving Defendants") hereby move to dismiss the First Amended

Complaint (Doc. 85) with prejudice for, once again, failing to state a claim upon

which relief may be granted.

**MEMORANDUM OF LAW**

The First Amended Complaint ("FAC") suffers from "a host of problems" –

many of which have already been detailed in the initial Motions to Dismiss (Docs. 9,

17, 19), and the Court's Orders in this case (Docs. 79, 84), as well as the Court's

Orders in A&E Auto Body, Inc. v. 21st Century Centennial Ins. Co. (No. 6:14-cv-

00310, Docs. 110, 291)) ("A&E") which provided ample guidance as to the

inadequacy of the nearly identical Complaints filed in this MDL.  To the extent to

which Plaintiffs now try to provide some allegations of fact that go beyond

1

conclusory allegations and group pleadings, those few added facts only serve to

highlight Plaintiffs' inability to allege a plausible cause of action.  Unable to hide

behind group pleadings, the FAC is a random collection of isolated facts, relating to

diverse subsets of Defendants.  The FAC comes nowhere close to alleging any

agreement to fix prices or boycott by thirty-one Defendants.  Similarly, the remaining

state law claims of tortious interference and quantum meruit continue to ignore the

Court's many admonitions regarding shotgun pleadings and the need to allege

specific facts.  Therefore, the FAC should be dismissed with prejudice.

I.      PLAINTIFFS' SHERMAN ACT CLAIMS (COUNT I AND COUNT II)
        SHOULD BE DISMISSED WITH PREJUDICE.

        The FAC reveals a stunning lack of facts that could plausibly suggest an

agreement among the thirty-one Defendants that Plaintiffs have chosen to sue.  To

state a claim under Section 1 of the Sherman Act, a plaintiff must allege: (1) an

agreement between two or more parties (2) that unreasonably restrains trade.

Levine v. Cent. Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1545 (11th Cir. 1996). See

also Duty Free Americas, Inc. v. Estee Lauder Companies, Inc., 946 F. Supp. 2d

1321, 1328-29 (S.D. Fl. May 9, 2013) ("Both § 1 and § 2 conspiracy claims 'require

the same threshold showing – the existence of an agreement to restrain trade.'")

(quoting Todorov v. DCH Healthcare Authority, 921 F.2d 1438, 1460, n. 35 (11th

Cir.1991)).  This Court has already recognized that the "crucial question" on a

Section 1 claim is whether the challenged conduct "stems from independent decision

or from an agreement, tacit or express."  A&E Auto Body, Inc. v. 21st Century

Centennial Ins. Co., No. 6:14-cv-00310, 2015 WL 304048, at *9 (M.D. Fla. Jan. 21,

2015) (quoting Bell Atl. v. Twombly, 550 U.S. 544, 553 (2007)).  The FAC adds bulk

but fails to provide any facts that would plausibly suggest an agreement among

thirty-one competing insurance companies to fix prices or to boycott the four plaintiff

shops.[1]

    A.    <u>Plaintiffs Fail to Allege Parallel Action Among Defendants That Would Support a Plausible Inference of an Agreement to Fix Prices.</u>

Recognizing that they have no facts alleging an express agreement, Plaintiffs

ask the Court to infer an agreement through parallel action by alleging that diverse

subsets of Defendants, at different points in time, paid the same price to one of four

body shops in Western Tennessee.  While even an adequate "showing of parallel

business behavior" can fail to suggest an agreement where there are other plausible

explanations (<u>A&E</u>, 2015 WL 304048, at *9), here, the FAC fails to allege facts

showing parallel behavior, much less any supposed agreement that could be

inferred from such parallel action.  Therefore, Plaintiffs' price-fixing claim must be

dismissed.

    1.    Alleging a Failure By Some Defendants to Pay the "Posted" Rate of Four Body Shops Does Not Support a Plausible Inference of an Agreement to Fix Prices Among All Defendants.

Plaintiffs purport to allege an agreement to fix prices across the entire state of

Tennessee (FAC ¶¶ 39, 40, 47-51), but they supply so few allegations as to make it

impossible – not merely implausible – to infer any agreement to fix prices.

According to the FAC, the relevant product market is auto body repair services: "As

---

[1] The various allegations about the body shop repair process (FAC ¶¶ 53-93) do nothing to support a cause of action.

3

traders within an identifiable market product, auto collision repair, the effect of competition between collision repair shops in the only effect to be measured." FAC ¶ 381.  In a group pleading, the FAC alleges that Defendants set a uniform price ($42/hr) for the entire state of Tennessee:  "The Defendants generally leave a particularly fixed price structure in place for several years in a row.  The determined 'market' or 'prevailing' rate for the State of Tennessee was $42.00 per hour body labor for at least two years."  FAC ¶ 383.  But the FAC, itself, states that $42/hr is the desired "posted" rate for the Plaintiffs: Brewer posted $42/hr in 2011 (id. ¶ 158); AAA Oakland posted $42/hr in 2012 (id. ¶ 161); and AAA Collision posted $42/hr in 2013 (id. ¶ 169).  It is hard to understand the basis for Plaintiffs' claim given these allegations that three Plaintiffs "posted" rates of $42/hr over three years, while the Defendants supposedly paid $42/hr "for at least two years."

Beyond this, Plaintiffs also assert that a plausible inference of price-fixing is presented whenever some subset of the Defendants pays less than Plaintiffs' "posted" rate.  The FAC never explains why the "posted rate" is relevant or meaningful. In fact, it is not. A body shop's posted rate is as meaningless as the "sticker price" in a car dealer's showroom. While that might be the price at which the seller would like to sell, it is not the actual, negotiated sale price at which sales are made in the market. And that is the only price that has relevance and meaning.

While purporting to allege that all Defendants agreed to fix prices, there is no mention of the rates paid by some (e.g., Auto-Owners or Pennsylvania National), and even when the FAC does identify certain Defendants paying the same price,

4

only a few Defendants are identified.  The composition of those subsets of Defendants varies between allegations, and many Defendants are not included at all.  For example, the FAC alleges that only six Defendants paid the same rate to Brewer in 2011: "USAA, Travelers, Shelter, Liberty Mutual, GEICO and Direct General. . . ."  FAC ¶ 160.[2]  The FAC fails to allege the rate or rates paid by these Defendants:  Allstate, Progressive, Nationwide, Hartford, Safeco, State Auto, Tennessee Farmers, Auto-Owners, First Acceptance and Pennsylvania National.  In other paragraphs, the FAC alleges different subsets of Defendants supposedly paying the same rate to different Plaintiffs, in different years.  See FAC ¶¶ 163, 168, 170, 172.  There is no uniformity or consistency to suggest parallel action by all Defendants, much less any agreement.

Moreover, the FAC provides no basis to infer that the Defendants were agreeing to fix prices across Tennessee simply because some Defendants paid someone – presumably one of four Plaintiffs – something slightly less than their "posted" price.  Even as to these four shops, the paucity and randomness of Plaintiffs' isolated price allegations cannot support any inference of an agreement to fix prices.  For example, Brewer alleges that it is one of only three shops in

---

[2] To be precise, that Paragraph of the FAC does not expressly state that those Defendants made payments to Brewer in 2011.  Rather, those facts are inferred from the two proceeding paragraphs.  FAC ¶¶ 158-59.  Moreover, some of these Defendants who are alleged to have paid $38/hr in 2011 are also alleged to have increased their rates in 2011. Therefore, it is not clear whether the $38/hr rate identified in paragraph 160 was increased to $40/hr in 2011 as alleged in paragraph 175.  Further, it is hard to reconcile the allegation of paying $38/hr or even $40/hr in 2011 when the FAC alleges that all Defendants were paying $42/hr "for at least two years."  FAC ¶ 383.

Millington, Tennessee.  FAC ¶ 158.  Yet, Brewer does not allege what price the other two shops in Millington charged.  It does not even identify the "posted" prices of the other shops.  Nor does it allege the prices that Brewer actually charged (and received) in 2011.  Obviously, there is no suggestion of collusion in setting the "market rate" if the other two shops (and perhaps Brewer too) all charged less than Brewer's "posted" price.

Likewise, in Paragraph 161, the FAC alleges that AAA Collision is the only body shop in Oakland, Tennessee.  Apparently assuming that it has a monopoly in a relevant geographic market comprised entirely within the town limits of Oakland, AAA Oakland complains that several Defendants – not all – paid slightly less than its asking price, or its "posted" rate, of $42/hr.  FAC ¶ 163.  But see FAC ¶ 383 (alleging that all Defendants were paying $42/hr for at least two years).  The FAC fails to take into account the prices charged by nearby competitors.  Moreover, nothing compels a buyer to purchase services at whatever price AAA Oakland chooses to "post."

When Plaintiffs exclaim that it is implausible to assume that the rate for body work is the same throughout the entire state of Tennessee (FAC ¶¶ 166, 173), the Plaintiffs expose two additional problems with their FAC.  First, the FAC provides no facts as to the specific rates charged or paid throughout Tennessee.  There are no allegations as to the prices paid by individual Defendants to identified body shops anywhere in Tennessee (beyond the prices related to these four Plaintiffs – and the contradictory allegation that all Defendants were paying $42/hr for at least two years).  Plaintiffs offer unsupported speculation when they allege that "[d]espite

there being demonstrable differences" prices should vary based on population. FAC ¶¶ 173, 222.  The FAC offers no facts to support these "demonstrable differences." To the contrary, while complaining that there is no basis for rates to be uniform over different population centers (id. ¶161), the FAC alleges that ICON (in Memphis, pop. 650,000) (id. ¶ 161) posted $44/hr in 2013 (id. ¶ 167) and Brewer (in Millington, pop. 10,000) (id. ¶158) also posted $44/hr in 2013 (id. ¶171).[3]  Indeed, suggesting that town lines do not establish meaningful geographic markets, Plaintiffs allege that they "perform repairs on vehicles primarily garaged at locations throughout the State of Tennessee."  Id. ¶ 39.  These few and random facts fail to show any pattern of parallel pricing.

> 2.    Unspecified and Random Time Frames Further Preclude Any Finding of Parallel Pricing.

Plaintiffs allege that the supposed price-fixing conspiracy has been in place for twenty years: "Over the last twenty years, in addition to manufacturing a 'market rate,' the Defendants have utilized other methods of intimidating the Plaintiffs and other body shops to suppress labor rates."  FAC ¶ 180.  But far from showing consistent pricing throughout the twenty-year period, Plaintiffs offer only a handful of isolated instances involving different Defendants, in different years, regarding only four shops.  Id. ¶¶ 160, 163, 172.  Rather than offering parallel facts about the prices

---

[3] While the FAC suggests that Brewer has two locations – one in Millington and one in Memphis – the FAC does not differentiate between the rates charged by those two locations.  See FAC ¶ 2 (identifying two addresses for Brewer – one in Memphis and one in Millington); Id. ¶¶ 54, 171 (listing rates for "Brewer's" without differentiating location).

that each Defendant was paying each year, Plaintiffs offer only a disjointed patchwork of their posted prices.[4]

The allegations of different posted rates, at different times, with subsets of non-identical Defendants paying rates at some times, and other subsets of Defendants paying prices at other times, underscores the failure to allege any consistent or identifiable parallel behavior.  Far from coming forward with facts showing parallel behavior, Plaintiffs offer only a few random pieces of a marketplace jigsaw puzzle – and those pieces don't fit.

> 3.   Rather Than Showing Parallel Action, The FAC Shows the Absence of Any Pattern of Price Movements.

The FAC shows no pattern of parallel action by alleging that different subsets of Defendants paid the same price, to different shops, in different years.  Likewise, by alleging that only some Defendants raised their prices in response to a State Farm price rise, the FAC suggests that all others did not follow suit.

The FAC alleges that only USAA, Travelers, Shelter, GEICO, and First Acceptance followed State Farm's price increase in March/April 2011. FAC ¶ 175.

---

[4] For example, Brewer alleges that it "posted" a labor rate of: $45/hr (at some unspecified time) (id. ¶ 54), $42/hr in 2011 (id. ¶ 158), and $44/hr in 2013 (id. ¶171). Further, the FAC does not indicate whether Brewer posted different rates for its two shops – one in Memphis and one in Millington.  Id. ¶ 2.  Other allegations suggest that Plaintiffs were "posting" the same rates at different times, e.g.: Brewer posted $42 in 2011 (id. ¶ 158); AAA Oakland posted $42 in 2012 (id. ¶ 161); and AAA Collision posted a rate of $42/hr in 2013. (id. ¶ 169).  The only thing the FAC alleges is that all Defendants were paying the "prevailing rate" of $42/hr for "at least two years."  Id. ¶ 383.  Although the FAC does not identify those "two years," if all Defendants were paying the $42/hr asking price of those three shops, that hardly supports an inference of collusion. There is no indication what rates each posted in the same year.

The FAC does not allege that any of these Defendants made a parallel price move: Progressive, Allstate, Nationwide, Safeco, Direct General, Liberty Mutual, Hartford, Auto-Owners, State Auto and Pennsylvania National.  Similarly, the FAC alleges that when State Farm increased its rate in April/May 2013, a different subset of Defendants  – State Auto, Shelter, and Tennessee Farmers – "altered their 'market rate' within days . . . ."  Id. ¶ 176.  Even as to those three Defendants, the FAC does not say that they made a change to the same price, merely that those three Defendants "altered" their rates.  Equally infirm is the allegation that within thirty - sixty days, Progressive, First Acceptance, Safeco, USAA and Nationwide "followed suit."  Id. ¶ 176.  Beyond the ambiguity as to the amount those Defendants "altered their rates," the FAC does not allege that Allstate, Travelers, GEICO, Hartford, Direct General, Auto-Owners, Pennsylvania National, and Liberty Mutual "altered" their rates at all.  Moreover, the list of Defendants changing price is not the same from March/April 2011 to April/May 2013.  Those disparate allegations do not show parallel action, much less suggest any agreement among all Defendants.[5]

---

[5] These specific, and limited allegations as to some Defendants destroys the sweeping generalizations appearing elsewhere, and illustrates the group pleading problem that was originally identified by this Court almost one year ago in his June 11, 2014 Order in A&E (Doc. 110).  See FAC ¶ 412  ("Defendants all raise their 'market rates' … within days of State Farm. . . ."); id. ¶ 418 ("All Defendants change their rates immediately following a rate change….").

4.    The Hodge Podge of Repair Practices Refutes Any Contention
of Parallel Action.

In a further attempt to conceal the lack of facts showing parallel pricing

behavior, Plaintiffs serve up a disjointed smorgasbord of non-price practices.  But

the facts alleged show <u>differences</u> more than any parallel action or agreement

between all Defendants.

As to the industry-wide use of one of three estimating databases (FAC ¶ 187),

this Court has already held that the allegations regarding the use of estimating

databases were insufficient to state a Section 1 Claim:

> As with the refusal to pay more than State Farm's allegedly depressed
> market rate, there is nothing about the refusal to pay in accord with
> repair-estimating databases, standing alone, that suggests that the
> Defendants are acting out of anything other than their own economic
> self-interest. And the Plaintiffs have not placed this refusal to adhere to
> the databases in a context that suggests a preceding agreement. <u>See</u>
> <u>Twombly</u>, 550 U.S. at 557, 127 S.Ct. at 1966. They do not, for
> example, allege that the Defendants formerly accepted the databases
> as authoritative but, around the same time, stopped doing so. In fact,
> the Plaintiffs do not allege that any of the Defendants ever strictly
> abided by the databases.
>
> It is not even clear that the Defendants' actions in regard to the
> databases could even be described as parallel behavior. The
> Defendants are not alleged to have acted uniformly, such as by only
> agreeing to pay the same fraction of the estimate provided by a
> database. Accepting the Plaintiffs' allegations as true, the Defendants
> are simply refusing to be bound by third-party estimates that they are
> not legally obligated to follow.

<u>A&E</u>, 2015 WL 304048, at *11.  The substance of the allegations here is the same

as in <u>A&E</u>.  <u>Compare</u> FAC ¶¶ 185-217 with <u>A&E</u> FAC ¶¶ 105-117.  The deficiencies

identified in <u>A&E</u> are the same as in the FAC:  (1) there is no allegation that the

defendants, all at the same time, stopped accepting the databases as authoritative;

(2) there is no allegation that the Defendants ever strictly adhered to the databases; and (3) there is no allegation that the Defendants ever agreed to pay the same fraction of an estimate provided by a database.  Thus, the same result should be found here.

The specific allegations regarding various repair procedures are leveled against only a few Defendants.  This diversity underscores the fact that not all Defendants are taking uniform action:

- The FAC alleges that Direct General, State Farm, and Allstate, alone, demand photos at stages of repair.  FAC ¶¶ 89-91.  There is no allegation that any other insurer does the same.

- The FAC alleges that some insurers – State Farm, GEICO and Progressive – have told Plaintiffs that they are "the only shop" seeking a price increase. Id. ¶ 181.  There are no similar allegations against the other Defendants (although the FAC conjectures that statements were made by "representatives of the remaining Defendants whose names are not presently known.").  Id.

- The FAC alleges that State Farm, Progressive, Allstate, Direct General, GEICO and USAA have historically refused to pay for feather, prime and block (id. ¶ 211), but says nothing about whether the other Defendants pay for such a procedure.[6]

- The FAC alleges that some insurers – State Farm, Progressive, USAA, Allstate, Liberty Mutual, Safeco, Direct General, GEICO and Nationwide – refuse to pay for denib and finesse (id. ¶ 216), but does not identify any other Defendants.

---

[6] The Amended FAC also alleges that employees of GEICO, Progressive, Nationwide, Allstate, USAA, Direct General, Liberty Mutual and Safeco have told Plaintiffs that they are the only shops that charge for feather prime and block (id. ¶ 211), but does not allege that any of the other Defendants have made such a statement.  Id. ¶ 213.  Notably, the FAC stops short of saying that Nationwide, Liberty Mutual or Safeco actually do not pay for the procedure.  See id. ¶¶ 211, 213.

- The FAC alleges that some insurers – State Farm, GEICO, Liberty Mutual, Allstate and Progressive – specify aftermarket parts to be used in repairs and do not provide adequate guarantees (see id. ¶ 236, 39), but does not identify any other Defendants.

It is fundamental that the variation alleged by Plaintiffs undermines their assertion of a cohesive and uniform group taking parallel action. See, e.g., In re Baby Food Antitrust Litig., 166 F.3d 112, 132 (3d Cir. 1999) (affirming summary judgment where the facts "refute rather than support" plaintiffs' allegations of parallel conduct).  See also In re Beef Indus. Antitrust Litig., 907 F.2d 510, 514 (5th Cir. 1990) ("When an antitrust plaintiff relies on circumstantial evidence of conscious parallelism to prove a § 1 claim, he must first demonstrate that the defendants' actions were parallel. The cattlemen have not done this.") (citations omitted); Aviation Specialties, Inc. v. United Techs. Corp., 568 F.2d 1186, 1192 (5th Cir. 1978) (plaintiff "brought forth no evidence of parallel behavior suggesting an unlawful agreement.").

     5.    There Exist Many Explanations More Plausible Than "Collusion" to Explain Any Isolated Occurrences of Similar Prices By Diverse Subsets of Defendants.

Even if it were assumed, arguendo, that the FAC did allege parallel pricing – which it has failed to do – that would not plausibly imply any agreement:

It is not illegal for a party to decide it is unwilling to pay a higher hourly rate than its competitors have to pay, and the fact that a number of the Defendants made statements to that effect does not tip the scales toward illegality.  The Sherman Act does not restrict the "long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell.

A&E, 2015 WL 304048, at *10. See also Quality Auto Body, Inc. v. Allstate Ins. Co., 660 F.2d 1195, 1204 (7th Cir. 1981) ("[T]he insurer's refusal to pay more than the prevailing competitive rate is not illegal.").

The Plaintiffs leap to the unwarranted conclusion that anytime two or more Defendants are paying the same rate, it must be because of an agreement among all Defendants to fix prices.  FAC ¶¶ 174, 177, 179.  To the contrary, courts and economists would expect to see prices being matched in a competitive market.  In re Graphics Processing Antitrust Litig., 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) ("We must remember that competitive market forces will tend to drive the prices of like goods to the same level, so like prices on like products are not, standing alone, sufficient to implicate price-fixing.").  See also Quality Auto Body, 660 F.2d at 1205 ("the practice of the insurance companies to calculate the reimbursement for its insured based upon the lowest prevailing price in the market place (and to insure the integrity of that estimate by having an open list of competing shops which will generally accept it) is the very essence of competition") (quoting Chick's Auto Body v. State Farm Mutual Auto. Ins. Co., 168 N.J. Super. 68, 87 (1979)).

The FAC offers this blind speculation:  "The odds of all the Defendants independently reaching the same conclusion as State Farm without conducting even a pro forma survey would be outside the realm of possibility."  FAC ¶ 174. See also id. ¶ 223.  Of course, Plaintiffs have failed to identify even a single incident in twenty years where "all the Defendants" paid the same price.  The more plausible explanation for the isolated instances alleged is that the body shops would tell every

other insurer that State Farm is now paying a higher price and demand that each insurer increase its price as well   Another plausible way for insurers to learn the rates being paid to shops would be through their common network of DRP shops. As plaintiffs allege, "the vast majority of them share DRP shops."  Id. ¶ 310.  These are more plausible than Plaintiffs' unsupported speculation of collusion.

B.      Plaintiffs Fail to Allege an Agreement to Boycott.

The Group Boycott claim (Count II) also fails because there is no factual basis for inferring any agreement.  As with price-fixing, a fundamental element of a group boycott claim is an agreement.  See A&E, 2015 WL 304048, at *12 ("In addition, to state a claim for a violation of § 1 by way of a boycott also requires allegations plausibly suggesting an agreement by the Defendants.").  The FAC shows disparate – not parallel – action by the various Defendants.

Furthermore, Plaintiffs fail to allege any "concerted refusal to deal" – a requirement for any boycott claim under the Sherman Act. In A&E, this Court identified the deficiency with regard to the "steering" allegations in that Complaint: "[T]here is no allegation that any Defendant refused to allow any of its insureds to obtain a repair from such a shop, or refused to pay for repairs performed at such a shop."  A&E, 2015 WL 304048, at *10.  As to Tennessee Farmers, Shelter, Direct General, Hartford, State Auto and First Acceptance, there is no allegation of any specific steering at all.  See FAC ¶¶ 251-314  As to the others, the few meager allegations advanced by Plaintiffs fail to identify any refusal by any Defendant to allow insureds to obtain a repair, or to pay for such repairs.  In fact, they tend to

14

show the opposite.  See, e.g., FAC ¶¶ 262, 266.  Indeed, far from alleging that all

Defendants refused to deal with the four Plaintiffs, the FAC alleges that Defendants

did deal with the Plaintiffs – the Plaintiffs just wanted bigger payments.

In another failed attempt to conjure up an agreement to boycott, the FAC

alleges that ICON lost business in 2011-12 from five insurer Defendants – Liberty

Mutual, Allstate, Auto-Owners, Pennsylvania National, and Travelers.  FAC ¶¶ 302-

04.  The FAC says nothing about any lost business from all other insurers.  And

ICON would know whether it also lost business from Safeco, State Auto, GEICO,

Hartford, Nationwide, Progressive, Shelter, USAA, Tennessee Farmers, First

Acceptance or Direct General.  There is no allegation as to the volume of business

from any of these Defendants.  The most logical implication from this omission is

that the conduct of all other Defendants would contravene Plaintiffs' theory of

collusion.

Ignoring the absence of any allegation of ICON losing business from the

majority of Defendants, Plaintiffs offer this implausible speculation: "The only

reasonable conclusion . . . is the named Defendants shared information about and

specifically targeted as a group the particular shops who refused to comply . . . ."

FAC ¶ 311.  But the reduction in work from only five insurers out of a much larger

group does not suggest a group decision to withhold business.  Further, there are no

similar allegations as to Plaintiffs other than ICON.  Moreover, Plaintiffs fail to

account for many other more plausible reasons for a reduction in business for this

one Plaintiff.  For example, those five insurers could have been making a decision to

exit the Tennessee market (or that portion of the state); they could have lost

business to other insurers (possibly to some of the other Defendants for whom ICON

provides no suggestion of lost business); they could have found better shops; they

could have been dissatisfied with ICON's work; and perhaps, the work declined due

to safer drivers or less expensive repairs.  As with the price-fixing allegations, a few,

isolated facts regarding one body shop do not suggest an agreement or parallel

behavior.  To the contrary, the variation in the allegations against the Defendants

reveals the complete absence of any agreement among Defendants to act in concert

to boycott Plaintiffs.

  C. <u>Opportunities to Conspire Fail to Show Agreement.</u>

  Plaintiffs allege that there have been numerous "opportunities for Defendants

to conspire," citing trade association memberships for some of the Moving

Defendants.  <u>See</u> FAC ¶¶ 352-76 (Doc. 296). These bare allegations, however, are

insufficient to demonstrate any alleged agreement among the Defendants:

> The class posits that PM, RJR, B&W and Lorillard enjoyed numerous
> opportunities to conspire, and that this supports their collusion claim.
> We unambiguously held in <u>Todorov</u>, however, that "the mere
> opportunity to conspire among antitrust defendants does not, standing
> alone, permit the inference of conspiracy." 921 F.2d at 1456 (<u>citing</u> <u>Bolt</u>
> <u>v. Halifax Hosp. Med. Ctr.</u>, 891 F.2d 810, 827 (11th Cir.1990),
> <u>overruled in part on other grounds</u> by <u>City of Columbia v. Omni</u>
> <u>Outdoor Adver.</u>, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382
> (1991)). Indeed, the opportunity to fix prices without any showing that
> appellees actually conspired does not tend to exclude the possibility
> that they did not avail themselves of such opportunity or, conversely,
> that they actually did conspire. Appellants may not rely on this
> proposition to support their allegations in this case.

Williamson Oil, 346 F.3d at 1319. These allegations regarding diverse trade association memberships do nothing to show an agreement.[7]

II.     PLAINTIFFS' CLAIMS OF TORTIOUS INTERFERENCE WITH
        BUSINESS (COUNT III) AND QUANTUM MERUIT (COUNT IV) SHOULD
        BE DISMISSED WITH PREJUDICE.

Both remaining state law claims (Tortious Interference with Business Relations and Quantum Meruit) should be dismissed for failure to allege any act by any Defendant with regard to any Plaintiff.  Counts III and IV do not mention a single Defendant, a single Plaintiff, or a single customer.  See FAC ¶¶ 437-57.  Nor do allegations in Count III or Count IV incorporate any specific allegations from the FAC.  This resort to shotgun pleading is precisely the pleading defect the Court pointed out in its June 11, 2014 initial dismissal of the A&E Complaint (A&E Doc. 110).  In its Order dated April 27, 2015 adopting the Report and Recommendation, the Court expressly instructed Plaintiffs, yet again, that shotgun pleading was unacceptable:

> Magistrate Judge Smith concluded that the generalized, shotgun nature of the Plaintiffs' contentions does not satisfy the applicable pleading standard and recommended that, in any amended complaint, the Plaintiffs be required to specify which Defendants interfered with which Plaintiffs. (Doc. 78 at 12). The Plaintiffs contend that this is an impractical pleading standard because it seeks to compel them to produce information "which is peculiarly within the possession and control of the Defendants." (Doc. 79 at 5). But there is nothing in the Complaint that explains why the Defendants, but not the Plaintiffs, would have this information. Surely the Plaintiffs must have some basis to believe that certain Defendants interfered with certain of the Plaintiffs' customers. A general allegation that some unidentified

---

[7] Going from baseless speculation to desperation, Plaintiffs offer some investment theory in Blackrock as a supposedly "plausible" explanation.  FAC ¶¶ 350-74.

> Defendants – or all Defendants – interfered with some unidentified
> customers of some unnamed Plaintiff does not satisfy the requirements
> of <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009).

<u>Brewer Body Shop, LLC v. State Farm Mutual Auto. Ins. Co.</u>, __ F. Supp. 3d __, __,

2015 WL 1911418, at *1 (M.D. Fla. Apr. 27, 2015).  <u>See also</u> Report and

Recommendations, No. 14-md-2557, at 39 (Doc. 192) ("Absent well pled allegations

that the Defendants joined in a conspiracy or acted in concert, liability for tortious

interference must be established on an individualized basis.").  Despite repeated

dismissals and repeated instructions from the Court, Plaintiffs have chosen to repeat

their shotgun pleading.

Having seen many of their carbon-copy state law claims dismissed because

of the allegation of DRP contracts between Plaintiffs and Defendants, Plaintiffs now

go out of their way to offer legal conclusions disguised as fact allegations asserting

that the "DRP agreements are not enforceable contracts."  FAC ¶ 106; <u>see also</u> <u>id</u>.

¶¶ 107, 108.  Legal conclusions are to be ignored in determining the adequacy of a

complaint.  <u>Twombly</u>, 550 U.S. at 555, <u>Iqbal</u>, 556 U.S. at 678; <u>Joseph v. Bernstein</u>,

No. 14–13989, --- Fed.App'x ----, 2015 WL 2190849, at *3 (11th Cir. 2015).

Notwithstanding their attempts to plead away these DRP agreements, the

FAC identifies a number of duties of performance:

> At present, Defendant insurers with direct repair programs require a
> shop to not only accept fixed prices on labor, fixed prices on paint and
> materials, fixed pricing  procedures on parts, refusal to compensate or
> fully compensate for processes and  procedures, but many compel the
> shop to include the DRP sponsor as an additional insured on the
> shop's liability insurance (even though the sponsor holds no lien or
> other ownership interest), compel indemnification for liability assessed
> to the sponsor, compel primary assumption of liability for repairs using

parts provided by or insisted upon by the sponsor, compel mandatory production of the shop's financial information and books upon demand, and authority to obtain background checks upon the shop's employees at the sponsor's will and pleasure.

FAC ¶ 102.  Those sure sound like contractual requirements.  See also id. ¶ 116 ("the insurers have independently contracted with parts suppliers as required in DRP agreements.); id. ¶ 249 ("Most DRP terms . . . require the shop to not only maintain an extensive liability policy with the DRP sponsor as a named insured. . . ."). And while Plaintiffs now contend that the insurers have no duties under these DRP agreements (id. ¶ 106), obviously, Plaintiffs saw their agreement to become a DRP shop as a benefit as they would view themselves as being one of the insurer's "preferred shops."  FAC ¶ 309, 310.  Therefore, both the Tortious Interference and Quantum Meruit claims fall on this fact.  General Agents Ins. Co. of Am., Inc. v. Mandrill Corp., Inc., 243 Fed. App'x 961, 969 (6th Cir. 2007); Lick Branch Unit, LLC v. Reed, No. 3:13–cv–203, 2014 WL 546696, at *14 (E.D. Tenn. Feb. 10, 2014).

Beyond arguing that these DRP agreements are not really contracts, Plaintiffs attempt to change their allegations by now declaring that "[m]any Plaintiffs have associated with DRPs from time to time over the last twenty years, though the majority have since left all such programs."  Id. ¶ 98.  The allegation that the majority of the plaintiffs no longer act as DRPs appears to be incorrect, as the FAC alleges that two of the four named plaintiffs still act as DRPs.  FAC ¶¶ 126-28.  Moreover, at least during some periods they were DRPs.

A.     The Tortious Interference Claim (Count III) is Deficient.

The elements of a tortious interference claim under Tennessee law were

articulated in United Pet Supply, Inc. v. City of Chattanooga, 921 F. Supp. 2d 835,

863 (E.D. Tenn. 2013):

> In Tennessee, the tort of intentional interference with a business
> relationship will lie only if the plaintiff can show '(1) an existing
> business relationship with specific third parties or a prospective
> relationship with an identifiable class of third persons; (2) the
> defendant's knowledge of that relationship and not a mere awareness
> of the plaintiff's business dealings with others in general; (3) the
> defendant's intent to cause the breach or termination of the business
> relationship; (4) the defendant's improper motive or improper means,
> and finally, (5) damages resulting from the tortious interference.

As to existing business relations, Plaintiffs offer but a handful of terse allegations of

purported "steering" by State Farm, GEICO, Allstate, Progressive, USAA, Liberty

Mutual, Nationwide, Safeco, Travelers, Auto-Owners and Pennsylvania National

(FAC ¶¶ 257-294, 304), none of which are sufficient to meet Plaintiffs' pleading

burden.[8]  As to the remaining Defendants – Tennessee Farmers, Shelter, Direct

---

[8] For example, the sole allegation against Pennsylvania National (lumped together
with Travelers and Auto Owners) (FAC ¶ 304) is conclusory and lacks any
specificity.  With respect to Nationwide, ICON alleges that one customer took her
vehicle to ICON after being unsatisfied with the repairs performed by a Nationwide
DRP shop.  Id. ¶¶  258-261.  Notably, ICON does not allege that Nationwide made
any misleading or inaccurate statements regarding ICON.  Rather, ICON merely
alleges that Nationwide informed the customer – truthfully – that it would not
guarantee ICON's work.  Courts have routinely dismissed tortious interference
claims where, as here, a plaintiff fails to allege any false statements or wrongful
conduct directed to it, especially where competition is involved.  See, e.g., Personal
Computer Sys., Inc. v. Central Knox, Inc., No. 3:11–CV–374, 2012 WL 1108245, at
*5 (E.D. Tenn. March 30, 2012) ("The complaint contains no allegations that Central
Knox made false statements about PCS's business . . . the court reads the
allegations against Central Knox as merely competitive actions taken to try to win a

General, Hartford, State Auto, and First Acceptance – Plaintiffs say nothing at all, confirming that Plaintiffs have no facts to support claims against them.

As to prospective business relations, the FAC purports to define a class of individuals as "those who identify the Plaintiffs, respectively, as the choice of body shop to perform repairs."  Id. ¶ 440.  But, that is insufficient under Tennessee law.  See, e.g., Gold Science Consultants, Inc. v. Cheng, No. 3:07-CV-152, 2009 WL 1256664, at *10 (E.D. Tenn. May 4, 2009) ("Generalized references to third parties simply fails to meet the specificity needed for this element.").

Further, the Moving Defendants have contracts with their insureds, and thus any alleged "interference" with any business relationship (prospective or otherwise) between any of the Defendants and their insureds would be privileged.  See Gunder's Auto Ctr. v. State Farm Mut. Auto. Ins. Co., 422 Fed. App'x 819, 822 (11th Cir. 2011) ("[A]s insurance companies are not strangers to the relationship between an auto-body shop and an insured, the insurer's acts are privileged and it cannot be held liable for tortious interference.").  In fact, the 11th Circuit in Gunder's held that even assuming the falsity of alleged slanderous statements made by an insurer to its

_____

bid."); Seaton v. TripAdvisor, LLC, No. 3:11–cv–549, 2012 WL 3637394, at *9 (E.D. Tenn. Aug. 22, 2012) ("intent" or "improper means" elements not met where "Defendant did not make any false statements of fact concerning Plaintiff").  Lastly, plaintiff ICON has not alleged the required element of damages.  See id. ¶ 261 (admitting that Nationwide facilitated payment to ICON for its repair work).  Likewise, in the single customer vignette allegedly involving Liberty Mutual and Safeco, respectively, there is no allegation that Liberty or Safeco made any misleading or inaccurate statement about any Plaintiff shop.  See id. ¶¶ 263, 268.  Indeed, Plaintiffs fail to allege that Safeco made any statement to the identified customer of any kind.  Id. ¶ 268.

insured regarding a body shop were privileged and could not give rise to a tortious interference claim.  Id. at 822-23.  See also Price's Collision, 2013 WL 5782926, at *2 (holding that repair shop could sue insurer for breach of contract as assignee of owner under the contract involving repair of vehicle).

This claim should be dismissed with prejudice.

B.      Quantum Meruit (Count IV) Should Be Dismissed.

The elements of a quantum meruit claim are not properly alleged in the FAC. Under Tennessee law, to prevail on a quasi-contractual claim such as quantum meruit, "a plaintiff must establish three elements: (1) [a] benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof."  Withco, LLC v. Republic Servs. of Tennessee, LLC, 818 F. Supp. 2d 1040, 1052 (M.D. Tenn. 2011).[9]

Notwithstanding the Court's repeated instructions, Plaintiffs still fail to identify any benefit that any Plaintiff conferred upon any Moving Defendant.  It is well settled that the body shop confers a benefit to the insured, not the insurer.  A&E, 2015 WL 304048, at *5 ("The repairs at issue obviously provided a benefit to the owners of the

---

[9] Additionally, a plaintiff must allege a reasonable expectation of additional compensation.  Swafford v. Harris, 967 S.W.2d 319, 324 (Tenn. 1998).  The facts alleged in the FAC demonstrate that there is no reasonable expectation of additional compensation.  See, e.g., FAC ¶¶ 180-81.  See also Report and Recommendations, No. 14-md-2557, at 26 (Doc. 192) ("On the contrary, Plaintiffs' complaints allege that they knew Defendants would not pay what they were asking for.").

vehicles.  But so far as the FAC discloses, the only effect of such a repair on the insurance company is the incurring of an obligation to pay for it."); Indiana Autobody Assoc., Inc. v. State Farm Mutual Auto. Ins. Co., No. 6:14-cv-6001 (Doc. 150 at 3 (M.D. Fla. Mar. 30, 2015) (ordering dismissal on same ground).  See also Adventist Health Sys. / Sunbelt Inc. v. Med. Savings Ins. Co., No. 6:03-cv-1121-Orl-19KRS, 2004 WL 6225293, at *6 (M.D. Fla. Mar. 8, 2004) ("[A] third-party providing services to an insured confers nothing on the insurer except, a ripe claim for reimbursement, which is hardly a benefit.").

Moreover, the repair of the automobile for the owner is subject to a contract between the body shop and the owner, regardless of whether the owner has an additional contractual right for the insurer to pay for the services rendered to the auto owner.  See, e.g., Price's Collision, 2013 WL 5782926, at *1-2 (upholding repair shop's right as assignee to sue insurer for breach of contract to recover cost of repairing vehicle for automobile owner).  Plaintiffs were paid for their work under their contracts; they simply want more money for the work they already performed. Because there is a contract governing the repair, Plaintiffs cannot state a claim for quantum meruit.  See Report and Recommendations, No. 14-md-2557, at 27 (Doc. 192) ("a plaintiff is not entitled to employ the legal fiction of quasi-contract to 'substitute one promisor or debtor for another.'") (quoting Callano v. Oakwood Park Homes Corp., 219 A.2d 332, 335 (N.J. App. Div. 1966) and citing 1 Dobbs, Law of Remedies § 4.9(4)).

23

III.     THE ENTIRE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.

Plaintiffs have no right to file yet another Complaint. "The district court . . . need not 'allow an amendment (1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." Corsello v. Lincare, Inc., 428 F.3d 1008, 1014 (11th Cir. 2005).

Although this is technically Plaintiffs' first Amendment, Plaintiffs have been on notice of the problems with these allegations repeatedly throughout this MDL proceeding.  Copy-cat complaints were first filed in January 2014, and not a single complaint of the twenty-eight (28) that the Eaves law firm has filed to date in the approximately 20 MDL cases has survived a motion to dismiss.  In its orders in A&E dismissing the original and First Amended Complaint (A&E (Docs. 110, 291)), and the numerous Report and Recommendations (and Orders adopting the Report and Recommendations) in other constituent cases doing the same (see, e.g., Parker, No. 14-cv-6004 (Docs. 109, 118), this Court has already provided clear instructions to the Plaintiffs as to how to cure their pleading deficiencies.  See also Report and Recommendations, No. 14-md-2557 (Doc 192) (identifying multiple cases where Plaintiffs have continued to ignore the pleading instructions of the Court).  They have chosen to ignore those instructions, and Defendants should not be forced to incur the expense of drafting motions to dismiss complaints which Plaintiffs either cannot, or will not, remedy.

24

Plaintiffs have had approximately 18 months to draft a complaint that satisfies Twombly and the Federal Rules of Civil Procedure.  They have still failed to do so, and should not be granted yet another try. Thus, the FAC should be dismissed as to the Moving Defendants with prejudice. See, e.g., Aquatherm Indus., Inc. v. Florida Power & Light Co., 145 F.3d 1258, 1264 (11th Cir. 1998) (affirming dismissal with prejudice because "we conclude Aquatherm can prove no set of facts in support of its claims which would entitle it to relief under the federal antitrust laws"); Ivanovic v. Overseas Mgmt. Co., No. 11-80726-CIV, 2011 WL 5508824, at *4 (S.D.Fla., Nov. 09, 2011) ("As Plaintiff fails to . . . satisfy basic federal pleading standards, the Amended Complaint must be dismissed as to all eight moving Defendants for failure to state a claim. Such dismissal should be with prejudice because Plaintiff has already once been granted an opportunity to amend and it is apparent that any further amendment would be futile.").

## CONCLUSION

For the reasons set forth herein it is requested that this Court dismiss the First Amended Complaint with prejudice.

Dated June 4, 2015                              Respectfully submitted,

By: /s/ Thomas G. Rohback                       /s/ Michael E. Mumford
Thomas G. Rohback                               Ernest E. Vargo, Admitted Pro Hac Vice
AXINN, VELTROP & HARKRIDER LLP                  evargo@bakerlaw.com
90 State House Square                           Michael E. Mumford, Admitted Pro Hac Vice
Hartford, CT 06103                              mmumford@bakerlaw.com
Phone: (860) 275-8100
Facsimile: (860) 275-8101                       BAKERHOSTETLER LLP
trohback@axinn.com                              PNC Center, Suite 3200

Attorneys for Defendants Hartford Fire
Insurance Company, Hartford Casualty
Insurance Company, Property and
Casualty Insurance Company of Hartford
(incorrectly named in the Complaint as
"Hartford Property and Casualty
Insurance Company"), Hartford
Insurance Company of the Midwest

1900 East 9th Street
Cleveland, OH 44114-3482
Telephone (216) 621-0200
Facsimile (216) 696-0740

Counsel for Defendants Liberty Mutual Fire
Insurance Company, Safeco Insurance
Company of Illinois, State Automobile
Mutual Insurance Company, and State Auto
Property and Casualty Insurance Company

s/ Jonathan S. Masters
R. Bradley Best (MS Bar# 10059)
Jonathan S. Masters (MS Bar #99419;
TN Bar #027733)
HOLCOMB DUNBAR WATTS
BEST MASTERS & GOLMON, PA
P.O. Drawer 707
400 South Lamar, Suite A
Oxford, MS 38655
Tel: (662) 234-8775
Fax: (662) 238-7552
bradbest@holcombdunbar.com
jmasters@holcombdunbar.com

Counsel for Shelter General Insurance
Company and Shelter Mutual Insurance
Company

/s/ Michael R. Pennington
BRADLEY ARANT BOULT CUMMINGS
LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
205.521.8391
205.488.6391
mpennington@babc.com

Counsel for First Acceptance
Insurance Company of Tennessee, Inc.

/s/ Michael H. Carpenter

Michael H. Carpenter
Michael N. Beekhuizen
David J. Barthel
Carpenter Lipps & Leland LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
(614) 365-4100 telephone
(614) 365-9145 facsimile
carpenter@carpenterlipps.com

/s/ Jeffrey S. Cashdan

Jeffrey S. Cashdan, admitted pro hac vice
Claire C. Oates, admitted pro hac vice
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Telephone:  (404) 572-4600
Facsimile:  (404) 472-5139
jcashdan@kslaw.com
coates@kslaw.com

26

beekhuizen@carpenterlipps.com
barthel@carpenterlipps.com

Mark J. Botti
Squire Patton Boggs (US) LLP
1200 19th Street, N.W., Suite 300
Washington, District of Columbia  20036
(202) 626-6600 telephone
(202) 626-6780 facsimile
mark.botti@squirepb.com

Attorneys for Defendants Nationwide
Mutual Insurance Company and
Nationwide Property and Casualty
Insurance Company

/s/ Michael A. Packer
Michael A. Packer
Marshall, Dennehey, Warner, Coleman &
Goggin
11th Floor
100 NE 3rd Ave
Ft Lauderdale, FL 33301
954/847-4920
Fax: 954/627-6640
Email: mapacker@mdwcg.com

Counsel for Defendant Pennsylvania
National Mutual Casualty Insurance
Company

/s/ Michael R. Nelson
Michael R. Nelson, admitted pro hac vice
Kymberly Kochis, admitted pro hac vice
Francis X. Nolan, admitted pro hac vice
Sutherland Asbill & Brennan LLP
1114 Avenue of the Americas, 40th Floor
New York, NY 10036-7703
Telephone:  (212) 389-5068

michael.nelson@sutherland.com
kymberly.kochis@sutherland.com
frank.nolan@sutherland.com

Counsel for Defendant
Progressive Hawaii Insurance Company

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of June, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record that are registered with the Court's CM/ECF system.

/s/ Thomas G. Rohback
Thomas G. Rohback
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
Phone: (860) 275-8100
Facsimile: (860) 275-8101
trohback@axinn.com

28