THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION

| | |
|---|---|
| BREWER BODY SHOP, LLC, *et al.*, | * |
| | * |
| PLAINTIFFS, | * MDL Docket No. 2557 |
| | * |
| v. | * Case No. 6:14-cv-06002-GAP-TBS |
| | * |
| STATE FARM MUTUAL AUTOMOBILE | * Originally filed in the Western |
| INSURANCE COMPANY, *et al.*, | * District of Tennessee |
| | * |
| DEFENDANTS. | * |

## CERTAIN DEFENDANTS' MOTION TO DISMISS
## PLAINTIFFS' FIRST AMENDED COMPLAINT

The Defendants listed in **Exhibit A** ("Defendants") move pursuant to Fed. R. Civ. P.

12(b)(6) to dismiss Plaintiffs' First Amended Complaint ("FAC") with prejudice.

## MEMORANDUM OF LAW

### I.   INTRODUCTION

The Tennessee Plaintiffs' allegations in support of their federal antitrust claims fail

for the same reasons as the antitrust claims in the second amended Florida, Indiana and Mis-

sissippi complaints.  Unlike the original Tennessee Complaint ("Original Complaint"), the

FAC offers some detailed allegations.  However, the detail cannot salvage the implausible

conspiracy and boycott theories Plaintiffs repeat in every complaint.  The FAC (i) continues

to rely on allegations of unilateral conduct and conscious parallelism that cannot give rise to

claims under Section 1 of the Sherman Act, 15 U.S.C. § 1; (ii) fails to correct the legal defi-

ciencies identified by this Court in its March 2 Order in this case (Doc. 78, *adopted* Doc. 84)

and in its January 22, 2015 Order dismissing the first amended complaint in the companion

*A&E Auto Body* case (*see A&E*, Doc. 293, adopted in this action at Doc. 78 at 13-14 and

Doc. 84 at 3); and (iii) continues Plaintiffs' pattern of impermissible group pleading.  The

key features of the FAC are summarized below:

- Plaintiffs have never alleged an express agreement among Defendants to set body shop reimbursement rates.

- The FAC relies on allegations that various Defendants, at different times, chose to follow some State Farm labor and material rate <u>increases</u>. Those allegations underscore State Farm's unilateral conduct followed by some parallel reimbursement conduct on the part of some Defendants in some periods of time.

- The FAC purports to allege "plus factors," such as opportunities to conspire and profit seeking, but these allegations are substantively indistinguishable from the same conclusory allegations previously rejected by the Court.  Plaintiffs' quixotic new theory that some Defendants have various relationships with the investment and asset management firm BlackRock lacks any factual or logical connection to a conspiracy claim.

- To support their group boycott claim, Plaintiffs have added a handful of allegations of purported steering conduct by a few Defendants.  Plaintiffs assert that these allegations of steering, which purportedly began ten years ago, support their sweeping claim that all Defendants have engaged in an unlawful boycott.  There are, however, no factual allegations to support the claim that all Defendants conspired to refuse to deal with Plaintiff shops.  The FAC fails even to allege conduct that could fairly be described as parallel.  Moreover, the FAC does not state a boycott claim for the same fundamental reason that the previous iterations fell short – vaguely asserted isolated examples of purported steering by individual insurers are not equivalent to a *concerted* refusal to deal.  Indeed, the allegations make clear that these Plaintiffs continue to do business with Defendants, so there has clearly been no "boycott" at all.

- Plaintiffs have larded the FAC with apparent new claims that Defendants have conspired to fix the prices of replacement parts and to require shops to use aftermarket, salvaged, or recycled parts.  Plaintiffs do not tie any of these allegations to any agreement among Defendants regarding reimbursement rates or otherwise; they fail even to allege parallel conduct.  These allegations also employ the same collective pleading technique which the Court has previously rejected.

This is the most recent of numerous iterations of essentially identical conspiracy

claims filed in this and other actions in this MDL brought by the same counsel as in this case.

Each iteration attempts to build on, add to, revise, or delete allegations in prior iterations to

attempt to remedy failings identified by the Court or to respond to or evade arguments raised

by Defendants in their prior motions to dismiss.  Yet, after more than a year of trying, Plain-

tiffs continue to fall far short of "nudg[ing]" their antitrust conspiracy claims "across the line

from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  It is

clear now that, no matter how many tries they get and no matter how many pages of allega-

tions they draft, Plaintiffs cannot state a claim for antitrust conspiracy against Defendants.

Plaintiffs' Sherman Act claims therefore should be dismissed with prejudice.

> Plaintiffs' state law claims should likewise be dismissed with prejudice:

- Plaintiffs' second attempt to state a claim for tortious interference with business rela-
  tions fails to remedy the deficiencies of their Original Complaint.  Plaintiffs continue
  to rely primarily on conclusory and generalized group pleading.  As this Court has
  recognized, such collective pleading is insufficient to state a claim.  No specific alle-
  gations of tortious interference are made against the majority of Defendants.  Moreo-
  ver, Plaintiffs' limited allegations regarding specific transactions simply demonstrate
  Plaintiffs' inability to allege key elements of tortious interference, including improper
  means or motive and the existence of business relationships.

- Plaintiffs' second attempt to plead a quantum meruit claim is just as legally insuffi-
  cient as their previous attempt.  Plaintiffs' quantum meruit claim fails because Plain-
  tiffs have not conferred a benefit upon the Defendants.

## II.   PLAINTIFFS' ANTITRUST CLAIMS (COUNTS ONE AND TWO) SHOULD BE DISMISSED[1]

### A.    Plaintiffs' New Conspiracy Allegations Fail to Overcome the Shortcom-ings of Their Original Complaint

To survive a motion to dismiss, a plaintiff alleging an antitrust conspiracy must

adequately plead that the defendants "(1) entered into 'a contract, combination or

conspiracy,' which was (2) 'in restraint of trade or commerce' and (3) that [the plaintiff] was

---

[1] Defendants hereby adopt and incorporate the legal standards for a Rule 12(b)(6) motion set out in the Court's March 2, 2015 Report and Recommendation (Doc. 78 at 3-4, *adopted* Doc. 84).

damaged by the violation." *Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291, 1300 (M.D. Fla. 2001) (citation omitted). Plaintiffs still fail to satisfy the first prong of this test because they have not alleged a plausible conspiracy among all or any Defendants.

The FAC must, but does not, contain "'allegations plausibly suggesting (not merely consistent with) [a conspiracy or] agreement,'" *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332-33 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 557), and must, but does not, offer "'enough factual matter (taken as true) to suggest that an agreement was made.'" *A&E*, Doc. 293 at 17 (quoting *Twombly*, 550 U.S. at 556). Allegations "that are 'consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy' are insufficient." *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1308 (S.D. Fla. 2010) (quoting *Twombly*, 550 U.S. at 554). "'[F]ormulaic recitations' of a conspiracy claim" are insufficient, and "'a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1294 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 557).

### 1. The FAC's Allegations of Conscious Parallelism Do Not Suggest a Conspiracy to Fix Reimbursement Rates

Plaintiffs allege that Defendants imposed maximum labor rates for automobile repair services. The "'crucial question,'" however, remains "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Twombly*, 550 U.S. at 553; *see also Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1298-99 (11th Cir. 2003) ("[I]t is important to distinguish at the outset between collusive price fixing, i.e., a 'meeting of the minds' to collusively control prices, which is prohibited under the Sherman and Clayton Acts, and 'conscious parallelism,' which is not.").

4

Like its predecessor, and the companion *A&E, Indiana AutoBody*, and *Capitol Body* second amended complaints, the FAC fails to meet the standards set by the Supreme Court and the Eleventh Circuit for pleading an antitrust conspiracy. The rate-fixing conspiracy alleged in the Original Complaint was based entirely on Plaintiffs' general characterization of Defendants' conduct as conscious parallelism, without so much as a single factual allegation that there were parallel rate reimbursement levels set by any Defendants. The FAC adds some allegations of episodic instances in which some, but not all, Defendants paid similar prices for repairs. This Court has already explained, however, that such parallel conduct "falls short of conclusively establishing agreement or itself constituting a Sherman Act offense." *A&E*, Doc. 293 at 16. In dismissing the antitrust conspiracy claims in the *A&E* case, this Court noted that, "aside from conclusory allegations that it exists, the Plaintiffs offer no details at all in the Amended Complaint about the alleged agreement, such as how the Defendants entered into it, or when." *Id.* at 17.

Plaintiffs have not cured these defects. They still do not offer any factual allegations to support the conclusion that there was a conspiracy among the Defendants. There are no allegations as to who reached an agreement with whom, what that agreement entailed, or when it began or ended. Their allegation that the supposed parallel conduct has been going on for at least 20 years (FAC ¶ 180) merely underscores the implausibility of their conspiracy theory. None of the newly added allegations in the FAC, separately or in context, raise a suggestion of a preceding agreement among Defendants to fix reimbursement rates. There is no factual context to suggest that Defendants agreed with State Farm or among themselves to adopt State Farm's rate reimbursement levels. Indeed, Plaintiffs' core allegation remains the

5

self-defeating generalization that after State Farm, the alleged market leader, unilaterally developed and adopted a price structure for labor rates, other Defendants at some point thereafter individually refused to pay any more than State Farm.

Plaintiffs do not allege sufficient factual matter to place this conduct in a "context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. Thus, there are no factual allegations supporting an inference that the parallel reimbursement rates resulted from a preceding agreement among the Defendants. Because conclusory allegations and recitals of the elements of a cause of action are not presumed true at the pleading stage, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), Plaintiffs have not, and plainly cannot, set forth factual allegations plausibly establishing an antitrust conspiracy.

On examination, even Plaintiffs' allegations of supposed parallel business conduct reflect inconsistent behavior among Defendants. For instance, they claim that State Farm determined that the market rate in Millington was $38 per hour in 2011, but they allege that only six of the 17 other Defendants paid the same rate to Plaintiff Brewer. (FAC ¶¶ 159-60.) Moreover, Plaintiffs allege that various subsets of Defendants, at different times, raised their reimbursement rates within days or months of State Farm changing its rates. (*Id.* ¶¶ 175-76.) (Other Defendants, apparently, did not follow State Farm's rate changes at all.)

Flunking basic deductive logic, Plaintiffs surmise from these inconsistent instances of parallelism that the rates paid by State Farm "could only have been provided by State Farm's internal and unpublished numbers to the other Defendants." (*Id.* ¶ 177.) Plaintiffs do not account for why, in service of a purported scheme to suppress reimbursement rates, Defend-

6

ants would gradually raise their rates, over a period of weeks or months, in response to State Farm's announcement of its own independent rate increase.  They also do not allege when, how, by what means or to whom State Farm provided such information to the other Defendants or that other Defendants agreed to use the same rates, nor do they allege that any Defendants possessed this information before State Farm raised the rates it paid to shops.[2]

State Farm is alleged to be the market leader (FAC ¶ 51) and to unilaterally set the prices it will pay for repairs based on its regularly conducted survey (*see id.* ¶¶ 136-47). Merely following a price leader is common within different industries and does not suggest the existence of an agreement.  *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910 (6th Cir. 2009) (explaining that, "'as will often be the case, the leader's price increase is likely to be followed'" and concluding that "each defendant's decision to match a new commission cut was arguably a reasoned, prudent business decision" (citation omitted)); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("merely charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act"); *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1200 (7th Cir. 1981) (conspiracy not inferable from Defendants' "adherence to a 'common formula' for calculating damage estimates" for automobile repairs).

Plaintiffs focus many allegations on State Farm's surveys, but they do not allege that the surveys involved anything other than State Farm's unilateral conduct or that any Defendant implemented a price change before State Farm implemented its survey results.  (FAC

---

[2] Tellingly, Plaintiffs' claim that "the Defendants all raise their 'market rates' contemporaneously or within days of State Farm raising their rates"" (FAC ¶ 412) actually refers to changes occurring between a few days and 30-60 days after State Farm began paying higher rates to body shops.  (*See id.* ¶¶ 175-76.)

¶ 137.)  Plaintiffs affirmatively allege that State Farm acted to protect the confidentiality of its surveys (*id.* ¶¶ 154-56), not that it used the surveys to communicate with other Defendants about rates.  In any event, the other Defendants did not need to know that information or to conduct their own surveys to know what State Farm and other insurers paid body shops.

As in *Twombly*, there are obvious explanations for why rational and self-interested insurers would know the rates paid by their competitors.  Plaintiffs allege that Defendants engage with Plaintiffs and with other body shops in hundreds of transactions every day in the ordinary course of business.  The rates body shops are paid are an integral part of these transactions.  Body shops doing business with State Farm across Tennessee, including Plaintiffs, all would learn in the ordinary course of business what rates State Farm was willing to pay them, just as they would know the rates paid by other insurers with whom they do business.  Moreover, these rates allegedly are static for years at a time.  (FAC ¶ 383.)  Thus, it is both obvious and entirely reasonable that the rates State Farm paid were well known among both body shops and the insurers with whom they regularly transact, and that alleged knowledge does not suggest a conspiracy.

Plaintiffs' contention that the other Defendants "cannot be cognizant of any purported changes in the market" and that the data "could only have been provided by State Farm to its ostensible competitors" is plainly wrong.  (*Id.* ¶ 418, 173.)  Shops would have been told the rates resulting from the State Farm survey, if not the methodology, when State Farm told them what rates it was willing to pay.  (*See, e.g.*, *id.* ¶¶ 150, 162, 166, 168, 170, 172.)  Plaintiffs' allegations also suggest that insurers would learn competitive pricing information in the implementation of DRP agreements, which purportedly require pricing concessions or most

favored nations provisions that oblige shops to charge no more than what other insurers pay for the same services.  (FAC ¶¶ 95, 100, 107.)  Thus, it is likely if not inevitable that State Farm's rates would be known among both body shops and the insurers with whom those shops did business.  *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) ("Similar contract terms can reflect similar bargaining power and commercial goals (not to mention boilerplate); similar contract language can reflect the copying of documents that may not be secret; similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy . . . .").

Moreover, in a case purporting to be about a conspiracy to suppress rates, the FAC's factual allegations of parallel price movements all involve Defendants <u>increasing</u> rates, to the benefit of body shops, not decreasing them.  (*Id.* ¶¶ 175-76.)  The body shops themselves obviously knew what rates State Farm was paying them and almost certainly would have been eager to tell other insurers refusing to pay more than the market leader that the market leader had increased the rates it was willing to pay.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 329 (3d Cir. 2010) ("The details of commission agreements with other insurers, for example, could be a powerful tool for a broker attempting to negotiate a more favorable agreement with a particular insurer-partner.").  The decisions of those insurers to increase their own rates after State Farm had increased its own market rate hardly indicate the presence of an agreement to suppress the rates (and in any event certainly did not prejudice Plaintiffs).  *See In re Travel Agent*, 583 F.3d at 907 (refusing to infer conspiracy where Defendants were not alleged to have received information about rate reductions before they were implemented).  If anything, this example tends to show that pricing movements in the market

are the result of independent rather than concerted action.[3]

As the Seventh Circuit stated, "'the practice of the insurance companies to calculate the reimbursement for its insured based upon the lowest prevailing price in the market place (and to insure the integrity of that estimate by having an open list of competing shops which will generally accept it) is the very essence of competition.'" *Quality Auto*, 660 F.2d at 1205 (citation omitted); *see also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) ("Gathering competitors' price information can be consistent with independent competitor behavior."); *In re Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999) ("There are many legal ways in which Cargill could have obtained pricing information on competitors.").[4]

---

[3] Presumably referring to – and mischaracterizing – allegations contained in other complaints discussing supposed statements by a USAA representative in Oklahoma, Plaintiffs allege that "Defendant representatives from other states have specifically stated that State Farm sends out its survey results to other insurers which prompts changes in the fixed labor rates paid to body shops." (FAC ¶ 418.) The actual allegation to which Plaintiffs refer claims that a single USAA representative told an Oklahoma body shop that USAA would soon pay *higher* labor rates because State Farm survey results "had just been sent out" and it would "take USAA a couple of weeks to put them in motion." (*See Indiana AutoBody*, No. 6:14-cv-06001, Doc. 151 (Second Am. Compl.) ¶ 182.) This allegation concerns a rate increase, so even taken at face value, it offers Plaintiffs little help. Moreover, the initial allegations do not include facts that explain how the purported statement is relevant to rates outside Oklahoma, who sent these results, or when and to whom, or how general dissemination of the results supports an inference of conspiracy. In short, the inference Plaintiffs insist must be drawn simply does not flow from the words that allegedly were said to some unidentified body shop employee in Oklahoma, nor is there any factual support for such an inference.

[4] Plaintiffs allege that Defendant Tennessee Farmers told unspecified "body shops" that it would "increase rates after State Farm sets the new ones," and they allege that Defendant Progressive "refuses payment for services because 'State Farm's not doing that.'" (FAC ¶ 140.) These allegations do not add support to Plaintiffs' conspiracy claim. The first allegation concerns a market buyer's refusal to accede to an attempt by a body shop to increase rates, which is indicative of an expected reaction to such an attempt. The second allegation merely suggests that another insurer openly is basing its independent decisions on what the market leader is doing. The Court has previously recognized that such allegations do not support an inference of a price-fixing conspiracy. (*A&E*, Doc. 293 at 18.) Moreover, nothing in these alleged statements confirms or even supports Plaintiffs' inference that the rates State Farm pays are secret and are shared by State Farm with the other Defendants; if anything, they support the contrary inference that State Farm's rates are well-known by body shops and their frequent interlocutors, the insurance companies.

In short, Plaintiffs' factual allegations of quasi-parallel conduct permit no inference other than that it was in the rational, independent business interests of State Farm to demand lower prices and of the other Defendant insurers to refuse to permit a body shop to charge them more than the shop was charging State Farm. *See Twombly*, 550 U.S. at 554 (allegations that are "consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy" do not suffice). In dismissing the Complaint, this Court adopted its analysis of the factually indistinguishable allegations in the *A&E Auto Body* case, where it ruled that Plaintiffs' allegations of purported statements by insurers that they would pay no more than State Farm did not give rise to an inference of a prior agreement:

> It is not illegal for a party to decide it is unwilling to pay a higher hourly rate than its competitors have to pay, and the fact that a number of the Defendants made statements to that effect does not tip the scales toward illegality. . . . Without more, statements such as these suggest that the party is acting out of its own economic self-interest rather than because of an agreement to fix prices, as required to violate § 1. . . . Plaintiffs themselves suggest that the Defendants might have been acting in response to perfectly lawful motivations.

*A&E*, Doc. 293 at 18. Plaintiffs have not provided any new allegations in the FAC that would alter this conclusion in the present case.[5]

---

[5] Plaintiffs now allege that an unidentified "State Farm employee" stated that "'every iota'" of the Louisiana Attorney General's action against State Farm "'is the truth . . . . when you read [the complaint], it's like, that "that's us."'" (FAC ¶ 152.) This purported recitation of the employee's personal opinion is too vague to provide any indication of which allegations this unspecified employee supposedly thinks are accurate or why the employee should be supposed to have any knowledge of the truth or falsity of any particular allegations. Moreover, the action brought by the Attorney General of Louisiana alleges unilateral conduct by State Farm and asserts only unfair trade practices and an intra-corporate conspiracy among State Farm entities (which is not a cognizable conspiracy under federal antitrust law, *see Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)), not a conspiracy between State Farm and any outside insurance companies. This supposed admission thus gets Plaintiffs no closer to satisfying their pleading obligations than they were before.

**2.   The FAC Does Not Allege Any Factual Plus Factor Supporting a Plausible Inference of Conspiracy**

The FAC provides no details regarding the supposed agreement or any "specific time, place, or person involved in the alleged conspiracies."  *See Twombly*, 550 U.S. at 565 n.10. Plaintiffs also do not offer any "plus factors" that might make it plausible to infer a conspiracy from the alleged parallel conduct.  *See id.* at 556 n.4 (discussing examples of plus factor allegations that might suffice to plead conspiracy); *Williamson Oil Co.*, 346 F.3d at 1301 ("[P]rice fixing Plaintiffs must demonstrate the existence of 'plus factors' that remove their evidence from the realm of equipoise and render that evidence more probative of conspiracy than of conscious parallelism.").  Plaintiffs simply recycle, at somewhat greater length, the conclusory allegations this Court previously rejected.

a.   Opportunities to Conspire (FAC ¶¶ 315-38)

In support of their theory that 24 different insurers conspired to fix the prices they would agree to pay for auto repairs throughout Tennessee, Plaintiffs point to Defendants' membership in various trade associations and standard-setting organizations.  (*See* FAC ¶¶ 316-38.)  Unspecified meetings of these associations, Plaintiffs speculate, could have served as opportunities for high-level executives and officers of Defendants to get together and form a conspiracy.  (*See id.* ¶¶ 321, 327-28, 333, 338.)

Contrary to Plaintiffs' claims, mere opportunities to conspire at trade association meetings do not plausibly suggest an agreement, particularly where the Defendants had an independent, rational reason to be at the alleged meeting place.  *See Am. Dental Ass'n*, 605 F.3d at 1295 ("participation in trade organizations provides no indication of conspiracy"); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 349 (affirming dismissal where "neither

12

defendants' membership in the CIAB, nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy"); *In re Travel Agent*, 583 F.3d at 911 ("[A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [Defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior.").  As this Court has explained, the fact that "State Farm and unnamed members of the 'insurance industry' meet regularly does not suggest that any Defendant insurance company entered into a price-fixing agreement." *A&E*, Doc. 293 at 17 n.11.[6]

Moreover, Plaintiffs have not alleged facts that could have created an opportunity to conspire in the first place.  They do not list or describe a single meeting of any of these associations, who attended, when it occurred, what contacts or communications occurred, or how any of these unspecified contacts or communications might be substantively, temporally, or causally related to any of the purported parallel conduct that Plaintiffs allege.  *See In re Travel Agent*, 583 F.3d at 910 (affirming dismissal where complaints did "not cite any specific meetings that involved both [Defendants]").[7]

---

[6] Plaintiffs allege that "Defendant insurers meet regularly and State Farm has disclosed the Defendant insurers discuss and strategize with each other payment of body shop charges at these regular meetings."  (FAC ¶ 418.)  The FAC contains no allegations elaborating on this supposed disclosure. Presumably, Plaintiffs are referring to allegations contained in companion complaints concerning a State Farm meeting with representatives of the Mississippi Department of Insurance and body shop representatives, at which a State Farm employee allegedly referred to monthly insurance industry meetings and said that he would raise the body shops' concerns at these meetings.  This Court already has dismissed these allegations as supporting neither Plaintiffs' characterization of the allegations here nor the inference of conspiracy Plaintiffs seek to draw.  *See A&E*, Doc. 293 at 17 n.11.

[7] Only four Defendants are members of the American Insurance Association (FAC ¶ 316), and only six are members of the Property Casualty Insurers Association of America (*id.*).  Only four are alleged to be members of the Certified Automotive Parts Association ("CAPA") (*id*. ¶ 332), which also includes body shop members – making its attractiveness as a conspiracy-planning location doubtful at best.  Only four are alleged to be members of the National Association of Mutual Insurance Companies ("NAMIC").  (*Id.* ¶ 316.)  State Farm, which purportedly plays "the leading

b.     Common Motive to Conspire (FAC ¶¶ 339-74)

As before, the only motive Plaintiffs offer for the alleged price-fixing conspiracy is that it would be profitable for Defendants to pay less for repairs.  (*See* FAC ¶ 339.)  A profit motive is not sufficient to articulate a common motive to conspire.  *See, e.g.*, *White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) ("Taking as a given that all of the defendants had motive to conspire with one another to earn high profits, all such a motive shows is that the defendants could reasonably expect to earn higher profits by keeping prices at a su-pracompetitive level through parallel pricing practices.").

As this Court noted in dismissing the Complaint, the parallel pricing conduct alleged by Plaintiffs is in the independent, profit-maximizing self-interest of each Defendant insurer, which renders Plaintiffs' conspiracy claim implausible.  *See A&E*, Doc. 293 at 18; *see also Jacobs*, 626 F.3d at 1342 ("Jacobs had the burden to present allegations showing why it is more plausible that TPX and its distributors—assuming they are rational actors acting in their economic self-interest—would enter into an illegal price-fixing agreement (with the attendant costs of defending against the resulting investigation) to reach the same result realized by purely rational profit-maximizing behavior.").

In the FAC, Plaintiffs have attempted to piece together a tenuous theory that some Defendants were somehow incentivized to conspire because they have relationships with BlackRock.  (FAC ¶¶ 348-74.)  Specifically, Plaintiffs allege that "the majority of the named Defendants" invest through BlackRock, an asset management firm that manages over $4.32 trillion.  (*Id.* ¶¶ 348, 350.)  (However, they name only six Defendants who are "invested in or

---

role" in the conspiracy (*id.* ¶ 52), belongs only to CAPA, NAMIC, and the Insurance Institute for Highway Safety ("IIHS").  (*Id.* ¶¶ 316, 326, 332.)

through BlackRock (*id.* ¶ 349), and merely speculate that further discovery would reveal other Defendants with connections to BlackRock.)

Plaintiffs claim, among other things, that Defendants profit by steering customers to a collision repair multi-shop operator, Service King, which was purportedly purchased from Carlyle Group by BlackRock.  (*Id.* ¶ 351.)  Plaintiffs' allegations rest on a blatant misstatement of fact.  Service King was purchased from Carlyle Group by Blackstone – not BlackRock.[8]  Defendants suggest no further response to the Service King-related allegations could possibly be warranted, but even if it were not blatantly false, this allegation hardly suggests a common motive to conspire to set reimbursement rates.

Plaintiffs' concoction of the BlackRock scheme continues, however.  They also allege that BlackRock owns shares of a paint manufacturer, PPG Industries, and a supplier of recycled parts, LKQ Corporation.  (FAC ¶¶ 357, 365.)  Plaintiffs claim that Defendants somehow share a motive to conspire, for reasons that are unclear, "through increased sales of the products sold by" PPG and LKQ.  (*Id.* ¶¶ 362, 371.)  Plaintiffs' contrived theory includes no allegation of how Defendants coordinated or could have coordinated their collision repair decisions through BlackRock, and no allegation that they had any say in BlackRock's investment

---

[8] *See* Blackstone, *Press Release: Blackstone to Acquire Majority Stake in Service King Collision Repair Centers* (July 23, 2014), http://blackstone.com/news-views/press-releases/details/blackstone-to-acquire-majority-stake-in-service-king-collision-repair-centers; Service King, *Press Release: Blackstone Acquires Majority Share of Service King Collision Repair Centers* (July 21, 2014), http://serviceking.com/news/67-blackstone-acquires-majority-share-of-service-king-collision-repair-centers.  The Court may take judicial notice of these press releases and articles under Fed. R. Evid. 201 because the ownership of Service King is not subject to reasonable dispute, is generally known, and can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned.  *See Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 458-59 (9th Cir. 1995) (taking judicial notice of facts in a newspaper article because they would be generally known and easily verified); *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1357 (3d Cir. 1994) ("we take judicial notice of newspaper accounts highlighting controversies over the DRPA's toll increases, spending practices, and public announcements.").

decisions.  Moreover, Plaintiffs do not allege that any Defendants have required that a specific type of paint be used, let alone PPG's paint, or that all Defendants require that LKQ's recycled parts must be used for repairs.  (*Id.* ¶¶ 357-72.)

c.      Action Against Self-Interest (FAC ¶¶ 375-78)

The FAC adds no coherent allegations that would show why, absent an agreement, it would be irrational for an insurer to ask body shops to lower their labor rates to the levels they charge a different insurer.  *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) ("buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers" and "that is the sort of conduct that the antitrust laws seek to encourage").  Defendants set the amounts they will pay to reimburse for repairs regardless of which body shop their policyholders choose, and Plaintiffs concede that even when a shop wants to charge higher rates, Defendants simply refuse to reimburse for the higher charges.  (*See, e.g.*, FAC ¶¶ 110, 117, 122-24, 181, 211, 226.)  Plaintiffs offer nothing to suggest that the ability or decision of a Defendant to refuse to pay these higher prices depended on the actions of other insurers.

**3.      Plaintiffs' New Allegations Regarding Prices of Replacement Parts, Types of Parts Used, and Reimbursement Policies for Various Repair Procedures Do Not Set Forth a Purported Price-Fixing Claim**

Plaintiffs have added or expanded a number of allegations concerning Defendants' payments for replacement parts (as distinguished from body labor or paint and materials rates), certain repair processes and procedures, and requirements for use of allegedly "sub-

16

standard or dangerous" replacement parts.  (FAC ¶¶ 44, 185.)[9]  The FAC does not tie any of

these allegations to any agreement by Defendants regarding parts reimbursement rates or pol-

icies.  To the contrary, these new allegations only underscore differences among the alleged

reimbursement practices and parts replacement decisions of Defendants, rendering any al-

leged conspiracy or agreement implausible.[10]  *See In re Elevator Antitrust Litig.*, 502 F.3d at

50-51 (affirming dismissal of claim that Defendants conspired to fix the various terms of ele-

vator repair parts and services for failure to show any parallel conduct in the first place).

Plaintiffs' suggestion that their allegations entitle them to discovery that will enable

them to repair the deficiencies in their claim (FAC ¶ 184) is wholly unwarranted.  In the ab-

sence of "allegations that reach the level suggesting conspiracy" and of any """reasonably

founded hope that the [discovery] process will reveal relevant evidence"' to support a § 1

claim," allowing this case to proceed to enormously expensive antitrust discovery would con-

travene the dictates of *Twombly*.  550 U.S. at 559-60 (alteration in original) (citation omit-

---

[9] The FAC is also replete with a catalog of other body shop grievances and accusations concerning matters having no apparent logical relationship to Plaintiffs' claims.  Examples include DRP indemnity agreements (FAC ¶¶ 102, 104, 118-19, 249), "desk review" claims processes (*id.* ¶ 206), and disclosures of aftermarket parts.  (*Id.* ¶¶ 236-45).  These irrelevant allegations of various supposed practices by different insurers also are inconsistent with any notion of parallel conduct by Defendants.

[10] With respect to the type of replacement parts the shops are required to use, some Defendants write estimates specifying the use of "aftermarket" (non-OEM) parts.  (FAC ¶ 72.)  Other Defendants allegedly specify salvage parts.  (*Id.*)  Yet other Defendants are "exceptions."  (*Id.*)  With respect to parts procurement, some Defendants require parts to be ordered through the Parts Trader electronic marketplace.  (*Id.* ¶¶ 73-74.)  Other Defendants order the parts themselves and ship them to the body shop.  (*Id.* ¶ 77.)  Still others tell the body shop which part to order from which vendor.  (*Id.*)  With respect to reimbursement practices, Plaintiffs allege that Defendants base their estimates on different estimating software programs or independent appraisers.  (*Id.* ¶¶ 193-96.)  Defendants' decisions to reimburse for certain procedures also are based on different methods and appear to vary depending on the circumstances.  (*See id.* ¶¶ 200, 202-04, 206-11.)  Such pervasive variations hardly support even the FAC's general allegations of parallel conduct, much less give rise to a plausible inference of conspiracy or agreement.

17

ted).  Indeed, given Plaintiffs' "repeated failure to cure deficiencies by amendments previ-ously allowed," *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003), Plaintiffs' antitrust conspiracy claims should be dismissed with prejudice as a matter of law.

### B.    The FAC's Boycott Allegations Are Insufficient As a Matter of Law

Count Two should be dismissed for the independent reason that Defendants' alleged conduct does not constitute a group boycott as a matter of law.  A group boycott under the antitrust laws requires proof of a "concerted *refusal*" to deal.  *Quality Auto Body*, 660 F.2d at 1206 (emphasis added); *Mendelovitz v. Adolph Coors Co.*, 693 F.2d 570, 577 (5th Cir. 1982).  The conduct that Plaintiffs allege in apparent support of their boycott claim includes a smattering of allegations that a few Defendants attempted to steer policyholders to non-plaintiff shops or told certain of their policyholders not to take their cars to certain body shops.  Steering is not equivalent to a refusal to deal and, accordingly, cannot support a boycott claim.[11]  Allegations concerning the purported impact of the alleged misconduct – for example, that Plaintiff ICON's revenue from State Farm business declined from 2011 to 2013 (FAC ¶ 299-301) – contradict the notion that even individual Defendants refused to deal with Plaintiffs.  Moreover, the allegations concerning ICON clearly suggest why its

---

[11] *See also Quality Auto Body*, 660 F.2d at 1206 (even if two insurers agreed to refuse to pay more than competitive price for automobile repairs, that agreement did not constitute a boycott); *Custom Auto Body, Inc. v. Aetna Cas. & Sur. Co.*, 1983 WL 1873, at *19 (D.R.I. Aug. 3, 1983) (body shop "at all times has been free to compete for the business of the defendant and its insureds by offering lower prices or higher quality services"); *Nationwide Mut. Ins. Co. v. Auto. Serv. Councils of Del., Inc.*, 1981 WL 2053, at *2-4 (D. Del. Apr. 10, 1981) (discouraging insureds from using body shops "by telling them that their prices were too high, and by notifying the owners that Nationwide would not guarantee full reimbursement" did not constitute refusal to deal; there was "no suggestion of an outright refusal of Nationwide to deal with any repair shop," rather Nationwide had "simply refused to accede to what it considers to be defendants' excessive prices").  Plaintiffs cannot cure the deficiencies of their boycott claim by invoking the word "coerce." (FAC ¶ 428.)  None of the alleged conduct comes close to coercion.  *See Nationwide Mut.*, 1981 WL 2053, at *3 ("driving a hard bargain . . . hardly constitutes a form of 'coercion' cognizable under the antitrust laws").

18

volume of business declined:  That shop left State Farm's DRP program in 2010 and was no longer a "preferred provider" receiving referrals.  (*Id.* ¶ 297.)[12]

In addition, as discussed above, there is no legally cognizable allegation of concerted action with respect to the alleged steering.  *See A&E*, Doc. 293 at 21 ("Plaintiffs offer even less 'evidence' of an agreement to boycott than they did of an agreement to fix prices.").  The FAC offers no facts to support the claim that 31 different insurers agreed to refuse to deal with Plaintiffs in hundreds or thousands of transactions, much less any detail about when, how, or with whom agreements were or could have been made.  Their only "evidence" to support the existence of such an agreement – that other Defendants allegedly steered business away from some Plaintiffs in the months or years after those Plaintiffs dissociated from other insurers' direct repair programs and therefore must have engaged in the steering to punish the shops – is a speculative interpretation of clearly insufficient allegations of parallel conduct.

## III.   PLAINTIFFS' CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS (COUNT THREE) SHOULD BE DISMISSED

Plaintiffs' claim for tortious interference with business relations fails as a matter of law.  The elements of such a claim are:  "'(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means, and

---

[12] Furthermore, Plaintiffs fail to identify even a single customer who heard and acted upon purported "false assertions" that Plaintiffs suggest were made by Travelers, Auto-Owners, and Pennsylvania National about ICON.  (FAC ¶ 304.)  Plaintiffs' non-specific, generalized allegations about such "false assertions" do not support Plaintiffs' claims.

finally, (5) damages resulting from the tortious interference.'" *United Pet Supply, Inc. v. City of Chattanooga*, 921 F. Supp. 2d 835, 863 (E.D. Tenn. 2013) (citation omitted).  The FAC fails to allege facts plausibly supporting the required elements of existing business relationships or an identifiable class of persons with whom Plaintiffs had prospective business relationships and improper motive or purpose.  Because Plaintiffs have not met their "obligation to provide the 'grounds' of [their] 'entitle[ment] to relief'" (*Twombly*, 550 U.S. at 555), the tortious interference claim should be dismissed as a matter of law.

In dismissing Plaintiffs' tortious interference claim in the original Complaint, the Court noted that Plaintiffs alleged that Defendants made "misrepresentations about the quality and integrity of Plaintiffs' businesses" and suggested that "making misrepresentations about the quality and integrity of another's businesses is improper" for purposes of Tennessee law of tortious interference.  (Doc. 78 at 11.)  Nonetheless, the Court dismissed Plaintiffs' tortious interference claim on the grounds that Plaintiffs had not "identif[ied] specifically which Defendants interfered with which Plaintiffs."  (Doc. 78 at 11-12; *see also* Doc. 84 at 2 ("A general allegation that some unidentified Defendants – or all Defendants – interfered with some unidentified customers of some unnamed Plaintiff does not satisfy the requirements of *Aschroft v. Iqbal*, 556 U.S. 662 (2009).").)

In the FAC, Plaintiffs have attempted to remedy that deficiency by including allegations regarding a limited number of transactions with specific insureds or car owners with which Defendants purportedly interfered.  (FAC ¶¶ 258-275.)  As a threshold matter, Plaintiffs' allegations of specific instances of purported interference do not include the majority of Defendants.  (*See* Exhibit B hereto.)  Moreover, with regard to other Defendants, Plaintiffs

20

allege only unsuccessful interference, which cannot state a claim.  (*See id.*; *see also* FAC ¶¶ 262, 267, 268.)  Given the Court's requirement of specific pleading against each Defendant, the tortious interference claims against such Defendants should be dismissed as a matter of law with prejudice.  (*See* Exhibit B hereto.)

Furthermore, Plaintiffs' limited allegations regarding specific transactions simply demonstrate Plaintiffs' inability to allege key elements of tortious interference.  In particular, Plaintiffs have entirely failed to allege facts supporting the element of improper means or improper motive against any Defendant.  Plaintiffs' allegations of specific instances of purported interference do not support their generalized assertions that Defendants made "misrepresentations about the quality and integrity of Plaintiffs' businesses."  (Doc. 78 at 11.)  While Defendants are alleged to have encouraged insureds to take their cars to DRP facilities, none of the descriptions of these individual transactions include allegations that the Defendants disparaged Plaintiffs' businesses.  In regard to one transaction, Plaintiffs allege that an insured was told that his insurer did not "guarantee" Plaintiff ICON's work, a statement that Plaintiffs assert that the insured "interpreted" "to mean ICON did not warrant its work" and that "Nationwide's representations cast ICON in a bad light."  (FAC ¶ 258.)  Plaintiffs do not allege, however, that the insurer actually represented that ICON did not warrant its own work, nor do Plaintiffs allege that the insurer disparaged ICON in any other way.  Accordingly, Plaintiffs' allegations regarding this transaction cannot support the element of "improper means."  *See, e.g.*, *Gibson Guitar Corp. v. Levine*, 2005 WL 1799305, at *3 (M.D. Tenn. July 27, 2005) (dismissing tortious interference claim where alleged statements were not defamatory, disparaging, misleading or unfair).

Plaintiffs' only other allegation of a purported misrepresentation regarding the quality and integrity of Plaintiffs' businesses is the allegation "[u]pon information and belief" that a particular Safeco adjuster "regularly and routinely tells consumers who have identified Plaintiff Brewer as the repair shop of choice they should not got [sic] to Brewer because Brewer 'gouges the insurance companies.'"  (FAC ¶ 273.)  However, Plaintiffs do not identify any insureds or consumers who were told this, nor do they allege that any consumers were dissuaded by the adjuster's alleged statement from having their cars repaired by Brewer.  (*See id.*)  Thus, this allegation does not support the element of improper means and does not establish any actual interference in any business relationship.

Plaintiffs provide no other specific examples of statements that would constitute disparagement and do not allege any other improper means in support of their tortious interference claims.[13]  Allegations that State Farm and other insurers urged insureds to go to DRPs for repairs (FAC ¶¶ 265, 270), or offered to waive a prior damage deduction if the insured went to a DRP (*id.* ¶ 266), that GEICO informed insureds they might be financially responsible for amounts not covered by their insurance (*id.* ¶ 272), or that Allstate "'tried to sell'" an insured on "a different DRP shop" (*id.* ¶ 267) simply do not constitute improper means as a matter of Tennessee law.  Indeed, Plaintiffs do not allege that any of this purported conduct violated any Tennessee statute.  Thus, Plaintiffs' specific examples completely fail to substantiate their generalized allegations of disparagement with Defendant-specific allegations

---

[13] Plaintiffs also attach a copy of the affidavit, filed in another case, of a Progressive adjuster and include allegations in the FAC recounting his contentions of conduct by Progressive directed against a body shop that is not a Plaintiff in this case.  Those allegations do not show tortious interference by Progressive (or any other Defendant) with Plaintiffs' purported business relationships in this case.  (*See* FAC ¶¶ 290-292.)

as required by this Court under *Twombly* and Tennessee law.[14]   (Doc. 78 at 11-12.)

Plaintiffs' tortious interference claim also fails for lack of an "identifiable class" of persons with whom they had "prospective relationship[s]." *United Pet Supply*, 921 F. Supp. 2d at 863.   A "'potential future contact[]' . . . does not to rise to the level of a prospective business relationship." *Harris v. Gaylord Entm't Co.*, 2013 WL 6762372, at *5 & n.2 (Tenn. Ct. App. Dec. 19, 2013) (affirming dismissal of claim for tortious interference with prospective business relationships, where plaintiff "d[id] not allege an existing or prospective relationship with any particular third party.").   Here, Plaintiffs do not allege who the required "identifiable class" would consist of or how it could be identified.   Plaintiffs' failure to provide allegations defining an "identifiable class" and factually supporting the existence of such a class requires dismissal of their tortious interference claim.

Finally, Plaintiffs again attempt to avoid by dismissal of their tortious interference claim by asserting they need discovery, contending that "the vast majority of evidence of successful steering lies solely within the control and custody of the Defendants."   (FAC ¶ 275.) The Court has already rejected this contention.   As the Court stated, in dismissing the tortious interference claim in Plaintiffs' Original Complaint, "there is nothing in the Complaint that explains why the Defendants, but not the Plaintiffs, would have this information. Surely the Plaintiffs must have had some basis to believe that certain Defendants interfered with certain of the Plaintiffs' customers."   (Doc. 84 at 2.)

Accordingly, Plaintiffs' claim for tortious interference with business relations fails as

---

[14] To allege an improper motive, Plaintiffs must allege facts showing that each Defendant's "'predominant purpose was to injure'" Plaintiffs. *See Brown v. CVS Pharmacy, L.L.C.*, 982 F. Supp. 2d 793, 802 (M.D. Tenn. 2013) (citation omitted).   Plaintiffs' generalized and conclusory assertions (*e.g.*, FAC ¶¶ 278-279) fall far short of establishing an improper purpose.

a matter of law and should be dismissed with prejudice.

## IV.    PLAINTIFFS' CLAIM FOR QUANTUM MERUIT (COUNT FOUR) SHOULD BE DISMISSED

Plaintiffs' second attempt to plead a quantum meruit claim is just as legally insufficient as their prior attempt.  Under Tennessee law, the elements of a quasi-contractual claim are:  "'(1) [a] benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of such benefit under such circumstances that it would be inequitable for [the defendant] to retain the benefit without payment of the value thereof.'"  *Withco, LLC v. Republic Servs. of Tenn., LLC*, 818 F. Supp. 2d 1040, 1052 (M.D. Tenn. 2011) (citation omitted).  Here, Plaintiffs have completely failed to identify any cognizable "benefit" that they conferred on Defendants.

Under the guise of group pleading, the FAC alleges that the repairs Plaintiffs performed "benefitted Defendants and Defendant's [sic] insured/claimants for whom Defendants are required to provide payment for repairs."[15]  (FAC ¶ 450.)  However, the FAC provides no support for this assertion.  As the Court explained in dismissing the plaintiffs' quantum meruit claim in *A&E Auto Body*, the repairs of insureds' vehicles at issue "obviously provided a benefit to the owners of the vehicles.  But so far as the Amended Complaint discloses, the only effect of such a repair on the insurance company is the incurring of an obligation to pay for it."  (*A&E*, Doc. 293 at 9.)  As the Court recognized, that

---

[15] Plaintiffs' reliance on impermissible group pleading flatly contravenes the Court's Orders directing Plaintiffs to provide "individualized allegations" to support their state law claims such as quantum meruit.  (*See A&E*, Doc. 110 ¶ 4; *A&E*, Doc. 293 at 6 & n.8.)  In their FAC, Plaintiffs entirely fail to provide the individualized factual allegations necessary to show that the elements of their quantum meruit claim are met with respect to any of the individual repair transactions at issue.  Plaintiffs' continued failure to plead with the required specificity warrants dismissal of their quantum meruit claim for this reason alone.

is hardly a benefit to the insurers.  (*Id.*)  Moreover, even to the extent that an obligation to pay could be construed as a "benefit," it is "certainly not something that has been conferred . . . by the repair shop."  (*Id.* at 10.)  In addition, because, according to their own allegations, Plaintiffs had no reasonable expectation of higher payments from Defendants,[16] there is no inequity in rejecting Plaintiffs' quantum meruit claim.  *Cf. Withco, LLC*, 818 F. Supp. 2d at 1052 (quasi-contractual claim requires that "'it would be inequitable for [the defendant] to retain the benefit'" (citation omitted)).  Therefore, Plaintiffs' quantum meruit claim should be dismissed as a matter of law.

## V.   CONCLUSION

After two tries, it is apparent that any further amendment of Plaintiffs' Complaint would be futile.  The Court should dismiss all of Plaintiffs' claims against Defendants with prejudice.  *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005); *Postell v. Fifth Third Bank*, 2013 WL 2042805, at *1 (M.D. Fla. May 15, 2013) (amended complaint dismissed with prejudice where it failed to cure identified deficiencies in prior complaint).

---

[16]  According to the FAC, Defendants made clear to auto body shops the amounts they were willing to pay for the services to be rendered.  (*See, e.g.*, FAC ¶¶ 101-03, 116-17, 122-23, 136, 219-22.) Furthermore, Plaintiffs' allegations make clear that the same or similar DRP agreements and pricing practices have existed for many years and are well known to body shops.  (*See, e.g*, *id.* ¶¶ 95-102, 388-400.)   As this Court stated in dismissing the quantum meruit claim in *Indiana AutoBody*, accepting Plaintiffs' allegations as true, "Plaintiffs could not, under any level of reasonableness, have expected to be paid more than what they received."  (*Indiana AutoBody*, Doc. 150 at 2.)

Dated:  June 4, 2015

Respectfully submitted,

*/s/ Johanna W. Clark*
Johanna W. Clark
CARLTON FIELDS JORDEN BURT, P.A.
450 S. Orange Ave., Suite 500
Orlando, Florida 32801
Telephone: (407) 849-0300
Facsimile: (407) 648-9099
Email: jclark@cfjblaw.com

Michael L. McCluggage
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Telephone: (312) 660-7600
Facsimile: (312) 692-1718
E-mail: mmcluggage@eimerstahl.com

Michael P. Kenny
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: 404-881-7000
Facsimile: 404-881-7777
Email: mike.kenny@alston.com

*Attorneys for Defendants State Farm Mutual*
*Automobile Insurance Company and State*
*Farm Fire and Casualty Company*

101209766.1

*/s/ Hal K. Litchford*              

Hal K. Litchford (272485)
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**
SunTrust Center
200 South Orange Avenue
Post Office Box 1549
Orlando, Florida  32802
Telephone:  (407) 422-6600
Facsimile:  (407) 841-0325
Email*:  hlitchford@bakerdonelson.com*

    *-and-*

Amelia W. Koch *(Admitted Pro Hac Vice)*
Steven F. Griffith, Jr. *(Admitted Pro Hac Vice)*
**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana  70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000
Email:  akoch@bakerdonelson.com
Email:  sgriffith@bakerdonelson.com

*Counsel for Defendants United Services
Automobile Association and USAA Casualty
Insurance Company*


*s/ Lori McAllister*             

Lori McAllister (P39501)
Theodore J. Greeley (P77862)
DYKEMA GOSSETT PLLC
201 Townsend, Suite 900
Lansing, MI  48933
(517) 374-9150
lmcallister@dykema.com

*Attorneys for Auto-Owners Insurance
Company*

101209766.1

<u>/s/ Richard L. Fenton</u>
Richard L. Fenton (admitted *pro hac vice*)
Mark L. Hanover (admitted *pro hac vice*)
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Tel:  (312) 876-8000
Fax: (312) 876-7934
Email: richard.fenton@dentons.com
Email: mark.hanover@dentons.com

Bonnie Lau
Dentons US LLP
525 Market Street, 26th Floor
San Francisco, CA 94105-2708
Telephone:  (415) 882-5000
Facsimile:  (415) 882-0300
bonnie.lau@dentons.com

Lori J. Caldwell (Florida Bar No. 026874)
Rumberger, Kirk & Caldwell, PA
300 S Orange Ave, Suite 1400
PO Box 1873
Orlando, FL 32802-1873
Tel:  (407) 839-4511
Fax: (407) 835-2011
Email: lcaldwell@rumberger.com

*Attorneys for Defendants*
*Allstate Property and Casualty Company*
*Allstate Insurance Company*
*Allstate Indemnity Company*

*/s/ Timothy J. Rooney*
Timothy J. Rooney (admitted pro hac vice)
Norman K. Beck (admitted pro hac vice)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
trooney@winston.com
nbeck@winston.com

Laura Besvinick
STROOCK & STROOCK & LAVAN LLP
200 South Biscayne Boulevard
Suite 3100
Miami, Florida 33131
Telephone: (305) 789-9300
Facsimile: (305) 789-9302
lbesvinick@stroock.com
Fla. Bar No. 391158

*Counsel for Defendants Travelers Property
Casualty Insurance Company, Travelers In-
demnity Company, Travelers Casualty
Company of Connecticut, and Travelers In-
demnity Company of America*

101209766.1

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of June, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record that are registered with the Court's CM/ECF system.

*/s/ Johanna W. Clark*
Johanna W. Clark

101209766.1