**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

---

BREWER BODY SHOP, LLC, *et al.*,

                        Plaintiffs,

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, *et al.*,

                        Defendants.

**Case No. 6:14-MD-2557-Orl-31TBS**

**RE: Case No. 6:14-cv-6002, TNWD**

DISPOSITIVE MOTION

---

**GEICO GENERAL INSURANCE COMPANY AND GEICO INDEMNITY**
**COMPANY'S MOTION AND SUPPORTING MEMORANDUM TO DISMISS**
**PLAINTIFFS' FIRST AMENDED COMPLAINT**

Despite this Court outlining fundamental defects in their pleadings and repeatedly outlining them in nearly identical pleadings in the many copycat cases before this Court, Plaintiffs' First Amended Complaint ("FAC")[1] is just another iteration of the same defective pleading.  *See* Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("*Twombly*"); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*").   Plaintiffs have had over 13 months since they filed their original Complaint to develop their factual allegations, as well as the benefit of Magistrate Judge Smith's Report and Recommendation (Doc. 78, "*Brewer* R&R") and this Court's dismissal Order (Doc. 84, "*Brewer* Order") to assist them in framing those allegations to properly plead valid claims.  Plaintiffs' counsel have even had the benefit of the instructions provided by the Court in the numerous dismissal Orders and Reports and Recommendations in the nearly identical copycat pleadings – yet Plaintiffs still cannot state a valid legal claim against GEICO General Insurance Company or GEICO Indemnity Company (collectively, "GEICO").  Indeed, despite all the time and resources spent by the federal court system (primarily this Court) and all the Parties involved, Plaintiffs are still not close to stating valid legal claims that are sufficient to survive a motion to dismiss.  The time has come to dismiss Plaintiffs' claims with prejudice.

Specifically, Plaintiffs have not addressed the following ***known deficiencies***:

1. ***Plaintiffs still do not plead plausible facts about GEICO to support their allegations.***  Plaintiffs cannot support their claims with sufficient factual allegations *against GEICO* to meet the requirements of *Twombly* and *Iqbal*.

2. ***Plaintiffs continue to ignore this Court's direction that they must plead plausible allegations that support each of their claims against GEICO (rather than just against the "Defendants").***  Plaintiffs again leave it to GEICO and this Court to wade through a nearly 100-page rambling, and often group-pled, FAC to attempt to decipher what GEICO is alleged to have done (if anything) and which allegations are intended to support which claims by which Plaintiffs, in direct violation of Federal Rules of Civil Procedure 8(a), 9(b) and this Court's Orders.

3. ***Plaintiffs do <u>not</u> and <u>cannot</u> allege facts sufficient to demonstrate the existence of a conspiracy, or that GEICO joined the putative conspiracy.***

---

[1] Plaintiffs filed their initial Complaint ("Complaint") on April 22, 2014 (Doc. 1) and FAC on May 18, 2015 (Doc. 85).

Plaintiffs continue to attempt to base their claims on alleged parallel conduct but the conduct actually alleged shows that Defendants (including GEICO) have unique systems for estimating and specifying parts, that Defendants are acting independently and that GEICO is acting out of its own economic self-interest.

4.   ***Plaintiffs fail to allege facts tending to prove any of the required substantive elements of their antitrust claims***.  The rule of reason applies to Plaintiffs' antitrust claims and they fail to allege any facts tending to prove it does not.  In addition to failing to allege GEICO joined an illegal conspiracy, Plaintiffs fail to allege any facts supporting any of the other rule of reason elements.

5.   ***Plaintiffs ignore this Court's Order to plead plausible facts as to their tortious interference claim and fail to identify which Defendants actually interfered with which Plaintiffs, likely because they cannot.***

6.   ***Plaintiffs fail to allege facts tending to prove they rendered valuable services to GEICO or that they had a reasonable expectation of payment that would support a quantum meruit claim.***

Rather than address the fundamental defects identified by this Court, Plaintiffs' FAC merely escalates the rhetoric, but still does not plead facts that state a claim that GEICO conducted any unlawful or tortious act against Plaintiffs.  Plaintiffs' alleging a broad-brush horror story about the insurance industry without facts, and then occasionally remembering to insert the name "GEICO" into those allegations, is not sufficient to state a claim against GEICO.  The FAC should be dismissed with prejudice.

## I.   PLAINTIFFS FAIL TO ALLEGE PLAUSIBLE FACTS IN SUPPORT OF THEIR CLAIMS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  "The plaintiff must provide enough factual allegations to raise a right to relief above the speculative level."  *A&E Auto Body, Inc. v. 21st Century Centennial Ins. Co.*, No. 6-14-CV-2257-GAP-TBS, 2015 WL 304048, at *4 (M.D. Fla. Jan. 21, 2015) (citing *Twombly,* 550 U.S. at 555).  A complaint is insufficient if it offers "only labels and conclusions."  *Iqbal*, 556 U.S. at 678.  The Court need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . ."  *Id*.  Here, Plaintiffs' FAC should be dismissed with prejudice because the claims are supported by nothing

more than labels, conclusory statements, threadbare recitals of the elements of the causes of action and contradictory facts that do not state a plausible claim for relief or come anywhere near raising a right to relief above the speculative level.

## II.   GROUP PLEADING "DEFENDANTS" AND "PLAINTIFFS" IS IMPROPER

Plaintiffs may not plead in the "common" or "group," but must adequately connect specific defendants to the acts they are alleged to have committed. *See A&E Auto Body, Inc. v. 21st Century Centennial Ins. Co.*, No. 6:14-cv-310-Orl-31TBS, at ¶ 4 (M.D. Fla. June 11, 2014) ("*A&E* June 2014 Order") (group pleading is inadequate); *Brewer* R&R at 11-12, (recommending dismissal of Plaintiffs' tortious interference claim because it is group pled); *Brewer* Order at 2-3 (adopting *Brewer* R&R); *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 619 F. Supp. 2d 1260, 1271-74 (M.D. Fla. 2009) *aff'd,* 451 Fed. App'x. 862 (11th Cir. 2012) ("The grouping of [d]efendants . . . does not afford these [d]efendants fair notice of the basis for the claims against them").  When a plaintiff fails to make specific allegations about a defendant, the claims are implausible and fail as a matter of law.  *Id.* at 1273; *see also Synergy Real Estate of SW Fla., Inc. v. Premier Prop. Mgmt. of SW Fla., LLC*, No. 2:11-CV-707- FTM-29, 2012 WL 4009534, at *2 (M.D. Fla. Sept. 12, 2012) ("indiscriminately lumping 'defendants' together" fails to comply with Rule 8).

## III.   PLAINTIFFS' PURPORTED FEDERAL ANTITRUST CLAIMS DO NOT ALLEGE A PLAUSIBLE CONSPIRACY – OR ANY CONSPIRACY – LET ALONE THAT GEICO KNOWINGLY JOINED THAT CONSPIRACY

"The elements of a conspiracy to restrain trade under Section 1 [of the Sherman Act] are (1) an agreement to enter a conspiracy (2) designed to achieve an unlawful objective."  *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir. 1993) *certified question answered,* 264 Ga. 295, 443 S.E.2d 833 (1994) (internal citations omitted).  Just like the *A&E* FAC and the original Complaint here, Plaintiffs' FAC does not allege any plausible facts tending to prove a conspiracy existed, let alone that GEICO acted with a unity of purpose or common design or pursuant to a "meeting of minds in an unlawful arrangement."  *Id.; see also A&E Auto Body,* 2015 WL 304048, at *10 ("To start with, aside from conclusory allegations that it exists,

3

the Plaintiffs offer no details at all in the Amended Complaint about the alleged agreement, such as how the Defendants entered into it, or when."); *Brewer* R&R at 13-14 (recommending dismissal of *Brewer* antitrust claims for reasons stated in *A&E Auto Body,* 2015 WL 304048, at *9-12); *Brewer* Order at 3 (adopting *Brewer* R&R).

Plaintiffs are required to allege facts tending to prove "the challenged anticompetitive conduct 'stem[s] from . . . an agreement, tacit or express'" with competitors and not from independent decisions. *A&E Auto Body,* 2015 WL 304048, at *9 (quoting *Twombly*, 550 U.S. at 553); *Brewer* R&R at 13-14; *Brewer* Order at 1. "To prove an agreement to restrain trade, a plaintiff must demonstrate a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement. To adequately plead that such an agreement exists requires allegations plausibly suggesting – not merely consistent with – agreement." *A&E Auto Body,* 2015 WL 304048, at *11 (internal citation omitted); *see also Monsanto Co. v. Spray-Rite Serv. Corp*., 465 U.S. 752, 761 (1984) (pleading a Section 1 claim requires plaintiff to establish agreement between two or more persons to restrain trade – unilateral or independent conduct is not actionable); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (where claim is implausible and makes no economic sense, more persuasive evidence than otherwise necessary is required). Plaintiffs' failure to plead facts plausibly demonstrating a conspiracy after over a year of trying should result in dismissal of their antitrust claims with prejudice.

### A.    Plaintiffs Do Not Offer Direct Evidence Of Any Conspiracy

Plaintiffs do not plead direct evidence of a conspiracy or that GEICO knew of or joined a purported conspiracy. "[D]irect evidence must be explicit and requires no inferences to establish the proposition or conclusion being asserted." *Holiday Wholesale Grocery Co. v. Philip Morris Inc.*, 231 F. Supp. 2d 1253, 1273 (N.D. Ga. 2002) *aff'd sub nom. Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) (internal citation omitted). Plaintiffs do not plead facts demonstrating the existence of an agreement to conspire, that GEICO knew of the purported conspiracy's general scope or purpose or that GEICO ever discussed, entered or acted

in furtherance of the purported conspiracy.  *See*, *e.g.*, FAC ¶¶ 184, 328, 373, 403, 408-10, 418-21, 428 (generally alleging Defendants engaged in the putative conspiracy, but *not* alleging facts demonstrating the existence of a conspiracy or how or when GEICO entered into it).

### B.    Plaintiffs Do Not Allege Facts Demonstrating Parallel Conduct

In the absence of direct evidence of an illegal antitrust conspiracy, Plaintiffs purport to rely on circumstantial evidence to show an illegal antitrust conspiracy premised on alleged parallel conduct.  *See* FAC ¶¶ 408, 417-18 (conceding the conspiracy allegations rest on alleged "parallel actions, and/or explicit agreement").  These "allegations" of an illegal conspiracy fail. While Plaintiffs generally allege Defendants exhibited parallel conduct, this allegation is contradicted over and over again by specific allegations Plaintiffs make demonstrating non-parallel conduct by Defendants.  This Court "need not accept factual claims that are internally inconsistent," *Campos v. I.N.S.*, 32 F. Supp. 2d 1337, 1343 (S.D. Fla. 1998), and "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556-57.

For instance, Plaintiffs allege Defendants use different repair-estimating databases, FAC ¶¶ 192-96, and have different practices with respect to the use of aftermarket or salvaged parts. FAC ¶¶ 73, 77, 233, 235, 238-245.  Certain Defendants allegedly refuse to pay for feather, prime and block, others pay for it.  FAC ¶¶ 201-11.  Some, but not all, Defendants allegedly refuse to pay for denib and finesse.  FAC ¶ 215-16.  Some Defendants allegedly require photographs before approving work.   FAC ¶¶ 87-91.   Defendants have different policies regarding administrative costs.  FAC ¶ 93.   Rates paid by Defendants allegedly vary.  *See*, *e.g.*, FAC ¶¶ 163-76 (alleging certain (not all) Defendants paid the same rate as State Farm in 2013).  Some, but not all, Defendants allegedly have DRP agreements.  FAC ¶¶ 95, 304.[2]  Since Plaintiffs allege different Defendants operate differently, there is no allegation of parallel conduct.

---

[2] GEICO does not have DRPs as alleged and defined in the FAC, but the FAC's DRP allegations are accepted as true for purposes of this Motion only.

### C.    Bare Assertions Of Conspiracy Will Not Suffice

Even if Plaintiffs properly alleged parallel conduct (they did not), "[i]t is well settled in this circuit that evidence of conscious parallelism alone does not permit an inference of conspiracy unless the plaintiff either establishes that . . . each defendant engaging in the parallel action acted contrary to its economic self-interest, or offers other 'plus factors' tending to establish that the defendants were not engaging merely in oligopolistic price maintenance or price leadership but rather in a collusive agreement to fix prices or otherwise restrain trade." *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 570-71 (11th Cir. 1998) (internal citations, brackets and quotations omitted).  Thus, to support their antitrust claims, Plaintiffs' allegations of conscious parallelism "must be placed in a context that raises a suggestion of a preceding agreement . . . ." *Twombly*, 550 U.S. at 556-57 ("an allegation of parallel conduct and a bare assertion of conspiracy will not suffice"); *A&E Auto Body,* 2015 WL 304048, at *10.

"Plus factors" refer to "the additional facts or factors required to be proved as a prerequisite to finding that parallel action amounts to a conspiracy."  *See* 6 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1433(e) (3d ed. 2010) ("Areeda"); *Williamson Oil Co.*, 346 F.3d at 1301 (plus factors "remove [ ] evidence from the realm of equipoise and render that evidence more probative of conspiracy than of conscious parallelism").  To be a "plus factor," a fact must "tend to exclude the possibility" of independent action.  *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 n.30 (11th Cir. 1991).   "Even the fact that competitors have knowingly charged identical prices is a neutral fact in the absence of evidence which would lead one to expect that the prices would have been different if truly independent decisions had been made."  *City of Tuscaloosa*, 158 F.3d at 570-71 (citations omitted) (contrasting collusion with legal price maintenance and leadership, noting "unilateral or procompetitive conduct is not [to be] punished or deterred").

This Court has already determined that the Defendants, under substantively similar allegations, were acting in a manner perfectly ***consistent with independent, procompetitive behavior, meaning these factors are not plus factors***.  *A&E Auto Body,* 2015 WL 304048, at

*10 ("It is not illegal for a party to decide it is unwilling to pay a higher hourly rate than its competitors have to pay. . . ."); *id.* at n.11 ("The fact that State Farm and unnamed members of the 'insurance industry' meet regularly does not suggest that any Defendant insurance company entered into a price-fixing agreement.").

         i.     *Changing Pricing Strategies at Similar Times Is Consistent with Independent, Procompetitive Behavior*

According to Plaintiffs, on *some* occasions, *some* Defendants alter their prices to meet the price changes of other Defendants, *see* FAC ¶¶ 140, 164, 175-76, 178, 411-12, 418, or, simply pay the same prices as other Defendants, *see* FAC ¶ 158-60, 161-63, 167-172 (alleging that, at times, some Defendants were willing to pay the same prices to some Plaintiffs, but not alleging any uniform change in pricing strategy). Notably, GEICO allegedly followed a State Farm price change in March/April 2011, but did not follow one in April/May 2013. FAC ¶¶ 175-76.

Even if Plaintiffs had alleged GEICO, or even all Defendants, paid the same labor rates as State Farm, this Court has already held such an allegation is not a meaningful plus factor because it would absolutely occur without an illegal conspiracy. *A&E Auto Body,* 2015 WL 304048, at *10 ("The Defendants' statements about paying no more than State Farm pays for labor do nothing to demonstrate that the Plaintiffs are entitled to relief. It is not illegal for a party to decide it is unwilling to pay a higher hourly rate than its competitors have to pay. . . ."); *see also In re Graphics Processing Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) ("[C]ompetitive market forces will tend to drive the prices of like goods to the same level, so like prices on like products are not, standing alone, sufficient to implicate price-fixing."); *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1205 (7th Cir. 1981) ("[T]he practice of the insurance companies to calculate the reimbursement for its insured based upon the lowest prevailing price in the market place . . . is the very essence of competition.") (internal quotation marks omitted); *In re Florida Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1309-10 (S.D. Fla. 2010) ("Many courts have found in concentrated industries . . . conscious parallelism and follow-the-leader pricing typically result from firms' rational recognition that the

market structure [] in which they operate will most easily yield profits by means other than price competition . . . . A firm in a concentrated industry typically has reason to decide (individually) to copy an industry leader . . . . One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry.") (internal quotations omitted).

GEICO has every reason to pay the lowest price the market will bear and to match a competitor when that competitor pays a lower price. *See Williamson Oil*, 346 F.3d at 1311 (rejecting as a plus factor competitors following price increases, as it was in the economic interest of the competitors to do so); *Todorov*, 921 F.2d at 1456 n.30 (meaningful plus factors threshold not met where alleged violators ***acted in independent economic interests)***. Moreover, body shops would surely trumpet to other insurers that the insurer they believe is the market leader (State Farm) is paying them more so other insurers will pay more too; therefore, even if State Farm did not make the information publicly available, it would become public as soon as it went into effect. *See Bolinger v. First Multiple Listing Serv., Inc.*, 838 F. Supp. 2d 1340, 1357 (N.D. Ga. 2012) ("[P]laintiff [ ] cannot state an antitrust claim by showing only that the [d]efendants made price information publicly available and thus had the opportunity to conspire.") (internal quotations omitted). That GEICO and State Farm have similar pricing is not indicative of any conspiracy, and Plaintiffs allege no facts plausibly suggesting otherwise.[3]

Plaintiffs' "new" allegation that "Defendant representatives from *other states* have specifically stated that State Farm sends out its survey results to other insurers which prompts changes in the fixed labor rates paid to body shops," FAC ¶ 418, does not "nudge[ ] their claims across the line from conceivable to plausible. . . ." *Twombly*, 550 U.S. at 570. First, it is a "bare assertion of conspiracy" that does not meet the *Twombly* pleading requirements. *See id.* at 556-57. The alleged statements say nothing about GEICO as either a speaker of these statements or a recipient of the allegedly shared survey results. Second, the alleged conduct occurred outside Louisiana and is irrelevant here. Third, sharing information is not, by itself, indicative of an

---

[3] Likewise, Plaintiffs' allegation that GEICO tells body shops not to raise their rates is also perfectly consistent with GEICO's independent economic interests. *See* FAC ¶¶ 181-83; *Todorov*, 921 F.2d at 1456 n30.

agreement to conspire.  *See, e.g.*, Areeda, ¶ 2113f ("where one firm, acting entirely unilaterally, gives pricing information to a rival . . . there has been no Sherman Act agreement between the sender and the receiver of the [information]."); *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 223-24 (3d Cir. 2011) ("[T]he exchange of price information still requires showing that the defendants had an agreement.").

> ii.     *Attending Some of the Same Conferences Is Consistent with Independent, Procompetitive Behavior*

GEICO's alleged participation in trade associations also does not constitute "an overt act more consistent with some pre-arrangement for common action than with independently arrived-at decisions."  Areeda, ¶ 1416 at 103; *see also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009) ("[A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior."); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 349 (3d Cir. 2010) (affirming dismissal where "neither defendants' membership in the CIAB, nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy"); *A&E Auto Body,* 2015 WL 304048, at *10 n.11 ("The fact that State Farm and unnamed members of the 'insurance industry' meet regularly does not suggest that any Defendant insurance company entered into a price-fixing agreement.").

> iii.    *Plaintiffs Fail to Allege Defendants Adhere to Parallel Estimating Practices for Labor*

Plaintiffs' allegations in the FAC actually demonstrate that Defendants' estimating practices are not parallel at all; let alone, a "plus factor" permitting an inference of illegal conspiracy.  For instance, Plaintiffs allege Defendants do not all use the same repair-estimating databases, FAC ¶¶ 192-96, and that Defendants' have widely varied estimating processes.  *See, e.g.*, *id.* ¶ 210-14 (alleging certain, but not all, Defendants have refused to pay for feather, prime and block); ¶ 215-16 (alleging certain, not all, Defendants refuse to pay for denib and finesse). Far from demonstrating parallel behavior, Plaintiffs' allegations demonstrate that Defendants have unique processes for estimating repairs.

>     iv.    *Plaintiffs Fail to Allege Defendants Adhere to Parallel Estimating*
>            *Practices for Replacement Parts*

Plaintiffs' FAC also demonstrates Defendants do not uniformly specify the use of aftermarket or salvaged parts or parts procurement programs.  *See* FAC ¶¶ 73-74 (stating that only some insurers, like State Farm, require use of parts procurement program); ¶ 77 ("[i]n many instances, a Defendant insurer will order the parts independently and ship them to the body shop or directly specify a part and vendor from which a purchase must be made"); ¶ 233 (State Farm writes estimates for salvaged bumper components, lighting components and radiator supports); ¶ 241 (Progressive writes estimates based on the use of crash parts supplied by sources other than the manufacturer); ¶ 235 (GEICO uses aftermarket bumper parts such as brackets and supports); ¶ 243 (Allstate guarantees the fit and corrosion resistance of any aftermarket outer body crash part).  As alleged, Defendants make unique decisions about the utility of when and how to specify the use of salvaged or aftermarket parts.

Despite alleging that different Defendants have different practices with respect to parts, Plaintiffs contradictorily assert that because "every named Defendant in this case writes repair estimates specifying the purchase of [aftermarket and salvaged] repair parts from LKQ and/or Keystone" and because "Defendants who invest with or through BlackRock [including GEICO] profit through increased sales of the products sold by . . . LKQ and . . . Keystone," FAC ¶¶ 366, 371, Defendants have a motive to conspire to require Plaintiffs to use LKQ and Keystone parts. Plaintiffs implausibly assert that "in the absence of a group agreement, the profit motive would not be worth the effort."  *Id.* ¶ 373.  But Plaintiffs admit that GEICO and the other Defendants have independent economic interests in specifying the use of non-OEM parts.  *See* FAC ¶ 368-69 (using non-OEM parts saves Defendants money otherwise paid out for OEM-parts, Defendants save more money by refusing to pay for alterations to the non-OEM parts).  Further, if GEICO is alleged to be independently profiting from its investments in Blackrock coupled with its recommending the use of non-OEM parts, it has no motivation to conspire.  *See* FAC ¶¶ 368-69. GEICO has an independent economic interest in increasing the return on its investments, no matter how small, and this allegation only demonstrates that GEICO is a rational actor, and that

the alleged conduct is not a meaningful plus factor.  *See Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 138 (2d Cir. 2013) ("abandoning bad investments was not just *a* rational business decision, but the *only* rational business decision") (emphasis in original).  Put another way, because Plaintiffs' own allegations demonstrate GEICO is acting rationally, Plaintiffs have failed to allege an appropriate plus factor related to replacement parts.

Moreover, Plaintiffs' allegation that Defendants further the alleged conspiracy through alleged "investments in or through" BlackRock is conclusory and meritless.  *See* FAC ¶¶ 348-74. The FAC does not allege Defendants control BlackRock or the companies BlackRock invests in, as they cannot in good faith, but just that certain Defendants invest in one of the largest asset management firms in the world.  *See* FAC ¶¶ 348-51, 355, 357, 363, 365, 371.  Nothing suggests that the investments flowed from a preceding agreement rather than each Defendants' own business priorities, and thus the alleged investment in BlackRock cannot be a meaningful plus factor.  *Citigroup*, 709 F.3d at 138-39 (dismissing antitrust claim premised on parallel conduct regarding investments where defendants acted rationally and in their self-interest); *see also Vedder Software Gp. Ltd. v. Ins. Services Office, Inc.*, 545 Fed. App'x 30, 32-33 (2d Cir. 2013) (allegations that insurance companies invested in the same publicly traded company and therefore controlled the company were conclusory, not accepted as true, and failed to establish a plausible conspiracy).

>    v.    *Rather than Allege Plausible Facts Suggesting an Agreement to Refuse to Deal with Plaintiffs, They Allege GEICO does Deal with Plaintiffs*

Despite this Court's holding in this case that alleging a "concerted refusal to deal" is a condition precedent to a valid Sherman Act boycotting claim, Plaintiffs still do not allege facts tending to show that GEICO engaged in a concerted refusal to deal with them.  *See Brewer* R&R at 13-14 (adopting reasoning of *A&E Auto Body,* 2015 WL 304048 re plaintiffs' antitrust claims); *Brewer* Order at 3 (adopting the *Brewer* R&R); *A&E Auto Body,* 2015 WL 304048, at *12 (finding that "the Amended Complaint does not set forth a 'concerted refusal to deal,'" and that "[t]he Plaintiffs offer even less 'evidence' of an agreement to boycott than they did of an

agreement to fix prices").  GEICO is still allegedly reimbursing its insureds and claimants for repairs performed by Plaintiffs' shops.  *See*, *e.g.*, FAC ¶ 254 (alleging "consumer must visit a preferred shop for an estimate *before proceeding to the shop of choice for repairs*") (emphasis added).  Still, "there is no [plausible] allegation that [GEICO] refused to allow any of its insureds to obtain a repair from such a shop or refused to pay for repairs performed at such a shop."[4] *A&E Auto Body,* 2015 WL 304048, at *12.  Moreover, Plaintiffs' allegation that at least seventy-five percent, and up to ninety-five percent of a given Plaintiffs' annual business comes from insurance-paying customers directly contradicts any alleged agreement by insurers to boycott Plaintiffs.   FAC ¶ 296; *see also* FAC ¶¶ 303-04 (alleging that after certain Plaintiffs disassociated with certain DRPs their revenue from repairs paid for by some Defendants, but not GEICO, decreased).   Plaintiffs offer nothing more than what was alleged in the original Complaint and *A&E*, which this Court already rejected.

### D.     Plaintiffs Have Not Alleged GEICO Joined The Putative Conspiracy

In addition to failing to allege either a conspiracy to fix prices or a concerted refusal to deal, Plaintiffs also fail to allege that GEICO joined any putative conspiracy.  To properly plead an alleged conspiracy, Plaintiffs must allege facts showing that:

1.   GEICO knew about the alleged conspiracy *and* its unlawful objective;

2.   GEICO intended to join the alleged illegal conspiracy; and

3.   GEICO acted in a manner that was interdependent with – not independent of – the other Defendants in that GEICO's conspiratorial benefits depended on the success of the overall conspiracy.

*See Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Communications, Inc.,* 376 F.3d 1065, 1078 (11th Cir. 2004) (stating elements of conspiracy); *U.S. Anchor Mfg.*, 7 F.3d at 1001; *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C. Cir. 1988); *In re Vitamins*, 320 F. Supp. 2d 1, 15-17 (D.D.C. 2004); *A&E* January 2015 Order at 17-20; *see also Marucci Sports v. Nat'l*

---

[4] Plaintiffs allege a GEICO adjuster tells consumers who identified Plaintiff Brewer as a repair shop they may be financially responsible for the costs GEICO chooses not to pay.  FAC ¶¶ 272.  Even if true, this allegation neither demonstrates a refusal to deal with Plaintiff Brewer, as the consumers were not alleged to have been prohibited from choosing Plaintiff Brewer and is not indicative of any group boycott or concerted refusal to deal as this allegation says nothing about a conspiracy or whether GEICO joined a conspiracy.

*Collegiate Athletic Ass'n*, 751 F.3d 368, 375 (5th Cir. 2014) (dismissing complaint for failure to allege specific facts demonstrating an intent to join a conspiracy); *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1575 (11th Cir. 1991) (requiring facts showing defendants knew of a conspiracy, the object of which utilized unlawful means and that defendants joined the conspiracy); *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp. 2d 249, 273 (D.N.J. 2003) (requiring facts showing defendants' knowing participation in a conspiracy); *Tucci v. Smoothie King Franchises, Inc.*, 215 F. Supp. 2d 1295, 1300 (M.D. Fla. 2002) (setting forth pleading requirements for an antitrust conspiracy).   There are no non-conclusory allegations that GEICO (a) knew about any conspiracy *and* its unlawful objective or (b) intended to join the alleged illegal conspiracy.   While there are many allegations about GEICO's conduct in the marketplace, the same allegations do not tend to prove that GEICO:  (a) acted in a manner that was interdependent with – rather than independent of – the other Defendants; or, (b) that GEICO's "conspiratorial" actions depended on the success of the overall illegal conspiracy – rather than the operation of the free market.

## IV.   PLAINTIFFS FAIL TO ALLEGE THE REQUIRED SUBSTANTIVE ELEMENTS OF THEIR ANTITRUST CLAIMS

The FAC makes *zero* effort to cure the Complaint's pleading deficiencies regarding the elements of an alleged antitrust violation, thus the two antitrust claims should be dismissed with prejudice.  As alleged, the rule of reason applies to both antitrust counts of the FAC as it did with respect to the Complaint.  Count One is subject to the rule of reason because Plaintiffs do not allege facts tending to prove the alleged conduct is the type of hard core cartel-like price fixing conduct subject to the *per se* illegal test.  *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (explaining the rule of reason is the presumptive standard); *Cha-Car, Inc. v. Calder Race Course, Inc.*, 752 F.2d 609, 613 (11th Cir. 1985) ("The *per se* doctrine should not be extended to restraints of trade that are of ambiguous effect; any departure from the rule of reason standard must be based upon demonstrable anticompetitive economic effect, rather than formalistic line drawing."); *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011 (7th Cir. 2012) ("even price

13

fixing by agreement between competitors . . . are governed by the rule of reason, rather than being per se illegal, if the challenged practice when adopted could reasonably have been believed to promote 'enterprise and productivity.'") (citing *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 24 (1979) and *Polk Bros., Inc. v. Forest City Enterprises, Inc.,* 776 F.2d 185, 189 (7th Cir. 1985)).  Boycott claims are also subject to the rule of reason when plausible justifications exist, as they do regarding Plaintiffs' Count Two.  *Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.,* 472 U.S. 284, 295-97 (1985);[5] *Leegin Creative Leather Prods., v. PSKS, Inc.,* 551 U.S. 877, 881-82 (2007); *Am. Needle v. Nat'l Football League,* 560 U.S. 183, 202-04 (2010).[6]  The Supreme Court has also held that rule of reason, as opposed to *per se,* analysis applies to agreements by buyers "to purchase goods and services from one supplier rather than another," even when there is "no legitimate business reason for that purchasing decision."  *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 135 (1998).  Plaintiffs allege no facts justifying a departure from the rule of reason.[7]

In addition to failing to properly allege conspiracy or that GEICO joined the conspiracy, Plaintiffs also fail to allege the substantive elements of the rule of reason, including:

1.   A product or service market relevant for antitrust purposes;

2.   A geographic market relevant for antitrust purposes;

3.   Market power in the relevant product/service and geographic markets;

4.   Barriers to entry;[8]

5.   Wrongful conduct resulting in anticompetitive effect (*i.e.,* conduct that raises prices above competitive levels, suppresses payments below competitive levels, or suppresses output below competitive levels);

---

[5] The Supreme Court applied the rule of reason to a group boycott because it "would seem to be designed to increase economic efficiency and render markets more, rather than less, competitive" by reducing costs.  472 U.S. at 295 (internal quotation marks omitted).  The same is true here.  Plaintiffs allege that the purpose of the alleged group boycott is to reduce costs by capping the maximum prices paid.  FAC ¶¶ 277-78.

[6] *See also United States v. Am. Exp. Co.,* 21 F. Supp. 3d 187, 194 (E.D.N.Y. 2014) (acknowledging that a boycott in the form of steering can have a procompetitive effect in certain circumstances).

[7] In addition to not meeting their burden to allege plausible facts establishing that the *per se* illegal test applies, Plaintiffs allege a purported illegal vertical conspiracy.  *See* FAC ¶¶ 348-54.  Purported vertical restraints are always subject to the rule of reason under federal antitrust law.  *See, e.g., Leegin Creative Leather Products,* 551 U.S. at 877; *Cont'l T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 59 (1978).

[8] *See Nat'l Bancard Corp. v. VISA U.S.A. Inc.,* 596 F. Supp. 1231, 1259 (S.D. Fla. 1984) (discussing market power/barriers to entry re: Section 1 conspiracy claim); *Reazin v. Blue Cross and Blue Shield of Kan., Inc.,* 899 F.2d 951, 968 (10th Cir. 1990) (barriers to entry relevant to Section 1 conspiracy claim market power analysis).

6.      The anticompetitive effects outweigh the pro-competitive benefits;

7.      Antitrust injury or standing (*i.e.*, plaintiff has suffered injury caused by the anticompetitive conduct); and

8.      Damages.

*See*, *e.g.*, *Image Technical Servs., Inc. v. Eastman Kodak, Inc.*, 125 F.3d 1195, 1202 (9th Cir. 1997) ("*Kodak*"); *Levine v. Cent. Florida Med. Affiliates, Inc.*, 72 F.3d 1538, 1552-55 (11th Cir. 1996) (stating the rule of reason test more generally); *Lakeland Reg'l Med. Ctr., Inc. v. Astellas US LLC,* No. 8:10-CV-2008-T-33TGW, 2011 WL 3035226, at *9-10 (M.D. Fla. July 25, 2011) (same); *Spanish Broad. Sys. of Fla.,* 376 F.3d at 1071-72 (same).[9]

## A.      No Plausible Facts Supporting A Product/Service Relevant Market

Plaintiffs must allege plausible facts that tend to prove a relevant product or service market amounting to the "commodities reasonably interchangeable by consumers for the same purpose." *See*, *e.g.*, *Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291, 1302-03 (M.D. Fla. 2001) (quoting *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)); *Levine*, 72 F.3d at 1552.  A relevant market includes all existing firms that would compete in the event of a small but significant, non-transitory price increase.  *U.S. Anchor*, 7 F.3d at 995.   Whether Plaintiffs intend the alleged product market to be auto collision repair or auto insurance is unclear.  *See* FAC ¶¶ 47, 381 (alleging Defendants hold over eighty-three percent of the auto insurance market and that auto collision repair is an identifiable market).  Plaintiffs plead no facts to support that either of their alleged "markets" are a product or service market relevant for antitrust purposes.

## B.      No Plausible Facts Supporting A Relevant Geographic Market

Plaintiffs must allege plausible facts tending to prove a relevant geographic market. *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010).  A relevant geographic market is the geographic area of effective competition, including firms that would enter in the event of a price increase.  *See*, *e.g.*, *Standard Oil Co. v. United States*, 337 U.S. 293, 299 n.5

---

[9] The same rule of reason applies equally to conspiracy claims as it does to monopoly claims.  7 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 1512 (3d ed. 2010) ("[T]he series of steps articulated for a §2 [monopoly] rule of reason case closely resembles that for the §1 [illegal conspiracy] inquiry.").

(1949); *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1573 (11th Cir. 1991) (explaining geographic market as an economic concept wherein courts examine supplier-customer relations to determine "how economic actors function in terms of where buyers seek supplies and sellers seek purchasers").

The FAC refers to the entire State of Tennessee, metropolitan areas and vast geographic areas of Tennessee, but fails to explain why any of these areas might be a relevant geographic market. *See, e.g.,* FAC ¶¶ 39, 158, 166, 173. Establishing a relevant geographic market is entirely Plaintiffs' burden – a burden they do not meet. *See, e.g.*, *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626-27 (5th Cir. 2002) (affirming dismissal for failure to plead plausible relevant geographic market, finding "the economic significance of a geographic area does not depend upon singular elements such as population, income, **political boundaries**, or geographic extent, but rather upon the relationship between these elements and the characteristics of competition in the relevant product market within a particular area") (emphasis added) (internal quotation marks omitted). There are simply no allegations tending to prove any relevant geographic area for antitrust purposes.

### C.  Plaintiffs' Market Share Allegations Are Immaterial Under *Twombly/Iqbal*

Under the rule of reason, Plaintiffs must allege that the putatively conspiring Defendants have market power in a properly-alleged relevant market. *See, e.g.*, *Levine*, 72 F.3d at 1538, 1551; *Spanish Broad. Sys. of Fla.*, 376 F.3d at 1073. High market share – absent proper market definition – does not tend to prove market power and is inconsequential. Fed. R. Evid. 104(b), 401; *see Cont'l Airlines v. United Airlines*, 277 F.3d 499, 509 (4th Cir. 2002) (absent market power in a relevant market, any purported restraint of trade does not implicate §1 of the Sherman Act). Plaintiffs allege no facts tending to prove market power. Plaintiffs' "market share" allegations relate to the "private passenger auto liability market," and provide no insight into

Defendants' alleged market power in the alleged "auto collision repair" market, if that even is an alleged product market.[10]  *See* FAC ¶¶ 47-49.

### D.       No Allegations Of Barriers To Entry

Counts One and Two also fail because Plaintiffs fail to allege barriers to entry in a relevant market.  *See, e.g.*, *Levine*, 72 F.3d at 1551, 1555; *Moecker*, 144 F. Supp. 2d at 1308.  A barrier to entry is any market feature capable of constraining normal operation of a relevant market to the extent the relevant market is unlikely to be self-correcting over time.  *Kodak*, 125 F.3d at 1208.  But, if the purported barrier to entry does not prevent self-correction over time, then the antitrust claim fails.  *Id.*  Plaintiffs must also allege facts tending to prove that new competitors (or existing competitors with excess capacity) seeking to enter the relevant market face high market barriers to entry.  *Id.* at 1207-08; *Lockheed Martin Corp. v. Boeing Co.*, 390 F. Supp. 2d 1073, 1078, 1079, n.6 (M.D. Fla. 2005).

Plaintiffs' failure to allege barriers to entry is incurable.  If the market is the automobile insurance market, Plaintiffs fail to plead barriers to entry because they concede 60 companies already provide automobile insurance in Tennessee.  FAC ¶ 47, Ex. 1.  If barriers to entry were high, so many companies could not be providing auto insurance and repair services in Tennessee.

### E.       No Allegation That The Purported Restraints, Even If True, Result In Anticompetitive Effects And That The Anticompetitive Effects Outweigh The Procompetitive Benefits

In Count One, Plaintiffs fail to plausibly allege how the particular pricing conduct (*i.e.*, ensuring lower prices) might be anticompetitive.  *See, e.g.*, *Aspen Skiing v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985); *Levine*, 72 F.3d at 1551 ("Rule of reason analysis requires the plaintiff to prove [ ] an anticompetitive effect of the defendant's conduct on the relevant market . . .").  The anticompetitive effects element cannot be met by simply alleging a restraint – particularly when that restraint is merely lower prices.  *See Appleton v. Intergraph Corp.*, 627 F. Supp. 2d 1342, 1354 (M.D. Ga. 2008) (holding on a 12(b)(6) motion to dismiss

---

[10] Plaintiffs' statement that "[i]nsurance –paying customers constitute between seventy-five and ninety-five percent of a given Plaintiffs' annual business," FAC ¶ 296, is not informative of Defendants' alleged market share in the auto collision market.

that "[a] plaintiff asserting a § 1 violation analyzed under the rule of reason must allege: '(1) the anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the defendant's conduct has no pro-competitive benefit or justification.'") (quoting *Levine*, 72 F.3d at 1551). Low prices rarely raise antitrust concerns but, instead, are precisely the effects the antitrust laws are designed to promote. *Matsushita Electric*, 475 U.S. at 594. Low prices typically indicate competition, not the lack of it. *Id.* Yet here, as alleged, the purported pricing conduct is efficiency-enhancing and lowers costs used to set premiums charged to consumers. FAC ¶¶ 157, 160, 166, 176, 408.

In Count Two, Plaintiffs allege a boycott of them – as suppliers, not competitors, of the Defendants. In addition to not alleging that the purported boycott caused cognizable anticompetitive effects except in the most conclusory fashion, the FAC repeatedly alleges a strong ***procompetitive*** benefit – lower prices – and that the purpose of the alleged boycott was to ensure these lower prices. FAC ¶¶ 277-78. Plaintiffs do not allege cognizable anticompetitive effects of a boycott, and do not plausibly allege procompetitive benefits outweighed by anticompetitive effects. *Nw. Wholesale Stationers*, 472 U.S. at 295-96.

### F. Plaintiffs Have Not Adequately Alleged Antitrust Injury

Plaintiffs must show an antitrust injury to have standing to bring a Sherman Act claim. *See*, *e.g.*, *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540-43 (1983). Because the antitrust laws protect competition and not competitors, many injuries – including direct injuries – allegedly suffered by plaintiffs are not cognizable under the antitrust laws. *See*, *e.g.*, *id.; Tucci v. Smoothie King Franchises, Inc.*, 215 F. Supp. 2d 1295, 1299-300 (M.D. Fla. 2002) ("The purpose of the Sherman Antitrust Act is to protect competition, not individual competitors."); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir. 1989) ("The Sherman Act protects competition, not competitors, and does not reach conduct that is only unfair, impolite, or unethical."). Plaintiffs must allege more than conclusory statements of injuries allegedly suffered from anticompetitive effects of purported

restraints, not injuries from Defendants' alleged goal of paying lower prices.  Plaintiffs fail to do so.  *See* FAC ¶¶ 421, 436.

## V.      PLAINTIFFS' TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS CLAIM (COUNT THREE) FAILS

### A.      Plaintiffs' Claims Are Implausible

As a threshold matter, Plaintiffs' tortious interference claim must be dismissed under Federal Rule of Civil Procedure 8(a)(2), *Twombly* and *Iqbal* because Plaintiffs do not indicate which of the FAC's 460 paragraphs allegedly support this claim and continue to rely on group pleading after this Court expressly instructed "Plaintiffs [to] identify specifically which Defendants interfered with which Plaintiffs."  *See Brewer* R&R at 12.  In dismissing Plaintiffs' tortious interference claim the first time, this Court held that "[a] general allegation that some unidentified Defendants – or all Defendants – interfered with some unidentified customers of some unnamed Plaintiff does not satisfy the requirements of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)."  *Brewer* Order at 2.  "Surely the Plaintiffs must have some basis to believe that certain Defendants interfered with certain of the Plaintiffs' customers."  *Id.*  Plaintiffs once again generally allege that Defendants, presumably including GEICO, interfered with unidentified customers of some unnamed Plaintiff.  *See* FAC ¶¶ 251-314 (alleging steering in general); ¶¶ 437-48 (alleging intentional interference in general).  Plaintiffs only discussion of GEICO in their allegations of steering and intentional interference include a general allegation that GEICO tells consumers they are required to have an estimate prepared at a preferred shop before the consumer can take their vehicle to a shop of the consumers' choice, FAC ¶ 254, one allegation related to a C. Dickerson by ICON, FAC ¶ 264, and one general allegation about comments allegedly made by a GEICO adjuster, FAC ¶ 272.  None of Plaintiffs' allegations provide a basis for a tortious interference claim against GEICO, but as to those Plaintiffs that do not allege anything as to GEICO (*i.e.*, all Plaintiffs except ICON), their claims must be dismissed for the same reasons this Court dismissed their claims in the Complaint.  *Brewer* Order at 2; *see also Overnite Transp. Co. v. Teamsters Local Union No. 480*, No. M2002-02116-COA-R3CV, 2004

WL 383313, at *13 (Tenn. Ct. App. Feb. 27, 2004) *aff'd*, 172 S.W.3d 507 (Tenn. 2005) (Dismissing tortious interference claim where "[t]here are no specific third parties named in the complaint, only general categories of persons, such as 'employees.'").[11]

## B.   Plaintiffs Do Not Plead The Requisite Elements

The elements of a tortious interference with business relationships are: "(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and . . . (5) damages resulting from the tortious interference." *Trau-Med of America, Inc. v. Allstate Ins. Co*, 71 S.W.3d 691, 701 (Tenn. 2002); *see also United Pet Supply, Inc. v. City of Chattanooga*, 921 F. Supp. 2d 835, 863 (E.D. Tenn. 2013).   Where GEICO is specifically identified in the FAC, Plaintiffs fail to allege the requisite elements of a tortious interference claim.

Plaintiffs fail to identify facts to establish that GEICO (or any Defendant) acted improperly or possessed an improper motive.   Improper motive "require[s] that the plaintiff demonstrate that the defendant's predominant purpose was to injure the plaintiff." *Trau-Med of America, Inc.*, 71 S.W.3d at 701 n.5 (citing *Leigh Furniture & Carpet Co.*, 657 P.2d 293, 307-08 (Utah 1982)).   If the conduct at issue is motivated by a "long-range purpose of achieving some personal economic gain," it cannot constitute an improper purpose as a matter of law. *Leigh Furniture*, 657 P.2d at 311; *see also Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 183 (Tenn. Ct. App. 2007) ("Clearly, it is not improper for a business to act with the intent of securing business for itself, even though the result is the loss of that business

---

[11] Further, to the extent Plaintiffs' tortious interference claim is based on any alleged misrepresentations made by GEICO, Plaintiffs must plead this claim with particularity pursuant to Federal Rules of Civil Procedure 9(b). Even though tortious interference is not labeled "fraud," if it rested on alleged misrepresentations, it would "sound in fraud" bringing it within the requirements of Rule 9(b). *See Cordell Consultant, Inc. Money Purchase Plan & Trust v. Abbott*, 561 Fed. App'x. 882, 884 (11th Cir. 2014) (citing *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1064–65 (11th Cir. 2007) (holding Rule 9(b) applies to claims that "sound in fraud"); *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502 (7th Cir. 2007) (holding that Rule 9(b) applies to a tortious interference claim based on alleged fraudulent conduct).

by a competitor. Whether the competitive motive is cast in terms of self-interest or in terms of lessening the competition's success is, arguably, purely semantics."); *Mosley v. GEICO Ins. Co.*, Cause No. 3:13CV161-LG-JCG, 2014 WL 7882149, at *13 (S.D. Miss. Dec. 16, 2014) (recommending network shops to insureds does not constitute intent to harm for tortious interference claim) (citing *Christmon v. Allstate Ins. Co.*, 82 F. Supp. 2d 612, 615-16 (S.D. Miss. 2000) (insurer's preapproving repair shops, guaranteeing their work, and obtaining discounts for insureds was not tortious interference with business relations of another shop when program not calculated to cause damage to owner's business). The desire to obtain lower prices from auto shops, as is alleged here, demonstrates an intention to advance Defendants' own economic interests and cannot be an improper motive as a matter of law.[12]

Magistrate Judge Smith has previously stated that "a defendant's motive is irrelevant if the means used are improper." *Brewer* R&R at 11. The only time GEICO is specifically identified as allegedly interfering with an identified alleged customer, Plaintiffs do not identify any improper means employed by GEICO. Regarding C. Dickerson, Plaintiff ICON merely alleges it "initiated a repair" and "GEICO sent Dickerson to its DRP preferred shop, Service King. The transaction with ICON was never completed." FAC ¶ 264. Plaintiff does not identify anything improper by GEICO, or that GEICO had any knowledge Dickerson had communicated with ICON previously. *Polk & Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 538, 543 (Tenn. 1989) ("Where the contract interfered with is terminable at will the privilege of competition has been recognized. In such a case there is no contract right to have the relation continued, but only an expectancy . . . . With such an expectancy of future relations, and prospective advantage, there has been no doubt that a competitor has the privilege of interfering to acquire the business for himself."). Based on Plaintiffs' allegations, the switch in repair shops

---

[12] In fact, Plaintiffs' only allegation relating to any Defendants' intent relates to the 1963 Consent Decree. This Court expressly held in *A&E* that "none of the parties in this case were parties to the 1963 case, and the Court does not find the 1963 consent decree to have any relevance to the instant case." *A&E Auto Body,* 2015 WL 304048, at *2, n. 6; *accord Mosley*, 2014 WL 7882149, at *2, n.2 ("[P]laintiffs have not demonstrated how they would have standing to enforce the Consent Decree, or that any of the defendants were parties to that litigation or are otherwise bound by the Consent Decree. Moreover, the Consent Decree was entered by the United States District Court for the Southern District of New York, and this Court would not have jurisdiction to enforce it."). Plaintiffs fail to plead intent.

may have been a result of the customers' dissatisfaction with Plaintiff ICON, or could have happened for any of a number of other reasons.   Indeed, since the FAC alleges GEICO **guarantees** repairs made by its preferred shops; there would be nothing improper, or beyond the privilege of free-market competition, for an insurer to suggest its own insured use a repair shop where it can guarantee the repair.   *Id.* ¶ 237 (alleging GEICO guarantee does not cover aftermarket and salvaged parts – not that there is no guarantee); *see also id.* ¶ 254-55 (alleging generally that GEICO encourages insureds to use preferred shops, not that it misrepresents anything in doing so).

With respect to the allegation that a GEICO adjuster allegedly commented about one Plaintiff possibly overcharging consumers, FAC ¶ 272, in addition to failing to identify any customers with whom GEICO allegedly interfered, failing to identify improper motive or means (Plaintiffs do not allege anything is improper about this statement or that the statement is even inaccurate), Plaintiffs also fail to allege any damages because they have not identified a single customer who did not choose Plaintiff Brewer as a result of this alleged statement. *See Brewer* Order at 2 (holding that general allegations about unidentified customers does not meet the requirements of *Iqbal)*.   Plaintiffs' inability to identify a single alleged incidence of tortious interference with business relationships more than a year after the filing of their original Complaint mandates dismissal of this claim with prejudice because Plaintiffs have demonstrated that they cannot plead this claim.

## VI.   PLAINTIFFS' *QUANTUM MERUIT* CLAIM (COUNT FOUR) FAILS

"A *quantum meruit* action is an equitable substitute for a contract claim pursuant to which a party may recover the reasonable value of goods and services provided to another." *Swafford v. Harris*, 967 S.W.2d 319, 324 (Tenn. 1998).   A plaintiff must show the following elements in order to plead a successful *quantum meruit* claim: (1) "There is no existing, enforceable contract between the parties covering the same subject matter;" (2) "The party seeking recovery proves that it provided valuable goods and services;" (3) "The party to be

charged received the goods or services;" (4) "The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated;" and (5) "The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment." *Id.*

Plaintiffs' *quantum meruit* claim fails in the first instance because Plaintiffs allege the existence of contracts covering the same subject matter with their individual customers.  FAC ¶¶ 40, 131 (alleging "Plaintiffs' agreement to effect repairs is with the individual consumers"). Because express written agreements governing the very subject matter of the Plaintiffs' claims are alleged (*i.e.*, the amount of payment which Plaintiffs should receive for their services for Defendants' insureds) Plaintiffs have a remedy and there can be no claim for *quantum meruit*. *See Ridgelake Apartments v. Harpeth Valley Utilities Dist. of Davidson & Williamson Counties*, No. M2003-02485-COA-R3CV, 2005 WL 831594, at *10 (Tenn. Ct. App. Apr. 8, 2005) ("In this state, no right exists in law or equity which allows a party to abandon an express contract and seek recovery in *quantum meruit* or under an implied contract theory.") (quoting *Scandlyn v. McDill Coumbus Corp.*, 895 S.W.2d 342, 349 (Tenn. Ct. App. 1994).[13]

Plaintiffs' *quantum meruit* claim also continues to be based upon the same flawed legal theory.  Plaintiffs assert that, after performing services under a pre-agreed pricing structure, their services are now worth more than the price they originally agreed to perform the work for.  This is not how free-market economics work, and *quantum meruit* claims cannot be used to secure a better bargain than what the parties originally negotiated for.  *See Wright v. Miller*, No. 88-178-II, 1988 WL 129755, at *2 (Tenn. Ct. App. Dec. 7, 1988) (noting that "the classic qualifications of [a] quantum meruit" claim occurred when parties to a lease agreement both "expected

---

[13] Section 25 of the Restatement (Third) of Restitution and Unjust Enrichment provides that a plaintiff will have a restitution claim against a defendant who benefits from the plaintiff's uncompensated performance of an obligation to a third party only when: (a) liability in restitution will not subject the defendant to a forced exchange; (b) absent liability in restitution, the plaintiff will not be compensated for the performance and the defendant will retain the benefit of it without paying for it; and (c) restitution will not subject the defendant to an obligation from which the parties understood the defendant would be free.  Comment b to this section explains that the second requirement will not be satisfied where the plaintiff sues the defendant for restitution "instead of pursuing a viable contract claim" against the other party to the plaintiff's contract.  Plaintiffs do not allege that they cannot recover the contract price for the repairs from the insureds or claimants.

payment of rent[] although the amount had not been agreed upon," and payment was never made).  Plaintiffs do not demonstrate GEICO was reasonably notified that it was to pay more for the repairs, or that Plaintiffs had a reasonable expectation of being paid more for the repairs.

This Court already dismissed Plaintiffs' *quantum meruit* claim for the same reason. *Brewer* Order at 1-2 (adopting the reasoning in *Indiana Autobody Association, Inc., et al. v. State Farm Mutual Automobile Ins. Co., et al.,* No: 6:14-cv-6001-Orl-31 TBS (M.D. Fla. March 30, 2015) which held that "Plaintiffs could not, under any level of reasonableness, have expected to be paid more than they received.").  Here, as in *Indiana*, Plaintiffs could not have reasonably expected to be paid more for their services because Plaintiffs agreed to perform the repairs at certain prices and knew that GEICO refused to pay more.  *See* FAC ¶ 110 ("Defendant insurers compel acceptance of a fixed pricing structure"); ¶ 117 ("Defendants . . . simply refuse to pay more for parts than the cheapest a part can be purchased"); ¶ 123 ("Payment is presented to Plaintiffs on a 'take it or leave it' basis."); ¶ 136 ("All Defendants assert they will pay no more than the market rate for labor in the market area.").

Plaintiffs also continue to fail to allege facts demonstrating they provided valuable goods or services that were received by GEICO.  Plaintiffs allege they "have done business at various times over the course of years with the Defendants' policyholders and claimants by providing to these policyholders and claimants motor vehicle collision repair services."  FAC ¶ 41. According to Plaintiffs, they render services to vehicle owners, not insurers such as GEICO. Despite this, Plaintiffs continue to re-assert the same failed argument that they provided services to Defendants.  *A&E Auto Body,* 2015 WL 304048, at *5 (finding that that "repairs . . . provide[] a benefit to the owners of the vehicles . . . [and] the only effect of such repair on the insurance company is the incurring of an obligation to pay for it").  As with their Complaint, Plaintiffs still have not alleged facts to support their claim that they provided valuable goods or services to GEICO, nor can they.

24

## VII.   CONCLUSION

Because Plaintiffs have had ample time and opportunity to properly plead their claims, and substantial instruction from this Court on what Plaintiffs must do to fix their claims, and have still failed to do so, GEICO requests that Plaintiffs' FAC be dismissed with prejudice, with such further relief as this Court deems proper.

DATED this 4th day of June, 2015.

SNELL & WILMER L.L.P.

 */s/ Dan W. Goldfine*
Dan W. Goldfine (*admitted pro hac vice*)
Joshua Grabel (*admitted pro hac vice*)
Jamie L. Halavais (*admitted pro hac vice*)
Ian Fischer (*admitted pro hac vice*)
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
Telephone: 602-382-6000
Facsimile:  602-382-6070
Email:  dgoldfine@swlaw.com
        jgrabel@swlaw.com
        jhalavais@swlaw.com
        ifischer@swlaw.com

Counsel for GEICO General Insurance
Company and GEICO Indemnity Company

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of June, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record that are registered with the Court's CM/ECF system.

 */s/ Dan W. Goldfine*

25