**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**BREWER BODY SHOP, LLC, et al**                              **PLAINTIFFS**

**VS.**                                                      **CASE NO. 6:14-CV-6002
                                                             MDL NO: 6:14-MD-2557**

**STATE FARM MUTUAL AUTOMOBILE
     INSURANCE CO., et al**                                  **DEFENDANTS**

---

**OMNIBUS RESPONSE TO CERTAIN DEFENDANTS' MOTIONS TO DISMISS**

---

Come now, Plaintiffs in the above-captioned cause of action and file this, their Omnibus Response to Certain Defendants' Motions to Dismiss Plaintiffs' First Amended Complaint ("FAC") [Doc. Nos. 86, 87 and 88] and states to the Court the following:

Two of the three motions addressed in this response were submitted by multiple defendants. For ease of reference, Plaintiffs refer to Document Number 86 as "the Hartford motion" or "Hartford" and Document No. 87 as "the Allstate motion" or "Allstate." Document No. 88 was filed by GEICO alone and will, of course, be referred to as "the GEICO motion" or "GEICO." Where all three motions make the same arguments, no identifier is added.

## INTRODUCTION

The Motions to Dismiss the Tennessee Amended Complaint may be summarized in three sentences: (1) the Court should ignore all applicable authority relevant to the stated causes of action and Federal Rules of Civil Procedure; (2) The Court should ignore all facts asserted in the Amended Complaint but if the Court doesn't ignore them, the Court should weigh them in favor of the Defendants; and (3) The Court should require the Plaintiffs to set out the specifics of each and every

fact for each and every claim for each and every Defendant to unequivocally prove all elements of all causes of action in their complaint

With a few exceptions discussed separately, the motions to dismiss filed by Defendants are, in essence, identical to all motions previously filed in this and companion cases.  The arguments pressed are the same as those previously pressed, including misrepresenting applicable authority, and make no substantive reference to the Order which set out the requirements the  Amended Complaint was to meet.

The Motions do not adequately or legitimately in any way argue or identify any failure of the Plaintiffs to meet the requirements set out in that order, merely continue to argue the very same things the Court has previously considered.  Having considered the same, having set out specific facts or factors to be included in the Amended Complaint, and Plaintiffs' having complied with those directions, Plaintiffs respectfully submit the Court has passed on the viability of Defendants' arguments and found them lacking.

One of the exceptions to this is the tendency of Moving Defendants to attempt to dissect specific facts into oblivion, presumably in hopes of destroying their import.  In fact, the Hartford motion is dedicated to this very strategy.  This strategy, however, is doomed to failure.  The facts asserted, facts the defendants themselves insisted the Plaintiffs had to provide, establish more than plausible grounds for this complaint to proceed to discovery,

## I.  RULE 12(b)(6) MOTION STANDARD OF REVIEW

In reviewing a motion to dismiss under Rule 12(b)(6), the Court's obligations are lightened by being limited and narrow in scope.  The Court is required to accept the factual allegations in the

complaint as true and construe them in a light most favorable to the plaintiff. *Orta v. City of Orlando*, 2015 U.S. Dist. LEXIS 64670 (M.D. Fla. May 18, 2015).

The Court may not weigh the facts set out in the Amended Complaint, nor construe them in the Defendants' favor. *Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1368 (M.D. Fla. 2005)("However, to reach this conclusion would require the Court both to weigh the facts and to weigh them in favor of the Defendants. The Court obviously can do neither in reviewing a motion to dismiss.") and *Well Fargo Bank, N.A. v. Barber*, 2015 U.S. Dist. LEXIS 13488 (M.D. Fla. Feb. 4, 2015)("However, it is not for the Court to weigh the parties' respective cases on a motion to dismiss, but rather to determine whether Plaintiffs, accepting the factual allegations of the Complaint as true, have established a prima facie case...")[1]

It is error for the Defendants to repeatedly argue and assert this case should be dismissed because the Plaintiffs will not be able to prove their claims presumably at some future point in the course of litigation. This is a form of premature summary judgment argument, which is not permitted in passing on a motion to dismiss.

The Supreme Court has explicitly stated a complaint should not be dismissed merely because the court thinks it unlikely the plaintiff will be able to win, or is dubious that evidence will be

---

[1]*See also, Grande Vill. LLC v. CIBC Inc.*, 2015 U.S. Dist. LEXIS 27384, 17-18 (D.N.J. Mar. 6, 2015)("Although defendants offer explanations for their decisions during the budget review process, the purpose of a motion to dismiss is not for the Court to weigh evidence but for the Court to determine whether the plaintiff has pleaded enough facts to suggest each element of their claim and whether they are entitled to pursue evidence in support of their claim. Further, the facts are viewed in the light most favorable to the plaintiff, not the defendant."); *Vogt v. Greenmarine Holding, LLC*, 318 F.Supp. 2d 136, 144 (S.D.N.Y. 2004)("[O]n a motion to dismiss, the Court does not weigh the strength of the evidence, and simply considers whether the complaint alleges sufficient facts which, if true, would permit a reasonable fact finder to find defendants liable.")

discovered to support a claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (U.S. 2007), *Plaza v. City of Vestavia Hills,* 2012 U.S. Dist. LEXIS 76922 (N.D. Ala. 2012)*(*"Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations")*(citing Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely*"), Halim Hanna v. Dep't of Educ.,* 2011 U.S. Dist. LEXIS 136991, FN 1 (N.D. Fla. 2011*), Yeakel v. Cleveland Steel Container Corp*., 2011 U.S. Dist. LEXIS 14792, *3 FN 1 (E.D. Pa. 2011)*.*[2]

## II.  F.R.C.P. RULE 8 PLEADING STANDARD

The Supreme Court has firmly established the factual pleading requirements necessary to satisfy F.R.C.P. 8: "Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)(internal punctuation retained).

While more than a bare allegation of wrongdoing is required, a complaint does <u>not</u> require detailed, specific pleading of facts, as Rule 8 does not require such. *Id*. at 555.  See also *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (emphasis added).

Additionally, "[t]he threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low, and Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376

---

[2]*See also*, *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)("In considering a motion to dismiss for failure to state a claim, we do not weigh potential evidence that the parties might submit at trial, but accept all well-pleaded factual allegations as true and view them in the light most favorable to the non-moving party.").

F.3d 1065, 1070 (11th Cir. 2004) (*citing Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.,* 711 F.2d 989, 994-95 (11th Cir. 1983)).

As part of their argument that Plaintiffs have failed to meet these requirements, the current motions as well as multiple previous motions in this and companion cases repeatedly assert the complaints contain naught but conclusory statements. This would strongly indicate the movants are unable to distinguish factual statements from conclusory ones.

"As a general rule, conclusory allegations are what plaintiff thinks about a particular thing or act (so-and-so was manipulative, dishonest, fraudulent, conspiratorial or malicious) and factual allegations are what was or may have been observed about the thing or act (so-and-so destroyed the documents, made an arrest, pressed charges or said "X," knowing that "Y" was the truth." *Kunferman v. Bd. of Regents of Univ. of Wis. Sys.*, 2010 U.S. Dist. LEXIS 59505, 8-9 (W.D. Wis. June 16, 2010).

Bearing this in mind, Plaintiffs submit–as demonstrated below–the Amended Complaint complies with previous directives of this Court as well as more than sufficient facts to satisfy the federal pleading standard under Rule 8.

### III.  PLAINTIFFS ARE NOT REQUIRED TO WIN THEIR CASE VIA THE COMPLAINT

The various motions are replete with references to Plaintiffs purported failure to "prove" particular facts or causes of action. Plaintiffs are not required to do so in a complaint.

As *Twombly* made clear, a plaintiff need only set out enough factual matter (taken as true) to suggest that an agreement was made. *Twombly*, 550 U.S. at 556. As *Twombly* also explicitly set

out, plausible does <u>not</u> impose a probability requirement, but only enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. *Id*

Thus, the Plaintiffs are not required to "prove," "establish" or otherwise conclusively win their case with their complaint.  The Defendants encouragement of the Court to simply choose to disbelieve the facts as unproven is contrary to law.

"*Twombly* does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true. We made it clear, on the contrary, that a court must take the allegations as true, no matter how skeptical the court may be."*Ashcroft v. Iqbal*, 556 U.S. 662, 696 (U.S. 2009)

## IV.  THE DEFENDANTS ATTEMPT TO ENCOURAGE THE COURT TO EXAMINE THE FACTS ALLEGED INDIVIDUALLY, WHICH IS CONTRARY TO LAW

Throughout the various motions, the moving Defendants repeatedly attack isolated facts asserted in the FAC, find it lacking then move on to another fact, presumably with the hope the Court will find itself, at the end of the motion, with no facts left.  This approach is contrary to applicable law.

The Court is required to view the entirety of the facts alleged and determine, with that entirety before it, whether or not the complaint meets the requisite pleading standard, in this case Rule 8 of the Rules of Civil Procedure.  The Court may not, as the Defendants encourage, dismantle the complaint, analyze it piecemeal without reference to other facts.

"In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. ". . . The character and effect of a conspiracy are not to be judged by dismembering it and viewing

its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (U.S. 1962)(abrogated by statute on other grounds).

"Like all complaints, the court must read the instant complaint in its entirety, and must not "scrutinize each allegation in isolation but [must] assess all of the allegations holistically.  In other words, as plaintiffs argue, defendants may not "cherry pick" specific allegations in the complaint that might be insufficient standing alone. Nothing in *Twombly* or any other case has diminished the application of these general standards to a § 1 Sherman Act claim." *In re Aftermarket Filters Antitrust Litig.,* 2009 U.S. Dist. LEXIS 104114 (N.D. Ill. Nov. 5, 2009)

Thus, whether or not a single fact in isolation is insufficient to plausibly suggest an agreement is irrelevant.  The Defendants arguments regarding individual facts are red herrings.

## V.  PLAINTIFFS' FAC COMPLIES IN ALL RESPECTS WITH THE PREVIOUS ORDER OF THIS COURT REGARDING SHERMAN ACT PRICE FIXING CLAIM

In January, 2015, this Court entered an order setting out additional facts it deemed necessary for sufficient pleading.  Though entered in a companion case, the Report and Recommendation issued by Judge Smith and adopted by Judge Presnell state dismissal of the Sherman Act claims was predicated on the same grounds as those set out in *A & E Auto Body, Inc., et al v. 21st Century Centennial Ins. Co., et al*, Case No. 6:14-CV-310.  Presumably then, the directions provided by the Court in that case are equally applicable to the present one.

### A.      "Group" Pleading

The Court expressed concern over Plaintiffs' assertion that each factual allegation applies to each Defendant in light of the fact that some Plaintiffs are not associated with any of Defendants' direct repair programs ("DRPs") and others have never been so associated.

Plaintiffs addressed this concern in the FAC by clarifying that association with a DRP is not the basis of the Complaint.  To use a metaphor, DRPs are not the crime, they are one of the weapons in Defendants' arsenal.  (See, e.g., FAC, ¶¶ 99, 109, 124.)

_____This is particularly enlightening as Defendants continue to assert no evidence of an agreement exists.  Yet Defendants without DRPs nonetheless are aware of and seek to compel compliance with DRP terms created by other insurers, indicative of sharing information by and between the Defendants as well as intentional agreement to uniformly enforce DRP provisions against the Plaintiffs.   (FAC, ¶¶ 109-29.)

_____This was further elucidated by setting out in the FAC that Defendants' enforce DRP terms against Plaintiffs who do not (and have never) associated with DRPs, as well as enforced by Defendants who never had a DRP.  (See FAC, ¶¶ 109-129).

Thus, the FAC sets out that DRPs are not the substance of the allegations, merely a tool of the Defendants.  Having providing the information the Court desired with respect to Plaintiffs' association with Defendants' DRPs (those which have them), the Plaintiffs have fully complied with the Court's order.

B.      Sherman Act Price Fixing Claim

In its prior order, the Court acknowledged three critical points: (1) a combination or conspiracy in violation of the Sherman Act need not be made via an express agreement, but also by tacit action; (See Doc. 293, pg. 16) and (2) that circumstantial evidence of a combination or conspiracy is sufficient to infer an agreement; (*Id.*) and   (3) that evidence of parallel conduct constitutes circumstantial evidence of a combination or conspiracy in violation of the Sherman Act. (*Id.*)

C.      The Plaintiffs have alleged substantial facts setting out the Defendants acted in combination or conspiracy

In response to the Court's order, the Plaintiffs set out numerous facts, including a plethora of very specific examples of uniformity of action by the Defendants, establishing they have engaged in behavior which violates the Sherman Antitrust Act.

The Sherman Act prohibits "contract[s], combination[s] . . ., or conspirac[ies], in restraint of trade or commerce." 15 USCS § 1.  Price fixing is prohibited by the Act.

The FAC includes facts showing the following:

Labor rates:

•       The Defendants collectively control over 80% of the private passenger auto insurance market in the State of Tennessee. (FAC, ¶¶ 47-51.)

•       The Defendants all pay the same labor rates, calling it the "prevailing rate," though this rate has no correlation to rates actually charged.  The "market rate" is set by State Farm utilizing a fabricated "survey."  A State Farm employee has admitted the "market rate" is fabricated, that it is "whatever State Farm wants it to be, that State Farm purposefully utilizes rate information it knows is out of date and inaccurate and that State Farm intentionally suppresses labor rates.  (FAC, ¶¶ 136-52.)

•       None of the other Defendants conduct any form of "survey" to purportedly establish a "market rate."   None of the Plaintiffs have been contacted by the Defendants regarding their posted  rates in at least five years. (FAC ¶¶ 138, 164)(the FAC actually contains numerous points wherein the fact that no Defendant but State Farm conducts even a pro forma survey; paragraph 138 identifies the Defendants who do not conduct a survey by name.)

•       State Farm's "market rate" bears no correlation to the actual rates charged by the Plaintiffs, even in situations where a Plaintiff is the only body shop in town and constitutes the entire body shop market. (FAC, ¶¶ 161-62, 173)

•       State Farm has repeatedly threatened Plaintiffs and other shops that discussion of State Farm's "market rates," in public or private, would constitute price fixing. (FAC, ¶¶ 183)

- In addition to threatening Plaintiffs and other body shops with antitrust accusations if they discuss their "market rate," State Farm does not publish or otherwise make publicly available its "survey." State Farm goes to great lengths in litigation to keep its "survey" and other related information confidential in litigation, having internal sealed. (FAC, ¶¶ 155-56, 175, 177, 179, 183, 221-22, 224-25, 411, 412, 413, 418)

- Despite the zealousness with which State Farm guards its internal documents, all of the other Defendants pay the same as State Farm's "market rate" and which is not publicly available.)(FAC, ¶¶ 157-73

- The non-State Farm Defendants' "market rate" is not only identical to State Farm's, but it also bears no relation to the rates actually charged by the Plaintiffs, even in situations where a Plaintiff is the only body shop in town and constitutes the entire body shop market. (161-62, 158-74)

- Numerous employees of Defendants have directly confirmed that State Farm "sets the rates," that their own set "market rate" is directly tied to State Farm which, again, does not publish or otherwise make that information public. (FAC, ¶¶, 139-40, 151-53, 164, 178)

- The "market rate" paid by the Defendants is uniform, with no variability between densely populated cities and extremely small towns, though the actual rates charged by the Plaintiffs does vary across population centers.(FAC, ¶¶ 165-66, 173, 220)

- The Defendants alter their "market rates" contemporaneously with State Farm, again without ever having conducted any survey of their own or contacting the Plaintiffs about their current rates. (FAC, ¶¶ 175-78, 224-25, 412)

Processes and Procedures:

- All of the Defendants utilize one or more of three accepted estimating databases, which are essentially identical, and which set out the necessary processes and procedures to properly repair a vehicle and State Farm has publicly stated failure to abide by the databases (p-pages) was not State Farm policy. (FAC, ¶¶ 198-200)

- The Defendants refuse to pay for the same processes and procedures required to return a vehicle to pre-accident condition. (FAC, ¶¶208-17)

- The Defendants utilize the same "reasons" for refusing to pay for those processes and procedures required to return a vehicle to pre-accident condition in contravention of the databases and the Plaintiffs' expert opinion. These "reasons" include, but are not limited to, statements that Plaintiff is "the only one" seeking compensation for

particular procedures, that a process or procedure is an "included operation" when it isn't, or the process or procedure "isn't customary in your market." (FAC, 208-17).

These are some, though not all, of the facts set out in the FAC. They are required to be accepted as true and given all inferences favorable to the Plaintiffs. The only reasonable inferences to be drawn from these fact are that State Farm shares its fabricated "market rate" with the other Defendants which the remaining Defendants apply across the board.

In the absence of distribution by State Farm to the other Defendants, it would not be possible for other Defendants to know what State Farm is paying, given State Farm data is not publicly available and is zealously kept from public view. Certainly not in the narrow time frame–the remaining Defendants usually adapt within twenty fours to a few days.

None of the other Defendants conduct even a pro forma review of what the Plaintiffs' charges actually are. In the absence of an agreement, the non-State Farm Defendants should not know what State Farm pays. It is irrational to suppose, much less conclude, that all Defendants spontaneously came to the exact same "market rate" as State Farm with no data input, that all Defendants spontaneously came to the exact same "market rate" as State Farm that bears no relation to the actual charges of the Plaintiffs, that all Defendants spontaneously decided to alter their determination of "market rate" at the same time (repeatedly and over the course of years) with no data input, to a number that bears no relation to the Plaintiffs' actual charges but does match the "market rate" of State Farm, which is fabricated.

In the absence of an agreement, there is no logical reason for numerous representatives of the non-State Farm Defendants to repeatedly tie their own "market rate" to that of State Farm, or for those same representatives to repeatedly state their rates will go up when State Farm's does,

particularly since the non-State Farm Defendants should not know what those rates are.  Agreement

is ever more plausible given the chronology. The Defendants act contemporaneously with State Farm

and with each other.  Repeatedly.

With respect to processes and procedures, the only reasonable inference to be drawn from

the facts is that the Defendants have agreed on what processes and procedures they will or will not

pay for.  The Defendants refuse to pay for the same processes and procedures, provide the exact same

reasons for refusing to do so which contradict the data bases they use themselves.  The Defendants

are fully aware their reasons are false, yet they all say the same thing.

It is worth noting that the justification regarding a process or procedure won't be paid

because it "isn't customary in your market" is quite telling.  Repairs are unique.  No two vehicles

crash or incur damage in exactly the same way so the processes and procedures required to repair

a vehicle will necessarily vary.  Refusing to pay for a repair process or procedure because "it isn't

customary in your market" therefor has nothing to do with a proper repair at all–what needs to be

done to fix a vehicle properly and everything to do with pre-set fixed prices.

## VI.  THE DEFENDANTS DISPUTE OF FACT AND JUSTIFICATIONS FOR THEIR ACTIONS CARRY NO LEGAL WEIGHT AND MUST BE DISREGARDED BY THE COURT

The Defendants are, of course, free to dispute these facts, but they may not do so in a motion

to dismiss.  They must do so in an answer.  *Ulbrich,* 2012 U.S. Dist. LEXIS 114941 (S.D. Fla. Aug.

15, 2012).

The Defendants are also free to offer justifications for their actions, but they may not do so

in a motion to dismiss.  The Defendants justifications and rationalizations may not be considered by

the Court.  "Although defendants offer explanations for their decisions . . . the purpose of a motion

to dismiss is not for the Court to weigh evidence but for the Court to determine whether the plaintiff has pleaded enough facts to suggest each element of their claim and whether they are entitled to pursue evidence in support of their claim. Further, the facts are viewed in the light most favorable to the plaintiff, not the defendant." *Grande Vill. LLC v. CIBC Inc.*, 2015 U.S. Dist. LEXIS 27384, 17-18 (D.N.J. Mar. 6, 2015). See also Lockheed Martin Corp.,, 357 F. Supp. 2d at 1368("However, to reach this conclusion would require the Court both to weigh the facts and to weigh them in favor of the Defendants. The Court obviously can do neither in reviewing a motion to dismiss**.**")

Despite this clear authority, the moving Defendants attempt to deconstruct and dispute the facts. The most vigorous proponent of this tactic are the Hartford movants. The vast majority of their motion is consumed by what may be generously characterized as "recasting" the facts. A less generous but more accurate characterization would be Hartford willfully and deliberately misrepresents the facts set forth in the Complaint.[3]

One particularly egregious example occurs very early in the motion, wherein Hartford asserts that $42.00 per hour is the posted labor rate for the Plaintiffs and that is exactly what was paid. Hartford's argument willfully misstates the facts and the chronology in which those facts were placed. Contrary to the assertion, the Defendants have <u>never</u> paid the posted rates as shown by the FAC.

As shown in the FAC, Plaintiffs posted labor rates for were as follows:

2013:

---

[3]Given the volume of misrepresentations of fact present in the Hartford and GEICO motions, the Plaintiffs cannot address each and every one in this response without creating an excessively lengthy document. Should the Court desire, Plaintiffs will happily prepare a separate document detailing each and every misrepresentation.

- Plaintiff ICON Collision (Memphis): $44.00 per hour body labor, $44.00 per hour refinish labor, $44.00 per hour paint labor, and $34.00 per hour for paint and materials.

- Plaintiff AAA Collision: $42.00 per hour for body labor, $42.00 per hour refinish labor, $42.00 per hour paint labor and $32.00 per hour paint and materials.

- Plaintiff Brewer: $44 per hour for body labor and refinish labor, and $34.00 per hour for paint and materials.

Defendants State Farm, Allstate, Liberty Mutual, Safeco, Nationwide, Progressive, GEICO, Hartford, Travelers State Auto, Tennessee Farmers all paid $40.00 per hour for body labor, refinish and $24.00 per hour for paint and materials. (FAC, ¶¶ 161-72).

- In 2012, AAA Oakland's labor rates were $42.00 per hour for body and refinish labor and $30.00 per hour paint and materials.

Defendants State Farm, GEICO, Hartford, Liberty Mutual, Safeco, State Auto, Tennessee Farmers, Progressive and Nationwide all paid $40.00 per hour for all labor. (FAC, ¶¶ 161-63.)[4]

As the FAC shows, the Defendants purported "market rate" never matched what the Plaintiffs were actually charging. The Defendants may suggest this is a quibble, just a couple of dollars, as Hartford does, but those couple of dollars for every hour, for every repaired vehicle over the course of years adds up to millions of dollars for the Plaintiffs. Millions of dollars due and owing the Plaintiffs which the Defendants refused to pay and used to profit themselves at the expense of the Plaintiffs.

Allstate also offers suggestions as to how they, along with all the other Defendants, could have learned of State Farm's rates without State Farm telling anyone. These speculations are of no moment to the motions to dismiss. Nor is the Allstate inference that Plaintiffs "suggest" the

---

[4]Plaintiffs note these facts belie Hartford's repeated arguments that Plaintiffs have failed to identify any point in time when the Defendants paid the same rates.

Defendants insurers learned of State Farm's rates in implementing DRPs with Plaintiffs.  The Plaintiffs suggest no such thing.  In fact, the only discussion of payment in the DRP discussion of the FAC sets out the most favored nation clause which does not include a specified rate at all, simply states the body shop will offer the insurer the best rate it offers other customers.  It certainly doesn't say State Farm or any other insurer gets to decide what the best rates are for every body shop in Tennessee.

Factually, Allstate's argument would place a very heavy weight on its co-Defendant, Tennessee Farmers since that is the only DRP with which any of the Plaintiffs have been associated for many years (Plaintiff ICON is not associated with any DRPs).  Tennessee Farmers must have been very busy indeed over the course of years to have carried information to so many other insurance companies, and worked quite fast, too, to share the information with the other Defendants so as to allow them to know what State Farm's new "market rate" determination was within a matter of hours or days of the change occurring.

Additionally, the motions argue at various points that because Plaintiffs do not assert all of the Defendants simultaneously changed their fixed prices on every occasion somehow indicates they did not.  That does not follow.  Or as Allstate puts it, the statement is a "logic failure."

Plaintiffs set out the facts in the FAC for which they have in hand demonstrable supporting evidence, whether that is written documentation, affidavits, audio or video recordings.  The listing of most but not all Defendants merely means the Plaintiffs did not happen to have a customer from a particular insurer at the exact time the fixed prices were "re-fixed."

However, based upon the arguments submitted, undersigned counsel returned to rate documentation and has found omissions.  The following Defendants not previously mentioned did

-15-

adjust the fixed prices in accordance with the new State Farm "market rate" in April/May, 2013: Allstate, and Hartford.   Undersigned counsel apologizes for the oversight and will properly amend to add this information.

GEICO further attempts to excuse its price fixing by stating "[t]hat GEICO and State Farm have similar pricing is not indicative of any conspiracy..." This self-serving statement turns the facts on their head.  The prices being fixed are not the insurance Defendants'; it is the <u>Plaintiffs'</u>.  The Defendants can have whatever "pricing" they choose, but their choice does not allow them to fix the prices of the Plaintiffs nor refuse to pay the cost of repairs when they are obligated to pay the cost of repairs and have admitted as much by making partial payment for the cost of repairs.  If they wish to have a "pricing," the Defendants are free to take that up with their insureds, and seek reimbursement from them.

Plaintiffs are permitted to set their own prices.  It is the hallmark of competition in a free market society:

> The right of each competitor to fix the prices of the commodities which he offers for sale, and to dictate the terms upon which he will dispose of them, is indispensable to the very existence of competition. Strike down or stipulate away that right, and competition is not only restricted, but destroyed.

*Whitwell v. Continental Tobacco Co.*, 125 F. 454, 459-460 (8th Cir. Minn. 1903).  See also, *Brosious v. Pepsi-Cola Co*., 59 F. Supp. 429, 431 (D. Pa. 1945), *Rolley, Inc. v. Merle Norman Cosmetics, Inc*., 129 Cal. App. 2d 844, 849 (Cal. App. 1954), *First Nat'l Bank v. Missouri Glass Co.*, 169 Mo. App. 374, 397-398 (Mo. Ct. App. 1912).

GEICO also asserts that sharing information is not, by itself, indicative of a conspiracy.  That may very well be but that is not the factual posture of this case.  The facts set out show information sharing of fixed prices, enforcement of fixed prices through economic pressure, retaliation and punishment, sharing of information for purposes of intentionally steering business away from disfavored shops, group action on that information to punish disfavored shops, uniformity of excuses for refusing to compensate for necessary repair processes and procedures and the numerous other facts set out in the FAC.

There is suggestive authority which not only contradicts GEICO's position but actually forwards that sharing information between competitors is not just a valid "plus factor"but a "super plus factor," one to be weighted most heavily in favor of finding collusion. William E. Kovacic, PLUS FACTORS AND AGREEMENT IN ANTITRUST LAW, Vol. 110:393, Mich. Law Rev. (December 2011).

If the Defendants wish to justify their actions or dispute the facts asserted, which are deemed true for purposes of this motion, they are free to do so, but must do so by way of answer, not a motion to dismiss.  If the Defendants wishes to dispute the facts with evidence, they are free to do so, but must do so by way of discovery, not a motion to dismiss.

The same misrepresentations permeate the uniform changes in rates the Defendants made Hartford suggests the chronology is scattershot and inconclusive.  It is not, even if the Plaintiffs were required to conclusively prove anything by way of the complaint, which they are not.   The FAC shows that when State Farm recalibrated its "market rate" in the spring of 2011, USAA, Travelers, Shelter, GEICO,  First Acceptance and Tennessee Farmers raised their "market rates" to the exact

same rate contemporaneously (without ever contacting any of the Plaintiffs for rate information). (FAC, ¶¶ 175).

When State Farm recalibrated its "market rate" again in the spring of 2013, State Auto, Shelter, Tennessee Farmers, Progressive, First Acceptance, Safeco, USAA and Nationwide raised their respective "market rates" to the exact same rate contemporaneously (without ever contacting any of the Plaintiffs for rate information). (FAC, ¶¶ 176).[5]

Allstate makes several individual statements which, although constituting factual disputes, nonetheless need to be briefly discussed.

As a matter of correction, Plaintiffs object to Allstate's repeated use of the phrase "reimbursement rates." The Plaintiffs are not being reimbursed for anything; they are being paid for their labors as any other seller of services expects to be.  "Reimbursement rates" are a term of art within the <u>health insurance</u> industry.  It does not apply to auto insurance nor to body shops.  Use of the phrase is intended to sway the Court into believing some contract or regulatory oversight governs their interactions.  There isn't.

If the Defendants wish to challenge these facts or provide some justification for them, they are free to do, but they may not do so by way of a motion to dismiss.  As the Defendants are well aware, a motion to dismiss is not the proper procedural vehicle for disputing facts or providing justifications.  In fact, the Court is <u>not permitted</u> to consider a factual dispute or Defendants' rationalizations.  Arguing such is an invitation to clear error the Court should not accept.

---

[5]Plaintiffs point out these facts contradict Hartford's repeated assertions that Plaintiffs did not assert facts showing uniformity of price changes.  Plaintiffs also note that Hartford bases part of this argument on the choice of vocabulary–Hartford submits because Plaintiffs used the word altered instead of changed, then there has been no contemporaneous uniformity of price changes. Plaintiffs submit this is a facially frivolous argument.

## VI.  THE APPARENT ARGUMENT THAT THE FIXED PRICES ACTUALLY BENEFIT THE PLAINTIFFS AND THE PUBLIC IS CONTRARY TO LAW AND REPUGNANT TO COMMON SENSIBILITIES

In several pleadings, including the current crop, there has been asserted various arguments themed along the lines of insurance control of body shop prices is actually beneficial.  In the Allstate motion, Allstate asserts it is actually beneficial to the Plaintiffs because the State Farm "market rate" resulted in an increase of labor rates.

Legally, the argument is fatally flawed

Any combination which tampers with price structures is engaged in an unlawful activity. Even though  the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive. It has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies. It has no more allowed genuine or fancied competitive abuses as a legal justification for such schemes than it has the good intentions of the members of the combination. If such a shift is to be made, it must be done by the Congress. Certainly Congress has not left us with any such choice. Nor has the Act created or authorized the creation of any special exception in favor of the oil industry. Whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike.

*Ariz. v. Maricopa County Medical Soc.*, 457 U.S. 332, 346 (U.S. 1982)(emphasis added).

In plainer words, the law does not permit price fixing.  Ever.  Price fixing is a per se violation of the Sherman Act.  It is deemed so detrimental to a free market economy that anticompetitive effect is automatically presumed.  *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 99-100 (U.S. 1984)

Factually, the assertion is fanciful.  The FAC shows that Defendants fix body shop rates, that the rates so fixed as "market rate" are fabricated from whole cloth, that the "market rate" does not fully pay the costs of repairs (see., e.g., discussion on paint and materials, wherein Defendants have been repeatedly notified the paint and materials rate they fix does not even cover the actual cost of paint and materials, leaving Plaintiffs to work at a loss).

To suggest that because the insurance industry deigns to allow the Plaintiffs an occasional "raise" somehow excuses their actions is repugnant to both the law and common sensibilities.  The Plaintiffs are not employees of the Defendants.  They do not work for the Defendants.  They are not required to ask the Defendants to permit them to run their own businesses.

Moreover, Defendants price fixing has had a devastating effect on competition within the body shop industry.  It has eradicated it.  As has been pointed out repeatedly, the fixed prices eliminate any distinction between shops.  The least ethical, least skilled, poorest repairer is paid exactly the same as the most scrupulously honest, highest skilled and technically advanced repairer.

This has been shown repeatedly as Plaintiffs have provided facts showing that despite knowing their DRPs perform bad repairs, sometimes leaving a vehicle unsafe to drive, Defendants still steer insureds and claimants to those known poor repair facilities. There is no incentive to innovation, no incentive to quality or quality improvement, there is no market fluctuation and body shops have no ability to make sound business decisions that directly affect consumer choice and safety.

## VII.  THE PLAINTIFFS AND DEFENDANTS ARE NOT COMPETITORS

The Plaintiffs and Defendants are not competitors.  Body shops repair wrecked cars, they do not sell insurance.  Insurers sell insurance, they do not fix wrecked cars.  Plaintiffs and Defendant

necessarily have overlapping customers but they are not in the same industry and they do not compete.

Arguments abound with much citation to authority regarding the rights of competitors to compete. GEICO suggests that the price fixing of the body shop industry by the insurers is actually the result of competitive behavior and sound business practices driving price controls.

Whether or not competitive market forces may or may not affect prices is not relevant–in a free market, without illegal price fixing, whatever competitive forces exist between the insurance defendants for customers to buy policies would have no effect upon the competitive forces between body shops to sell their services. Much like candy stores and dentists, who often share common customers, the products are different, the sales are different, there is no direct competition between them for those customers and the pricing structures are independently determined by each separate and distinct industry.

The Supreme Court has unequivocally held there is no justification or legal excuse for fixing prices. "Any combination which tampers with price structures is engaged in an unlawful activity." *Maricopa County Medical Soc.*, 457 U.S. at 346. GEICO may believe it is merely exercising "sound business practices" by engaging in price fixing, but the Supreme Court says they are breaking the law and must be held accountable.

And as Allstate pointed out, it is certainly a competitive practice to play "follow the leader" within your industry to get the best prices. It works extremely well with gas stations. The problem, once again, is that body shops and insurance companies are not competitors. By playing follow the leader in this context, the Defendants are not exhibiting competitive behavior, they are complicit parties to a combination or conspiracy in violation of law.

Nor can Allstate seek refuge in *In re Citric Acid Litigation*, 191 F.3d 1090 (9th Cir. 1999) language endorsing obtaining the pricing information of competitors to better their own offering. The Plaintiffs and Defendants are <u>not</u> competitors.  Allstate is not gathering its competitors' pricing information.  It is joined in a combination or conspiracy that fixes the prices of an entirely separate industry, one that causes substantial harm to both the Plaintiffs and the public and does substantial violence to the concept of a free market economy.

## VIII.  THE FAC SETS OUT MORE THAN SUFFICIENT "PLUS FACTORS"

The Court pointed out, and the Plaintiffs have never asserted otherwise, that facts going towards supportive indications of a combination or conspiracy are required when the bulk of the outward behavior of the defendants displays parallel conduct.  These are the "plus factors" identified by the United State Supreme Court.

There is no definitive or finite list of "plus factors."  Rather there are suggested considerations.  As the Supreme Court discussed, a plus factor may include, "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," as well as "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement," and "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 FN4 (U.S. 2007).

Circuit courts around the country have identified specific "plus factors" a court may consider in addition to the Supreme Court's broad definition of a "plus factor."  These include, but are not limited to:

-22-

(1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether the defendants have been uniform in their actions; (3) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether the defendants have a common motive to conspire. *Re/Max Int'l, Inc. v. Realty One, Inc.,* 173 F.3d 995, 1009 (6th Cir. 1999).  See also, *In re Publ'n Paper Antitrust Litig.,* 690 F.3d 51, 62 (2d Cir. 2012), *Merck-Medco Managed Care, LLC v. Rite Aid Corp.,* 1999 U.S. App. LEXIS 21487 (4th Cir. 1999) and *Wilcox v. First Interstate Bank, N.A.,* 815 F.2d 522, 526 (9th Cir.1987).

Plaintiffs are not required to establish the entire universe of plus factors.  Rather asserting facts of only one is sufficient, "since plus factors are, by definition, facts that tend to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors." *Mayor & Council of Baltimore v. Citigroup, Inc.,* 709 F.3d 129, 137 (2d Cir. 2013).

In response to the Court's order, the Plaintiffs set out facts supporting a multitude of "plus factors." These include, but are not limited to, the following:

- Market Power:        Collectively, the named Defendants hold over eighty-three percent (83%) of the private passenger insurance market within the State of Tennessee. (FAC, ¶¶ 47-49).

- Motive:        The Defendants shared a motive to conspire, profit. As the profit in this case reaches the billions of dollars, the motive is substantial.  Additionally, the Defendants substantially benefit through their combination or conspiracy as they jointly profit through their mutual investments through BlackRock, Inc., in the same companies to which they steer business, provide materials at deep discount and otherwise coordinate and act in concert by agreement. . Defendants would be unable to achieve the record profits reported without the coordinated and agreed upon actions. (FAC, ¶¶ 339-72.)

- Opportunity to conspire:        The Defendants have numerous opportunities to conspire through their membership in trade associations (which, in turn, regularly

work together), involvement with purported beneficent organizations (e.g., IIHS) and similar organizations. (FAC, ¶¶ 315-38).

The moving Defendants attempt to make much of the argument that opportunity to conspire is not proof of actual conspiracy. Plaintiffs submit Hartford's argument is misplaced. The Plaintiffs are not required to provide direct evidence of a conspiracy (though it certainly appears there is direct evidence of a conspiracy). Price fixing may be established through circumstantial evidence, as the Court has previously acknowledged.

What the Court requested in its January 22, 2015 order was facts supporting the <u>opportunity to conspire</u> in support of this particular plus factor. Plaintiffs have done so. The Defendants attempt via a motion to dismiss to dispute and debate the facts is prohibited. The Defendants may dispute and debate by filing an answer and engaging in discovery.

- <u>Actions that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties</u>:

  (A)   The State Farm labor rate survey is created from manipulated information, sometimes created out of whole cloth, then "calculated" utilizing a formula which bears no indicia of mathematical/statistical legitimacy. (See above for citations to FAC.)

  (B)   State Farm does not publish or make publicly available it's purported survey results, even going so far as seal such information in other litigation, calling it proprietary, confidential and/or trade secret information. This is set out in several sections of the FAC, but Defendants continue to argue that competitors are free to make changes in their prices based upon prices offered by the competition. This argument continues to be made despite the fact that the prices in question are considered secret and not published, and are not reflective of competition as the defendant insurers are not in competition with the plaintiff body shops, whose prices are controlled not by a free market but by an entirely separate industry. (See above for citations to FAC.)

  ©   None of the Defendants except State Farm even allege they conduct a market survey to determine the purported "market rate," yet each Defendant pays the

same rate, claiming it is the "market rate" and that "market rate" is the rate State Farm has created through its manipulated and unpublished "survey" results and which bears no relation to the rates actually charged by the Plaintiffs. (See above for citations to FAC.)

(D)     Despite conducting no independent fact gathering or analysis of their own, the Defendants quickly conform to rate changes set by State Farm. (See above for citations to FAC.)

(E)     The Defendants rely upon the exact same excuses for refusing to pay for necessary processes and procedures, though those reasons are demonstrably false (e.g., assertions that a particular plaintiff is "the only one" to perform a particular procedure or to bill for that procedure when numerous plaintiffs have performed and/or billed for those same procedures), the reasons are contradicted by the databases the Defendants themselves use . (See above for citations to FAC.)

As set out in the FAC, the statistical likelihood of the Defendants each independently arriving at the same labor rates is likely astronomical, particularly where, as here, the rates bear no connection to real rates as publicly posted by the Plaintiffs and there is no variability, again, in contradiction of rates publicly posted by the Plaintiffs.

The likelihood of the Defendants each independently arriving at the same labor rates when they conduct no information gathering of their own is likely astronomical, particularly where, as here, the rates bear no connection to real rates as publicly posted by the Plaintiffs and there is no variability across the entire state, again, in contradiction of rates publicly posted by the Plaintiffs.

The likelihood of the Defendants each independently arriving at the same labor rates as State Farm without State Farm's sharing of its unpublished, purportedly confidential survey results is likely astronomical, particularly where, as here the rates bear no connection to real rates as publicly posted by the Plaintiffs and where, as here, State Farm's methodology is fatally flawed and scientifically invalid.

The likelihood of the Defendants each independently deciding to alter rates in conformity with State Farm's "survey" results, including within twenty-four hours, <u>without</u> State Farm advising of such in advance of or simultaneous with that decision is likely astronomical, particularly where, as here, the rates bear no connection to real rates as publicly posted by the Plaintiffs and State Farm consistently alleges its survey information is confidential.

The likelihood of the Defendants each independently deciding not to pay/fully pay for the same processes and procedures is likely astronomical, particularly where, as here, the databases they each utilize contradicts their expressed rationales.

The likelihood of the Defendants each independently deciding to utilize the same excuses and rationales for refusing to pay/fully pay for the same processes and procedures is likely astronomical, particularly where, as here, the databases they each utilize contradicts their expressed rationales, and shops were told each was "the only one" seeking payment for those processes and procedures when numerous Plaintiffs had billed for the same processes and procedures.

<u>Defendants' actions, if taken independently, would be contrary to their economic self-interest:</u>

If only a single Defendant took the position that underpaying for repairs, compelling use of substandard and/or dangerous replacement parts, failing and refusing to pay for repairs that will return a vehicle to pre-accident condition and similar actions, that Defendant would find i t s e l f losing customers for insurers who do pay for full and proper repairs utilizing safe and appropriate parts.

## IX.  PLAINTIFFS ARE NOT REQUIRED TO PLEAD FACTS EXCLUDING NON-COLLUSORY INDEPENDENT ACTION

Contrary to arguments asserted in their most recent motions to dismiss, the Plaintiffs are not required to allege facts that tend to exclude possible non-collusory or independent action by the Defendants to move beyond a motion to dismiss.  The Eleventh Circuit has specifically recognized this, going so far as to note a district court which dismissed upon this, among other, ground was in error.  The district court had misinterpreted a prior Eleventh Circuit ruling.  *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 571 (11th Cir. 1998).  See also, *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010)("Defendants first argue that a plaintiff seeking damages under Section 1 of the Sherman act must allege facts that "tend[] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior."[ . . .]  **This is incorrect**." (internal citations omitted, emphasis added).[6]

This is consistent with the obligation of the Court to accept the allegations of the complaint as true and construe them in the light most favorable to the plaintiff.  *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. Fla. 2008).  Accepting statements of defendants in motions to dismiss and construing those statements in the light most favorable to defendant would contradict well-established rules of analysis.

---

[6]The entirety of the Second Circuit's ruling reads:  Defendants first argue that a plaintiff seeking damages under Section 1 of the Sherman act must allege facts that "tend[] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." Appellee's Br. 15-17. This is incorrect. Although the *Twombly* court acknowledged that for purposes of summary judgment a plaintiff must present evidence that tends to exclude the possibility of independent action, 550 U.S. at 554, and that the district court below had held that plaintiffs must allege additional facts that tended to exclude independent self-interested conduct, id. at 552, it specifically held that, to survive a motion to dismiss, plaintiffs need only "enough factual matter (taken as true) to suggest that an agreement was made," id. at 556; see also 2 Areeda & Hovenkamp § 307d1 (3d ed. 2007) ("[T]he Supreme Court did not hold that the same standard applies to a complaint and a discovery record . . . . The 'plausibly suggesting' threshold for a conspiracy complaint remains considerably less than the 'tends to rule out the possibility' standard for summary judgment.").

Further, the Defendants variously attack individual facts which constitute a plus factor and attempt to recast them as independent business decisions, as if the FAC will fall by removal of a piece. This avails the Defendants nothing. In addition to the Plaintiffs having no responsibility to exclude Defendants' possible defenses in the Complaint (see *Harcros*, above), the argument encourages the Court to view individual facts in isolation. This is contrary to nationally accepted practice.

Having provided facts which meet numerous plus factors, the Court's concerns have been fully addressed. This alone, should be sufficient, particularly when reviewing the facts in their totality.

## X.  THE FAC COMPLIES WITH THE COURT'S DIRECTION TO PROVIDE DETAILED FACTS OF THE PRICING STRUCTURE

In its order, the Court found the payment structure was inadequately described. (Docket 6:14-CV-310, Doc. No. 293, pg. 17). In response, the FAC set out in substantial detail the various components of body shop costs and revenue.   The FAC further set out in substantial detail the manner and methods by which the Defendants control, cap and otherwise fix prices for those respective components.

Having satisfied the Court's requirement on this set of facts, the Defendants' motions to dismiss are without merit.

## XI.  THE DEFENDANTS ARE NOT LEGALLY PERMITTED TO REFUSE TO DEAL WITH PLAINTIFFS

Yet again, the Defendants argue the FAC must be dismissed because their refusal to deal with Plaintiffs is well within their legal rights and does not suggest evidence of a conspiracy. This argument tends to be more closely relevant to the boycotting claim than price fixing, but whichever

Count it most closely relates to, it is erroneous and the continued pressing of it is misleading to the Court for several reasons.

First, the Defendants are <u>not</u> free to refuse to deal with the Plaintiffs, particularly with respect to third-party claimant repairs.  The choice of repair facility belongs to the consumer.  The obligation and duty to pay for those repairs is not elective for the Defendants; they are not free to choose  which vehicles they will pay to repair unless the vehicle meets the legal definition of a total loss.

Second, the Defendants here are neither the buyers nor the sellers, they are the payers and only the payers.  Under other circumstances, a seller may refuse to sell at a particular price, and a buyer may shop around for a better deal.  The Defendants are neither buyers nor sellers; their only obligation and concomitant right is to pay for repairs.

Third, "refusal to deal" considerations are only applicable to monopoly claims under Section 2 of the Sherman Act.  The Plaintiffs have not asserted a monopoly claim.  See, e.g., *United States v. Colgate & Co.*, 250 U.S. 300 (U.S. 1919), and Note, Delegation of the United States to the Competition Committee, Directorate for Financial and Enterprise Affairs Competition Committee, ROUNDTABLE ON REFUSALS TO DEAL, 12 October 2007.

As Plaintiffs have not asserted a monopoly claim, the Defendants' arguments on right to refuse to deal are legally barred.  Factually, the Defendants have no right to refuse to deal with the Plaintiffs, nor has any Defendant identified any authority legally permitting one industry to unilaterally fix the prices of an entirely separate industry.

GEICO adds a gloss to this argument by stating the facts show GEICO actually does deal with the Plaintiffs.  This argument is presented in such a manner as to suggest that Plaintiffs argued a refusal to deal claim as part of the antitrust allegations.  The Plaintiffs have never asserted any such

thing.  The matter is raised continually by GEICO as well as other Defendants alleging their price

fixing is excused because they have a right to refuse to deal with anyone they choose and Plaintiffs

only inclusion of argument is to rebut the erroneous assertions of GEICO and other Defendants..

As has been repeatedly stated, GEICO does not have the right to refuse to deal with the

Plaintiffs.  Choice of repair facility belongs to the consumer.  GEICO's illegal activities with respect

to price fixing have nothing to do with refusal to deal and everything to do with fixing of prices in

the auto repair industry.

Arguing GEICO does business with Plaintiffs therefore Plaintiffs' claims have no merit is

patently absurd.

## XII.   PLAINTIFFS HAVE ALLEGED FACTS REGARDING ACCEPTANCE OF DATABASES (P-PAGES) IN COMPLIANCE WITH THIS COURT'S PREVIOUS ORDER

_____The Court previously noted the Plaintiffs did not place the Defendants' refusal to adhere to

the databases in context suggesting a preceding agreement.  "They do not, for example, allege that

the Defendants formerly accepted the databases as authoritative but around the same time, stopped

doing so.  In fact, the Plaintiffs do not allege that any of the Defendants strictly abided by the

databases."

In response to this concern, the FAC sets out in detail that the databases are accepted by the

Defendants, identified which databases the Defendants currently use or have used in the past, and

identified specific public endorsements of the databases. (FAC, ¶¶ 198-200.)

The FAC further set out details of a verbal agreement and acknowledgment by State Farm

that it was supposed to be applying the databases and would do so in the future, though this promise

was never fulfilled.  _Id._

-30-

The FAC further set out facts showing the Defendants selectively ignore the databases, i.e., refusing to recognize the very same processes and procedures in contradiction of the databases, give identical reasons for these refusals in contradiction of known facts (e.g., each Plaintiff is "the only one").   Inasmuch as the Defendants themselves utilize the databases for preparing their own estimates, the databases contradict the express statements of the Defendants, and the Defendants express <u>identical</u> reasons for their decision that are directly contrary to those databases, the only reasonable inference for the uniformity of behavior by the Defendants is a preceding agreement. (FAC, ¶¶ 198-217)

### XIII.  PLAINTIFFS' FAC COMPLIES IN ALL RESPECTS WITH THE PREVIOUS ORDER OF THIS COURT REGARDING SHERMAN ACT BOYCOTTING CLAIM

With respect to the federal boycotting claim, the Court expressed concern that the pleading did not allege facts relative to "any Defendant refus[ing] to allow any of its insureds to obtain a repair from such a shop, or refus[ing] to pay for repairs performed at such a shop."

The concern was directly addressed in the FAC.  The FAC provided factual details setting out specific instances where a named Defendant prohibited a customer from using a Plaintiff's services, i.e., requiring that customer to patronize another shop.  (FAC, ¶¶ 258-275.)

The FAC also set out a list of the most commonly conveyed misrepresentations and misleading statements made by the Defendants to consumers who identified the Plaintiffs as their respective choice of repair facility.  (FAC, ¶¶ 253.)

Additionally, the FAC set out data showing the Defendants act in concert to deliberately punish shops.  These include facts showing that not only does a Plaintiff's business suffer from

steering when it leaves a DRP, but that their business suffers contemporaneously from sudden, unexplained drops from <u>other</u> Defendants' claimants and insureds (FAC ¶¶ 302-305.)

Further still, Plaintiffs provided the affidavit of a former Progressive employee which stated unequivocally that Progressive targets shops it does not like, steers customers away, and deliberately underpays claims when repairs are performed at the disfavored shop. (FAC ¶¶ 290-292, and Ex. "3" to FAC.)

These facts satisfy the requirements set out by the Court in its 22 January Order. As was noted in the FAC, these are examples, and do not constitute the entire universe of successful boycotting by the Defendants. The information necessary to fully establish the breadth of Defendants' boycotting is within the control and possession of the Defendants' themselves.

A complaint is not susceptible to dismissal where the evidence to prove a claim is within the control and possession of a defendant, not even under the heightened pleading requirements of Rule 9, which this case is not. See, e.g., *Craftmatic Sec. Litigation v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989)(Courts "must be sensitive to the fact that application of Rule 9(b) prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud.")

The only other factual concern expressed by the Court was evidence suggesting an agreement to boycott by the Defendants. The FAC also addressed this concern. The Plaintiffs provided facts showing:

- The Defendants' targeted specific shops for punishment, i.e., when a Plaintiff disassociated from one Defendants' DRP, that Defendant as well as others specifically began steering customers away from that Plaintiff, even though the Defendants should not have known of the dissociation or had any reason to care.

- Defendants' intentional and group targeting for punishment, particularly of shops who left DRPs, is further indicated by the timing of the boycotting, e.g., steering commenced immediately following .

- The Defendants targeted specific shops for punishment for refusing to comply with Defendants' price fixing, simply because it insisted on being paid for the work it performed

- Facts also asserted show the boycotting of Plaintiffs was intentional and malicious, with intent to harm–while the Defendants' boycotting Plaintiffs through false and defamatory statements, intentional misrepresentations and misleading innuendo, for which there was no factual basis, the Defendants were intentionally withholding information of shops that perform unsafe, inadequate and/or incomplete repairs while requiring or attempting to compel consumers to take their vehicles to those same shops for repairs.

- The Defendant insurers use the same "script" to boycott targeted Plaintiffs, i.e., that shop is not on our "list," that shop overcharges, complaints about that shop have been received, if you use that shop the repairs will take too long and the consumer will run out of rental car time, the insurer can't guarantee the quality of work done at Plaintiffs' shops, a consumer is required to take their vehicle to a preferred shop for an estimate, and so forth.

These facts show that Defendant insurers acted as a group to punish and harm specific targets, the Plaintiffs.  The facts show that Defendants began steering and boycotting specific targets for no discernable legitimate reason, but did so immediately following an event, such as disassociating from a particular DRP, of which the other Defendants should have no knowledge or concern.   The Defendants utilize the exact same script for boycotting Plaintiffs.  The Defendants knowingly withhold factual information showing the shops to which they are steering consumers perform bad repairs, while simultaneously publishing false, defamatory and misleading statements about the Plaintiffs.

These facts show uniformity plausibly suggesting a preceding agreement, as well as intent to harm the Plaintiffs' specifically.

-33-

Having provided the information the Court required in its Order, the Defendants' arguments of insufficiency are without merit.

## XIV THE FACTS ASSERTED IN THE FAC ARE MORE THAN SUFFICIENT TO DENY THE DEFENDANTS' MOTION TO DISMISS

In addition to meeting the requirements of the Court's previous Order, the facts asserted in the FAC are consistent with sufficiency found by district courts within and without the Eleventh Circuit.

In *In re Marine Hose Antitrust Litigation*, the district court found the following allegations sufficient to withstand a motion to dismiss:

> [A]s discussed in the Omnibus Order on Motions to Dismiss, Plaintiff has alleged sufficient facts of an overall antitrust conspiracy. Moreover, unlike the First Amended Complaint, the Second Amended Complaint contains additional facts alleged against Defendant Scaglia. Specifically, Defendant Scaglia is alleged to have worked in the oil and gas unit of Defendant ITR. According to the Second Amended Complaint, Defendant Scaglia joined in and was an active member of the conspiracy while at ITR. Furthermore, Defendant Scaglia is alleged top have "communicated regularly by e-mail with cartel coordinator Whittle regarding prices to be charged for Marine Hose, and the jobs that ITR had been 'awarded' by the cartel and to lobby for additional jobs." Defendant Scaglia is further alleged to have continued to actively participate in and engage in conduct in furtherance of the conspiracy to fix the price of Marine Hose and to regularly communicate with Whittle, complaining for example, that Manuli was not being awarded sufficient work by the cartel.

*In re Marine Hose Antitrust Litig.*, 2009 U.S. Dist. LEXIS 133199, 10-11 (S.D. Fla. May 21, 2009)(citations to record omitted). These were the only facts alleged against this particular defendant and the court found them sufficient.

Also in that same case, the court found the following factual allegations sufficient to withstand dismissal:

Specifically, according to the Second Amended Complaint, Defendant "Northcutt engaged in conduct in furtherance of the conspiracy, by inter alia, soliciting and coordinating bids through Whittle, receiving and following cartel bid instructions, quoting cartel-set prices for Marine Hose customers, and having regular discussions with Defendants Furness and Gillespie regarding Manuli's participation in the cartel." Plaintiff further alleges that Northcutt attended at least one cartel meeting in Japan in 2002.

*Id.* at *13 (citations to record omitted).

And:

Specifically, ITR and its predecessors Pirelli Itala and Pirelli Treg are alleged to have been "active members of the conspiracy to fix, raise maintain and stabilize the price of Marine Hose in the United States through the Class period, including but not limited to those periods when it was owned by Pirelli, S.p.A. and Parker Hannifin. Plaintiff further alleges that "co-conspirator Romano Pisciotti ran ITR's Marine Hose business" and that Pisciotti attended cartel meetings and agreed with Defendants to . . . fix prices for Marine Hose and to allocate among themselves the Marine Hose market."

*Id.* at *14-15 (citations to record omitted).

Florida District Courts have also found the following more than sufficient factual allegations

to withstand a motion to dismiss:

Plaintiff argues that Defendant pleads no relevant facts to state a cause of action of a violation of Section 1 of the Sherman Act. The Court disagrees. Count II alleges that Plaintiff acquired title to a competitor's patent (McNaughton Inc.) in order to restrain commerce in the relevant market, by requiring other competitors, like Defendant, to take a license from Plaintiff at an exorbitant royalty. Defendant also alleges that Plaintiff has acquired more than 10 patents covering plural chamber drinking cups, known as bombers or shooters, in order to obtain licenses from competitors at exorbitant rates. At this stage, this is sufficient to state a claim.

*Hurricane Shooters, LLC v. EMI Yoshi, Inc.*, 2010 U.S. Dist. LEXIS 127411 (M.D. Fla. Dec. 2, 2010).

Plaintiffs' group-boycott allegations include the following: Over multiple encounters, representatives from Health First, including Defendants Senne and Means, expressly informed Plaintiffs that inclusion in HF Health Plans' provider network was

conditioned upon exclusively referring patients to Health First's subsidiaries. The representatives further emphasized that physicians who were included in HF Health Plans' provider network were "not" to refer patients to excluded practice groups or their members. Members of excluded practice groups would be admitted into HF Health Plans' provider network and would be eligible for referrals from Health First's subsidiaries only if they left the excluded group and joined one that was more "friendly" or "loyal" to Health First—that is, "one in which the physicians had entered into exclusivity arrangements."  Health First's representatives specifically named MIMA as an example of an independent but "friendly" practice group. When Plaintiffs refused to enter into exclusive referral arrangements, HF Health Plans excluded them from its provider network and, shortly thereafter, MIMA and other independent in-network providers stopped referring patients to them.

Plaintiffs insist, and the Court agrees, that their meetings with Health First's representatives, coupled with their subsequent exclusion from HF Health Plans' provider network and "blacklisting" by its in-network providers, plainly provide "context that raises a suggestion of a preceding agreement" to boycott physicians who refuse to enter into exclusive referral arrangements with Health First. *Twombly*, 550 U.S. at 557. That context provides enough "heft" to plausibly allege a conspiracy and not merely parallel action. See id. Defendants' motion to dismiss for failure to plausibly allege a conspiracy is therefore due to be denied.

*Omni Healthcare, Inc. v. Health First, Inc.*, 2015 U.S. Dist. LEXIS 7284, *45-47 (M.D. Fla. Jan. 21, 2015).

The quantity and specificity provided in Plaintiffs' FAC not only meets the necessary standard already in place in this Court, but far exceeds it, as a brief comparison between the allegations of the FAC and other complaints found more than sufficient establishes.

This Court's holdings as such are consistent with other courts.  The Seventh Circuit affirmed the district court's denial of a motion to dismiss because the complaint alleged facts showing a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion.  The complaint further alleged the defendants belonged to trade associations which allowed them the opportunity to meet and conspire, alleged defendants raised prices when costs were

falling, enacted a uniform pricing structure that simultaneously raised rates. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627-28 (7th Cir. 2010).

Bearing in mind the present case involves price suppression rather than price inflation, all of those same facts are alleged in the FAC–uniformity of prices imposed on the Plaintiffs, membership in trade associations and other organizations offering numerous opportunities to conspire, uniform changes in price ceilings, continued price suppression even in the face of documentation submitted by Plaintiffs their actual costs were rising (see, e.g., FAC discussion on paint and materials compensation) and numerous Defendants posted record high profits.

In *Starr v. Sony BMG Music Entertainment*, the court found highly persuasive facts alleging that defendants held over 80% of the market share. "[E]mpirical studies considering many industries have suggested that noncompetitive pricing [that may be the result of price coordination] is likely to appear when the four leading firms account for some 50 to 80 percent of the market." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324 (2d Cir. 2010)(citing 7 Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law § 1431a (2d ed. 2003). In the present cause, the Defendants control over 70% of the market.

Also of note from *Starr* is the fact the court considered pending government investigation a highly relevant factor in assessing a probable conspiracy. *Id.* at 323. Although not referenced in the FAC, Plaintiffs' submit the Court may take note of another action in this MDL, *State of Louisiana v. State Farm, et al*, 6:14-cv-6017, wherein the state attorney general has not merely investigated the price fixing spearhead, State Farm, but has sued the State Farm entities for actions which duplicate and overlap those set forth in the FAC.

In summary, the Plaintiffs have supplied all facts requested of them by the Court.  The facts alleged are far and away sufficiently ample to withstand Defendants' motions to dismiss, as shown by a simple comparison between the contents of the FAC and other cases where motions to dismiss were denied.  The Defendants' motions are without merit.

## XV.   THE PLAINTIFFS ARE NOT REQUIRED TO SET OUT FACTS ESTABLISHING THE SPECIFIC TIME, PLACE OR PERSON(S) INVOLVED IN THE COMBINATION OR CONSPIRACY

Defendants, particularly GEICO, have repeatedly urged that the Plaintiffs' complaints must be dismissed for failing to detail the specific time, place or persons involved in initiating the conspiracy, agreeing to the conspiracy and so forth.  This Court has already declined to accept the invitation of GEICO and other Defendants to improperly require such details.

Despite this, the argument continues to be urged, in both current motions and motions to dismiss filed in the several companion cases collected within MDL 2557.  This argument is contrary to applicable law.

> Defendants next argue that *Twombly* requires that a plaintiff identify the specific time, place, or person related to each conspiracy allegation. This is also incorrect. The *Twombly* court noted, in dicta, that had the claim of agreement in that case not rested on the parallel conduct described in the complaint, "we doubt that the . . . references to an agreement among the [Baby Bells] would have given the notice required by Rule 8 . . . [because] the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies." 550 at 565 n.10. In this case, as in *Twombly*, the claim of agreement rests on the parallel conduct described in the complaint. Therefore, plaintiffs were not required to mention a specific time, place or person involved in each conspiracy allegation.

*Starr*, 592 F.3d at 325 (emphasis added).

Allstate attempts to argue the Court has already de facto ruled the FAC is insufficient for failing to identify the who, what, where and when of the conspiracy.  Allstate quotes a sentence from

-38-

the Courts January order regarding the absence explicit details regarding the formation of the conspiracy but fails to include the sentence which follow, that the absence is not fatal to Plaintiffs' claims.  Very likely that is because Plaintiffs are not required to establish these facts.

This argument is contradicted by authority and is therefore without merit.

## XVI.  PLAINTIFFS ARE NOT REQUIRED TO ALLEGE OR PLEAD FACTS REGARDING AN EXPRESS AGREEMENT TO CONSPIRE

As with the immediately preceding argument, this argument has been repeatedly pressed in prior motions to dismiss and the Court has declined to impose this requirement.

Plaintiffs are not required to present evidence of an express agreement in their Complaint. Plaintiffs are not even required to provide evidence of an express agreement to survive summary judgment and proceed to jury trial.

"It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."  *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939).  See also *United States v. Paramount Pictures, Inc.*, 334 So. 2d 131, 143 (1948)("It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to the arrangement.") See also, *William Inglis & Sons Baking Co. v. Itt Cont'l Baking Co.*, 668 F.2d 1014, 1055-56 (9th Cir. 1982), *Volasco Products Co. v. Lloyd A. Fry Roofing Co.,* 308 F.2d 383, 389 (6th Cir. 1962),  *Ball v. Paramount Pictures, Inc.*, 169 F.2d 317, 320 (3RD Cir. 1948)  *Ross v. American Express Co.*, 2014 U.S. Dist. LEXIS 50550, *70-71 (S.D.N.Y. 2014)

As these cases demonstrate, it is generally accepted and understood across the national judiciary that only rarely will there be direct evidence of an express agreement.  Logic dictates this

as conspirators are generally anxious to conceal their crimes and any direct evidence of unlawful agreements are solely within the possession or control of the guilty parties or they were not foolish enough to write down their illegal agreement.

Authority, both binding and persuasive, makes it extremely clear Plaintiffs are not required to plead, or even prove at trial, the existence of an express agreement amongst the conspirators.

## XVII.  PLAINTIFFS ARE NOT REQUIRED TO SET OUT SPECIFIC FACTS CONNECTING EACH AND EVERY ELEMENT OF EACH AND EVERY CLAIM WITH EACH AND EVERY DEFENDANT

This, too, is an argument repeatedly pressed by a number of Defendants in prior motions and which the Court has not accepted.

Plaintiffs are required to set out sufficient factual matter to plausibly suggest a conspiracy. The Plaintiffs are not required to set out specific, detailed facts as the Defendants argue.  The United States Supreme Court has made this point quite clear.

"[W]e hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.

The Court further stated, quite clearly, that detailed factual allegations are not required under Rule 8 to defeat a Rule 12(b)(6) motion to dismiss.  *Id*. at 555.  This was apparently of sufficient importance the Court reiterated this holding with equal clarity just two years later:  "As the Court held in *Twombly*, the pleading standard Rule 8 announces does not require "detailed factual

allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added).

Several Defendants allege they are mentioned only a few times or not at all by name in the FAC and therefore should be dismissed. None of the Defendants making this argument cite any authority for this proposition and presumably, the Defendants fail to meet their burden under the Federal Rules of Civil Procedure.

However, even if some authority did exist, the Defendants' argument is rather misleading, such as Hartford's assertion the FAC fails to plausibly assert facts against thirty one separate insurance companies.

The vast majority of Defendants exist under or within a single corporate structure. There are a number of such linked companies as the corporate disclosures on file establish. State Farm Fire and Casualty is a subsidiary of State Farm Mutual. Nationwide Property and Casualty is a subsidiary of Nationwide Mutual. The Travelers Defendants are all subsidiaries of The Travelers Companies, Inc. The Hartford Defendants are all subsidiaries of The Hartford Financial Services Group, Inc. The Allstate Defendants are all subsidiaries of the Allstate Corporation. Safeco is a subsidiary of Liberty Mutual. The GEICO Defendants are all subsidiaries of GEICO, which is itself an indirect, wholly owned subsidiary of Berkshire Hathaway. Shelter General is a subsidiary of Shelter Mutual, and so forth.

There are very few independent insurance companies named as Defendants. The vast majority are joined, answerable to their respective parent.

Regardless, as noted previously here and in other pleadings, the Plaintiffs are required to allege facts sufficient to raise a plausible inference of an agreement. That is all. Plaintiffs are not

<u>required to set forth detailed factual pleading.</u>  The Court required examples and examples were provided.  The Court cannot and has not ordered Plaintiffs to list each and every bad act of each and every Defendant against each and every Plaintiff for each and every element of each and every cause of action.  Such a suggestion by the Defendants clearly and unequivocally violates the Rules of Civil Procedure and binding, applicable Supreme Court authority.

Beyond this, however, as noted above, the vast bulk of evidence proving the violations of federal law is within the possession and control of the Defendants. *Craftmatic Sec. Litigation v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989)(Courts "must be sensitive to the fact that application of Rule 9(b) prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud.")

If the FAC should not even be dismissed under Rule 9 heightened pleading standard (which this case is not), it certainly should not be dismissed under the far less strenuous Rule 8 standard of pleading.

The FAC alleges more than sufficient facts, taken as a whole, to establish a reasonable probability of agreement in violation of the Sherman Act.  That Plaintiffs presently know more details about some Defendants' illegal acts than others, but this does not excuse the acts of those who have been more successful at hiding their misdeeds and is not grounds for dismissal.

## XVIII.  DEFENDANTS' ARGUMENT THAT INDIVIDUAL PLUS FACTORS ARE INSUFFICIENT CONTRAVENE EXISTING AUTHORITY

Some Defendants, particularly GEICO, attempt to persuade the Court that the plus factors set forth in the FAC are not "meaningful" or are individually insufficient to rise to the level of excluding legitimate, non-conspiracy behavior.

      These arguments are contrary to established Supreme Court authority and contains numerous citations to inapplicable law.

      <u>There is no such thing as a "not meaningful" plus factor and Defendants' argument misrepresents the facts and law</u>

Defendants' assert that contemporaneous changes in pricing strategies is not "meaningful" because it is consistent with non-conspiratorial behavior.  Defendants are wrong.

First, the change is not to any "pricing strategy."  The right to establish the price of their goods and services belongs to the Plaintiffs, not the Defendants.  What is being altered, in concert, is the fixed prices the Defendants impose upon the Plaintiffs, not the pricing strategies Defendants charge for their own goods or services.

Second, not a single court in the country has declared a plus factor identified by the Supreme Court as "not meaningful."  Defendants cite absolutely no authority to support its argument this plus factor and the numerous facts set forth in the Complaint can simply be set aside as somehow lacking.

No such authority exists because, third, the Supreme Court has declared directly contradictory to this argument.  The United States Attorney General, Department of Justice and Federal Trade Commission also disagree with this argument.

      Per the Federal Trade Commission, " Price-fixing schemes are often worked out in secret and can be hard to uncover, but an agreement can be discovered from "circumstantial" evidence. For example, if direct competitors have a pattern of unexplained identical contract terms or price behavior together with other factors (such as the lack of legitimate business explanation), unlawful price fixing may be the reason."  See *An FTC Guide to The Antitrust Laws*, www.ftc.gov.

Per the Department of Justice, one should suspect an antitrust conspiracy when "Large price changes involving more than one seller of very similar products of different brands, particularly if the price changes are of an equal amount and occur at about the same time."  See U.S. Department of Justice, *Antitrust Enforcement and the Consumer*, http://www.justice.gov/atr/public/div_stats/ antitrust-enfor-consumer.pdf.

The United State Attorney General has stated the same, "Keep an eye out for telltale signs [of price fixing or bid rigging], including: . . .  large price changes involving more than one seller of very similar products of different brands, particularly if the price changes are of an equal amount and occur at about the same time;" See *Price Fixing or Bid Rigging Determination*, Office of the Attorney General, http://oag.dc.gov/page/price-fixing-or-bid-rigging-determination.

Finally, per the United States Supreme Court, "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason, would support a plausible inference of conspiracy." *Twombly*, 550 U.S. at 557.  See also *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. Ill. 2010), and *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1092 (N.D. Cal. 2007).

Every federal entity, court and agency, agree that the behavior set forth by the Plaintiffs in the FAC is entitled to be given due deference as a probable indicator of an agreement to fix prices. As set out in great detail, none of the Defendants conduct any form of marketplace study of body shop prices with the exception of State Farm, which fabricates the numbers it determines to be the prevailing price in the market area and as shown in the FAC have no basis in reality whatsoever**.**

It is simply not possible for the Defendants to decide they will all change their determination of the "market rate," reach an identical conclusion as to that market rate which bears no relation to

the pricing actually in place by the Plaintiffs, have that conclusion be identical to State Farm's "market rate" which it does not publicly publish, and have that new "market rate" apply at approximately the same time as every other Defendant and call that independent conduct.  This is particularly patently ridiculous when the FAC sets out facts showing the Defendants managed to do all these things not once, but repeatedly.

There is simply no basis whatsoever to support the Defendants arguments.  With respect to the federal antitrust claims, Plaintiffs respectfully submit the motions to dismiss must be denied.

## IXX.  CLAIMS PARTICULAR TO GEICO

Defendant GEICO has repeatedly pressed the argument that Plaintiffs have failed to present a case for establishing the eight "substantive elements of an antitrust claim."  This argument has appeared in every single motion to dismiss GEICO has filed and Plaintiffs have repeatedly pointed out that absolutely no authority whatsoever exists which sets out eight "substantive elements of an antitrust claim," not even the authority cited by GEICO.  Indeed, as above, one of the purported elements–barriers to entry–is only applicable to monopoly claims, which Plaintiffs have not asserted.

Plaintiffs have also repeatedly pointed out the factual inaccuracies GEICO repeatedly and persistently presents as part of its argument.  As these particular facts have not changed, GEICO repeated insistence of blatantly inaccurately portraying them is clearly intended as bad faith.

GEICO continues to waste the Court's time and counsel's time by repeatedly pressing an argument it has full knowledge is not supported by law or fact.  This is an explicit violation of Rule 11 of the Federal Rules of Civil Procedure, which provides:

> (b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's

knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

GEICO is fully aware its argument has no support whatsoever in the law and it does not bother to even pretend it advocates for an extension, modification or reversal of the law which does not support it.  Having that full awareness, it can only be presumed GEICO' intention is improper, to harass, cause unnecessary delay and needlessly expend the resources of Plaintiffs.

Undersigned counsel is fully aware of the procedure for requesting sanctions and is not doing so as part of this response.  Court intervention for GEICO's repeated and numerous misrepresentations of law and fact will be sought at a later date via proper procedure.

However, to forestall any claim that Plaintiffs failed to respond to this argument, which has never been accepted by the Court in the dozens of pleadings GEICO has filed, the Plaintiffs respond in full.

GEICO asserts eight elements must be pled in a complaint for Sherman Act violations. Those elements, according to GEICO, are:

1. A product or service market that is relevant for antitrust purposes;

2. A geographical market that is relevant for antitrust purposes;

3. Market power in the relevant product/service and geographic markets;

4. Barriers to entry;

5. Wrongful conduct resulting in anticompetitive effects;

6.      That the anticompetitive effects outweigh the pro-competitive benefits;

7.      Antitrust injury or standing

8.      Damages.

Neither of the cases GEICO cites list these eight "requirements." *Image Technical Services, Inc. v. Eastman Kodak, Inc.,* 125 F. 3d 1195 (9th Cir. 1997) does not include the eight "requirements" listed by the Defendant GEICO.   Even if this were a binding, rather than persuasive citation to authority, it would still not avail. The opinion does discuss the need to show barrier to entry, market definition and that a defendant holds a dominant share of the market. *Id.* at 1202. The opinion does describe the need for anti-competitive effects. *Id.* at 1224. Unfortunately for Defendant GEICO, these "requirements" were set out in terms of a <u>monopoly</u> claim under 15 U.S.C. §2.  The Plaintiffs have not asserted this claim and therefore have no obligation to plead the elements of a claim they have not made.

> **I.      Plaintiffs have asserted sufficient facts regarding the product or service market**

GEICO complains the Plaintiff has failed to adequately define the relevant market.   But see Complaint, ¶ 70. The Plaintiff is in the business of recovery and/or repair of motor vehicles involved in collisions.

There is no question but that the product market is identified in the Complaint.  After all, the product market is merely a matter of identifying the product at issue in the litigation.  The product at issue is automobile collision repair.  This is not challenged at all by GEICO.  In fact, GEICO is completely silent as to the purported deficiencies.  It merely makes the conclusory statement that Plaintiffs failed to alleged facts tending to prove the relevant product market.

Defendant GEICO appears to believe there is something scientific or statistical that needs to be pled.  There isn't.  Identifying the product market is simply a matter of identifying the product at issue.  *Spanish Broad. Sys. v. Clear Channel Communs., Inc.*, 242 F. Supp. 2d 1350, 1357 (S.D. Fla. 2003).

### ii.     Plaintiffs have asserted sufficient facts regarding the geographic market

Though authority cited by Defendant GEICO does not require these eight elements be pled in the complaint for the claims asserted, the Plaintiff points out the relevant geographic market is the State of FAC.  See, e.g., Complaint, ¶¶ 28. The Plaintiff is a Tennessee business, repairs vehicles from throughout the State of Tennessee.

GEICO complains this is insufficient. Why this is insufficient is not made particularly clear. GEICO does complain Plaintiff failed to exclude some other possible geographic market but makes no argument as to how or why some other geographic market is more accurate, which is its burden as the movant challenging the contents of the Complaint.  Furthermore, GEICO submits no authority Plaintiff bears the burden of excluding other possible geographic determinations of market area. Certainly the authority cited by GEICO, *Apian*, does not place upon the Plaintiff the burden of anticipating defense objections and incorporating such into the Complaint.

### iii.     Plaintiffs have asserted sufficient facts regarding market power in the relevant market

Interestingly, GEICO asserts that it is Plaintiff's burden to assert facts establishing the market power of the defendants in the relevant product/service and geographic markets but then argues that market share allegations are irrelevant under *Twombly* and *Iqbal*.

-48-

In fact, Plaintiffs cannot understand at all what argument GEICO is attempting to make as it makes no sense.  Plaintiffs are truly baffled by citation to the Federal Rules of Evidence, the rules regarding admissibility of evidence, which are plainly not applicable to factual allegations of the Complaint. Citation to *Spanish Broadcasting* has no apparent point as the citation references nothing set forth in this section of GEICO's argument.

GEICO does appear to be attempting to argue there is both a distinction and interdependence between market power and market share.  If so, it provides no argument and cites no authority, nor provides any explanation as to how the Complaint is deficient.  As this is solely GEICO's burden as the movant, it is self-evident GEICO's failure to do so renders this purported argument wholly without merit.

### iv.     Barriers to entry are not relevant to the allegations of the Complaint

Barriers to entry are only applicable in  monopoly cases, including predatory pricing claims. See cases cited in Defendant GEICO's Memorandum of Law.  See also *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818 (6th Cir. 1982)(monopoly) and *Western Parcel Express v. UPS of Am.*, 65 F. Supp. 2d 1052 (N.D. Cal. 1998).

Neither of these are relevant to the current cause as the Plaintiffs do not compete in the same industry as the Defendants, have not asserted a monopoly claim nor have they asserted a predatory pricing claim.   The Defendants cite no authority for their proposition which fits the facts of this case.

In addition to not asserting a monopoly claim, the Plaintiffs are not a competitor of the Defendants.  It does not sell insurance.  Whether or not there are barriers, high or low, to other insurance companies entering or leaving the insurance market area of Tennessee has no bearing

whatsoever on the Plaintiffs or its claims as the Plaintiffs are in the business of automobile collision repair.

### v.   Plaintiffs have pled sufficient facts regarding anti-competitive effect

The anti-competitive effect of Defendants' actions, including GEICO's, is the suppression of labor rates below competitive levels, suppression of compensation for paint and materials below competitive levels, steering, among others.   The anti-competitive effect has been to destroy competition in the auto collision repair industry.

The entirety of Defendant GEICO's arguments that low prices are typically indicative of competition and therefore constitute a pro-competitive benefit of the Defendants' price fixing is so obviously and fundamentally flawed, one can only assume it was forwarded with the deliberate intent to deceive rather than by error.

Lower prices in a free and open market may very well be the product of competition and reflective of competitors offering better, faster, innovative products and services to stay ahead of those competitors.

This is not that situation.   Here, prices are not "low" because body shops have healthy competition. Prices are artificially suppressed through fabrication, manipulation, coercion, economic duress, and just plain law breaking by the Defendants, who occupy an entirely different industry and compete, at least ostensibly, with each other, not the Plaintiff or any other collision repair facility.

Defendant GEICO does not cite a single piece of authority which holds that price fixing of an entire industry by a wholly different industry constitutes pro-competitive conduct.   It is not possible, of which GEICO is well aware.   On the contrary, this is exactly the behavior that prompted

an antitrust complaint to be filed by the Department of Justice in *United States v. Association of Casualty and Surety Companies, et al.,* which led to entry of the 1963 Consent Decree.

### vi. Plaintiff is not required to assert facts that the anticompetitive effects outweigh the pro-competitive benefits.

Proving that purported pro-competitive benefits exist is an affirmative obligation of the Defendants, including GEICO, not a pleading requirement of the Plaintiff.  The Tenth Circuit has stated the matter most clearly and cogently:

> ...[T]he plaintiff bears the initial burden of showing that an agreement had a substantially adverse effect on competition. . . . If the plaintiff meets this burden, the burden shifts to the defendant to come forward with evidence of the procompetitive virtues of the alleged wrongful conduct.

*Law v. NCAA*, 134 F.3d 1010, 1019 (10th Cir. 1998)(internal citations omitted).

See also, *Nilavar v. Mercy Health System-Western Ohio*, 244 Fed. Appx. 690, 695 (6th Cir. 2007), *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1205 (10th Cir. 2006) *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1121-22 (E.D. Ca. 2002).

Of course, this is premised upon application of the rule of reason analysis framework, which has not been decided.  Under a per se analysis, no justification asserted by Defendants would suffice.

Nonetheless, for purposes of this Motion Response, having cited no authority from any jurisdiction that Plaintiff is required to assume Defendants' burden, this argument is without merit.

Additionally, GEICO's argument that agreement by buyers to purchase goods or services from one supplier rather than another is wholly without merit.  GEICO does not have a choice whether or not it chooses to deal with the Plaintiff.  The choice of body shop belongs solely to the

consumer. .  Asserting this line of argument is disingenuous, forwarded in bad faith and done solely for the purposes of harassment and delay.

### vii.   Plaintiff has asserted facts establishing an antitrust injury

The Sherman Antitrust Act, § 1, prohibits any contract, combination or conspiracy in restraint of trade or commerce. *JES Props. v. USA Equestrian, Inc*., 253 F. Supp. 2d 1273, 1279 (M.D. Fla. 2003).  An antitrust injury is an injury of the type the antitrust laws were intended to prevent and flows from that which makes defendant's acts unlawful.  *ErinMedia, LLC v. Nielsen Media Research, Inc*., 401 F. Supp. 2d 1262, 1267 (M.D. Fla. 2005).

Defendants' anti-competitive acts, including GEICO's, include the suppression of labor rates below competitive levels, suppression of compensation for paint and materials below competitive levels, steering, among others.  The anti-competitive effect has been to destroy competition in the auto collision repair industry in the State of Tennessee, retard innovation, prohibit broad capital improvements across the industry, limit choice of consumers, place consumers in a position of physical and financial peril due to incomplete and unsafe repairs performed at the direction or compulsion of the Defendants. (See Complaint, e.g., ¶¶ 73, 77, 83–90, 99-105,106-110, 113, 120-123, 124-28.)

The Plaintiff has sustained damages as a result of the Defendants' unlawful actions. Defendants, including GEICO have engaged in a combination or conspiracy in placing and enforcing payment ceilings through collective market share control and power and the financial reality that Plaintiff is dependent upon work for which Defendants are responsible for payment.  These payment ceilings are enforced against the present Plaintiff and all other body shops.  The result of these

payment ceilings is the destruction of competition in the auto collision repair industry within the state.

Plaintiff has no ability to raise or lower prices to establish a competitive environment or operate in a free market subject to ordinary economic forces and choices as Defendants exercise their power through force of economic loss and/or reprisal should Plaintiff decide to "buck the system."

These are the actions taken by the Defendants and the injuries suffered by the Plaintiff as a result. These are exactly the type of actions the Sherman Antitrust Act was intended to prevent and thus Plaintiffs' injuries are antitrust injuries as that term is here used.



**viii. Plaintiff has asserted it suffered damages as a result of the Defendants' unlawful actions.**

As Defendant GEICO makes no argument regarding this "requirement," presumably the issue is conceded.

## XX. TORTIOUS INTERFERENCE

Incredibly, the Hartford and GEICO motions submit the state-law tortious interference claim must be dismissed because it doesn't name the Defendants individually, nor lay out the acts purportedly commited by the Defendants which constitute tortious interference in the causes of action section of the FAC..

The facts supporting this cause of action are set out in over seventy pages of facts. Hartford's argument they must be re-alleged with the same degree of specificity in the section of the complaint identifying the applicable causes of action is unsupported by any authority. This section of the FAC is not intended to duplicate the entire facts section but to identify the law under which the Plaintiffs

make claims.  Including complete duplication of facts is not required.  Or if such duplication is required, the Defendants have failed to identify their authority for the statement.

Plaintiffs would also point out that they would have incorporated by reference the facts preceding the designation of the cause of action but that has already been done and the Defendants complained about that, too.

A summary of relevant facts applicable to the tortious interference claim was provided. Given the Defendants have over seventy pages of facts, that should be more than sufficient, particularly given the lack of authority for needless repetition.

Hartford further argues the claim suffers from the same "shotgun pleading" defects and a somewhat incoherent diatribe regarding DRPs which in Hartford's view requires dismissal of the tortious interference claim.  Plaintiffs are baffled.  The Plaintiffs have never asserted DRPs were the source of the Defendants' tortious interference, nor that tortiously interfering with Plaintiffs' business is a DRP term..  Plaintiffs have asserted and submitted facts to substantiate that Defendants steer to punish Plaintiffs for a variety of reasons, including punishment for leaving a DRP which shows intentional malice.

The lengthy recitation regarding DRPs in Hartford's motion simply makes no sense. However, if Hartford seems to be implying there is a contract which allows them to slander the Plaintiffs, then Plaintiffs respectfully submit it is incumbent upon the Defendants to plead and produce the same as an affirmative defense.

Like the Hartford motion, the Allstate and GEICO motions submit this claim must fail because Plaintiffs failed to specifically identify which Defendants interfered with which Plaintiffs. This is not true.  The FAC sets out numerous detailed examples of specific instances where

Defendants interfered, both successfully and unsuccessfully with Plaintiffs' prospective customers. The manner in which this was done is consistent with the assertions made and, where presently known, the Defendant insurer was identified, the Defendant insurer's employee was identified and the customer was identified, with details of the interference.

How this is insufficient is a puzzle.  More puzzling is the fact that such specificity is not required by the law of Tennessee.  As Allstate even set out in its motion, the elements of this claim require identification of an identifiable class of third persons, not identifiable people.  The FAC sets out that the Defendants interfered with consumers who had identified a Plaintiff as the shop they had chosen to perform repairs. (FAC, ¶¶ 252, 253, 258-274, 297, 304, 432.)  Having identified the class of persons and provided specific examples, the Plaintiffs have exceeded their pleading obligation for this element.

Hartford also asserts the claim must fail because, as they have contracts with their insureds, they are privileged to interfere.  For support, Hartford cites to another case setting forth Florida law of tortious interference.  Respectfully, Tennessee is not Florida and Florida law does not apply to a Tennessee state law claim.

The elements of a Tennessee tortious interference claim are: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons;  (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002).

There is no privilege to interfere under Tennessee law.  Undersigned counsel could not find any authority to that effect and Hartford does not cite any.

Allstate also argues the FAC steering allegations do not mention "the majority of the Defendants." This is not true.  As noted above, the majority of Defendants are members of corporate families and thus the examples given cover a substantial number of the individual Defendants.

Allstate further asserts the failed steering attempts cannot state a claim for tortious interference.  To the extent Allstate means the Plaintiffs did not incur damages as a result of the unsuccessful steering, that would be correct (except to as failure to make full payment).  However, that is not the value of the unsuccessfully steering examples.  Rather, the unsuccessful attempts provide additional factual support showing the Defendants do, indeed, behave exactly as the Plaintiffs have alleged and as a former Progressive employee swore under oath.

The true number of successful steering attempts lies solely within the control and possession of the Defendants.  Unless a customer notifies a Plaintiff they were interfered with, the Plaintiff cannot know about it.  However, the examples of known steering, successful and unsuccessful, more than sufficiently establish the Defendants do tortiously interfere with Plaintiffs' business and Plaintiffs are entitled to discovery to determine exactly how much of their respective business they have lost as a result of Defendants' actions.

The same is true for the information provided regarding Brewer Body Shop.  Allstate attempts to make much of the information provided as "upon information and belief."  Allstate suggests the Court merely ignore these examples, though the examples include the name of the company representative and a sampling of statements that representative makes to consumers who identified Brewer as their repair shop of choice.

Asserting facts upon information and belief is a perfectly acceptable manner of pleading, particularly when paired with details, such as the name of the adjuster who uttered the tortiously interfering statements and the contents of the statements themselves.  That witnesses were not privy to the name of the customer with whom that adjuster was speaking on the telephone when the interference occurred, does not impair the allegation.  It merely means the Plaintiffs are entitled to discovery.

The remainder of Allstate's arguments are similar to those forwarded by most of the Hartford brief, an urging of the Court to disbelieve the facts provided, to weigh the value of the statements and find them wanting.  As has been repeatedly stated in this Response, Allstate's urging contradicts clear authority.  The Court is not permitted to weigh the evidence or disbelieve it.  On the contrary, the Court is required to accept the facts as true.  Allstate's urging to disregard this is legally deficient.

Additionally, this argument is moot.  In its Report and Recommendation, the Court stated the original complaint adequately identified the class of persons with whom Defendants interfered and that the actions described taken by the Defendants to interfere adequately alleged facts sufficient to withstand dismissal.  The Defendants are re-arguing points the Court has already decided against them.  (See Doc. No. 78, pp. 10-11.)

GEICO argues the claim must fail because Plaintiffs do not assert they acted improperly or possessed an improper motive.  However, the Court has previously rejected this argument: "Defendants argue that Plaintiff has not shown an improper motive (see, e.g., Doc. 17-1 at 18; Doc. 19-1 at 9–10), but a defendant's motive is irrelevant if the means used are improper. Common sense suggests that making misrepresentations about the quality and integrity of another's businesses is

improper, and Defendants do not argue to the contrary."  (Doc. 78, pg. 11.)  GEICO is re-arguing a

point the Court has already decided against it.

## XXI  QUANTUM MERUIT

Hartford argues Plaintiffs' quantum meruit cause must fail for a number of reasons.

Plaintiffs first note the egregious misrepresentation Hartford makes in FN 9, to wit, "Additionally,

a plaintiff must allege a reasonable expectation of additional compensation.  *Swafford v. Harris*, 967

S.W.2d 319, 324 (Tenn. 1998).  *Swafford* says absolutely no such thing.  *Swafford* was a claim for

breach of contract with a quantum meruit claim alleged in the alternative.  The Tennessee Supreme

Court ruled the underlying contract was void as against public policy and denied the plaintiff

equitable recovery because the Plaintiff had acted so unethically, "that allowing quantum meruit

under these circumstances would undermine and subvert strong public policies established to

prohibit unprofessional conduct which affects the integrity of the judicial process and the

administration of justice."  *Id.* at 325.

Those are not the facts of this case.

Just as falsely, Hartford asserts Plaintiffs did not properly allege the elements of this claim.

However, Hartford does not actually identify what error Plaintiffs purportedly committed.

Hartford goes on to argue the claim must fail because Plaintiffs have failed to establish they

conferred a benefit upon the Defendants.  For support, Hartford once again cites to Florida law, as

well as New Jersey law, but not Tennessee law.  Neither Florida law nor New Jersey law  apply to

a Tennessee state law cause of action.

Hartford in fact cites <u>no</u> Tennessee authority whatsoever to support this argument.  Tennessee

law does not agree with Hartford.  It does, however, establish this issue may not be decided by a

motion to dismiss.  "Whether or not a benefit was conferred on the defendants by the plaintiffs is a fact question."  *CK Supply v. Scrivner, Inc*., 1989 Tenn. App. LEXIS 855 (Tenn. Ct. App. Dec. 8, 1989).  The dispute, ergo, is reserved for the jury's factual resolution.

As an issue of fact, the determination of whether or not a benefit was conferred is left to the finder of fact, in this case, the jury.  Allstate's motion makes the same argument and it fails for the same reason.  As Hartford did, Allstate cites Florida law to argue no benefit has been conferred, but the State of Tennessee disagrees with Allstate, as well.

GEICO alone argues the claim must be dismissed because there is an express contract and thus no equitable remedy is available.  The contract GEICO submits precludes recovery on this claim is the contract for repairs entered between the Plaintiffs and their customers.

GEICO's references to the FAC do not say anything about a contract by or between anyone. Paragraph 40 reads, "Each individual Defendant is an insurer providing automobile policies to consumers throughout the state of Tennessee, and payment of claims to third-party claimants, resident both within or without the State of Tennessee."

Paragraph 131 reads, "Nevertheless, the Defendant insurers have officiously interjected themselves into every step and aspect of automobile collision repairs.   Although Plaintiffs' agreement to effect repairs is with the individual consumers, all Defendants require all Plaintiffs to wait to begin repairs until after an agent of the responsible insurer has inspected the damaged vehicle upon threat of refusal to pay for necessary repairs.  All estimates prepared by the agent of all Defendants include the statement that the estimate is not an authorization to repair (although that is a right belonging to the consumer, not the Defendants). "

GEICO interchanges the word "agreement" for "contract" but Plaintiffs will not quibble. Plaintiffs do perform repairs and even if the rendering of those services constitutes a contract it is of no moment. If such a transaction constitutes a contract, GEICO was not a party to it. Quantum meruit is not foreclosed when relief is sought against a defendant not a party to a contract. See *Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.3d 211, 219 (Tenn. Ct. App. 2009).

If GEICO wishes to assert a contract governs its transactions between it and the Plaintiffs, GEICO bears the burden of proof and persuasion for that affirmative defense.

GEICO also argues the claim must fail because the Plaintiffs were fully paid under a "pre-agreed pricing structure" and Plaintiffs cannot now seek a better bargain. These are completely false statements. Nowhere in the FAC does there state the Plaintiffs entered into a "pre-agreed pricing structure." On the contrary, the FAC is replete with references that they did not agree to the prices; that the Defendants hold such nearly complete control of the private passenger auto insurance market and that insurers have a great deal of influence over where consumers take their vehicles for repairs. The FAC states repeatedly that Defendants exercised extreme coercion, utilizing their dominant financial and collective market share to control, punish and retaliate against Plaintiffs, when they simply would not go along. The FAC states repeatedly that Defendants' insureds and claimants represent the vast proportion of the Plaintiffs' customers and losing those customers means the Plaintiffs face economic ruin..

Defendants paid what they agreed amongst themselves to pay. Payment was made to Plaintiffs on a take-it-or-leave-it-basis. And while this is the quantum meruit section of the Response, because GEICO has placed this argument here, Plaintiffs point out the Supreme Court has long ago found this very fact pattern to be price fixing. Where Defendants fixed prices and exert

economic coercion upon plaintiffs whose only options are to submit to fixed prices or go out of business, the Defendants have violated the law. *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 29 (1947).

## CONCLUSION

The Defendants' motions lack merit. In prior motions, they complained of no facts. Now they complain of too many facts but assign them no value. They repeatedly urge this Court to weigh facts and determine they favor them, through piecemeal examination.

That is not the law. Despite the Defendants' urging, the Court is undoubtedly aware all facts must be presumed true, all reasonable inferences drawn from those facts must favor Plaintiffs and that facts are not view in isolation, examined and discarded but viewed in their totality as the form a picture.

Plaintiffs have complied with the Court's previous order, they have provided the facts requested including timelines of events, examples of Defendants' illegal behavior and request this Court apply the law and Rule as the Supreme Court has ruled. The only manner the Court could grant the motions to dismiss would be to make fact judgments not suitable for motion to dismiss analysis. Plaintiffs have met their pleading burden and respectfully submit the Court deny the motions to dismiss and allow this case to move forward to discovery.

Respectfully submitted, this the 1st day of June, 2015.

**BREWER'S BODY SHOP, INC., ET AL**


**BY:**      /s/ Allison P. Fry
         John Arthur Eaves, Jr.
         Allison P. Fry

-61-

Attorneys for the Plaintiff

John Arthur Eaves,
Attorneys at Law
101 N. State Street
Jackson, MS 39201
Telephone:     601.355.7961
Facsimile:     601.355.0530
allison@eaveslaw.com

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Plaintiff's Response to Defendants'

Motion to Dismiss has been served electronically via the ECF system all counsel of record registered

to receive note.

/s/ Allison P. Fry

-62-