# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

BREWER BODY SHOP, LLC, et al.,

    Plaintiffs,

v.                                                            Case No: 6:14-cv-6002-Orl-31TBS

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, et al.,

    Defendants.

## ORDER

This matter comes before the Court on motions to dismiss (Doc. 86-88) filed by various groups of Defendants, the omnibus response in opposition (Doc. 92) to those motions filed by the Plaintiffs, and the replies (Doc. 95-97) filed by the movants. The portions of those motions having to do with the Plaintiffs' state law claims have been referred to Magistrate Judge Smith for disposition by way of a report and recommendation. Accordingly, this order will address only the portions of those motions that deal with the Plaintiffs' claims under federal law.

**I.  Background**

The instant case is one of 24 similar actions, consolidated for pretrial purposes, in which auto repair shops in a particular state have accused insurance companies of violating Section 1 of the Sherman Antitrust Act and various state laws by conspiring to suppress the amounts they are obligated to pay for automobile repairs. The lead case among these actions – henceforth, the "Florida Action" – was filed in this court in February 2014. The initial complaint in that case was dismissed *sua sponte* in June 2014 on the grounds that it was a prohibited "shotgun" pleading, that it failed to properly set forth the basis for the Court's jurisdiction, that it failed to identify which

parties had ongoing contracts with one another, and that all of the alleged misdeeds were attributed, collectively, to every Defendant, even where such collective attribution made no sense. (Doc. 110 at 1-2 in Case No. 6:14-cv-310-Orl-31TBS).

The plaintiffs in the Florida Action filed an amended complaint later that same month. (Doc. 167 in Case No. 6:14-cv-310-Orl-31TBS). Subsequently, various defendants moved to dismiss. In January 2015, this court granted those motions in part, dismissing all the claims in the Florida Action, some with prejudice. (Doc. 291 in Case No. 6:14-cv-310-Orl-31TBS). The Sherman Act claims in that case – one for price-fixing, and one for an illegal boycott – were dismissed because the Florida Action Plaintiffs had failed to adequately plead the existence of an agreement and had failed to adequately allege a concerted refusal to deal, respectively. (Doc. 291 at 20-21 in Case No. 6:14-cv-310-Orl-31TBS). After another amended complaint and another round of motions to dismiss, the Court dismissed the Florida Action with prejudice in September 2015. (Doc. 341 in Case No. 6:14-cv-310-Orl-31TBS). In regard to the antitrust claims, the court again found that the plaintiffs had failed to adequately allege the existence of an agreement or a concerted refusal to deal. (Doc. 341 at 20-21 in Case No. 6:14-cv-310-Orl-31TBS). The plaintiffs in the Florida Action did not appeal that dismissal.[1]

The instant case was filed in the United States District Court for the Western District of Tennessee in April 2014. (Doc. 1). In June and July 2014, a number of Defendants filed motions to dismiss. (Doc. 9, 17, 19). The United States Judicial Panel on Multidistrict Litigation transferred the case to this Court on August 12, 2014, along with the pending motions. (Doc. 63).

---

[1] As of the date of this order, of the 24 actions in these consolidated proceedings, the Florida Action and five others have been dismissed and not appealed; one was remanded; five were appealed but had the appeals dismissed for lack of prosecution; and twelve remain pending before this court.

On March 2, 2015, Magistrate Judge Smith entered a Report and Recommendation (Doc. 78) that all of the claims asserted in the Amended Complaint in this matter be dismissed, some with prejudice. On April 27, 2015, the Court adopted the Report and Recommendation. (Doc. 145). In May 2015, the Plaintiffs filed their first Amended Complaint (Doc. 85) (henceforth, the "FAC"); in response, the Defendants filed the motions that are the subject of this order.

**II.     Legal Standards**

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief" so as to give the defendant fair notice of what the claim is and the grounds upon which it rests, *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957), *overruled on other grounds*, *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A Rule 12(b)(6) motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case. *Milbum v. United States*, 734 F.2d 762, 765 (11th Cir.1984). In ruling on a motion to dismiss, the Court must accept the factual allegations as true and construe the complaint in the light most favorable to the plaintiff. *SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir.1988). The Court must also limit its consideration to the pleadings and any exhibits attached thereto. Fed. R. Civ. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).

The plaintiff must provide enough factual allegations to raise a right to relief above the speculative level, *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1966, and to indicate the presence of the required elements, *Watts v. Fla. Int'l Univ*., 495 F.3d 1289, 1302 (11th Cir. 2007). Conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal. *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court explained that a complaint need not contain detailed factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id*. 678, 129 S.Ct. at 1949 (internal citations and quotations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the plaintiff is entitled to relief.'" *Id.* at 679, 129 S.Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

### III. Analysis

According to the allegations of the FAC, which are accepted in pertinent part as true for purposes of resolving the instant motions, the Plaintiffs are a group of four Tennessee automobile repair shops; the Defendants are a group of 31 insurers who, collectively, write more than 83 percent of the private passenger automobile policies in that state. (FAC at 1-7, 9). The Plaintiffs contend that the Defendants have engaged

> in an ongoing, concerted and combined intentional course of action
> and conduct to improperly and illegally control and depress
> automobile damage repair costs to the detriment of the Plaintiffs and
> the substantial profit of the Defendants.

(FAC at 8).

The Plaintiffs go on to assert that the Defendants have

> intentionally combined to utilize their aggregated market power to
> exert control over every aspect of the collision repair industry,
> including but not limited to price fixing of labor rates, price fixing of
> replacement parts, compulsory use of substandard or dangerous
> replacement parts, compulsory use of a parts procurement program
> which directly financially benefits State Farm Defendants and
> indirectly benefits the remaining Defendants, boycotting shops which
> refuse to comply with either fixed prices or use of substandard or

> improper parts, and interfering with Plaintiffs' current and prospective business relations by intentionally misrepresenting and making knowingly false statements regarding the quality, efficiency and ethical reputation of Plaintiffs' businesses, exerted economic duress and coercion upon both the Plaintiffs to capitulate and upon consumers, including direct threats to consumers to refuse coverage or portions of available coverage if consumers persist in their efforts to patronize Plaintiffs' businesses.

(FAC at 8-9).

Simply stated, the Plaintiffs complain that the Defendants pay Tennessee automobile repair shops (on behalf of the Defendants' insureds or claimants) essentially the same hourly rates for repairs, painting and the like.   Those rates, the Plaintiffs allege, are based on market surveys performed by Defendant State Farm Mutual Automobile Insurance Company and Defendant State Farm Fire and Casualty Company (henceforth, collectively, "State Farm").   (FAC at 2, 28).   The Plaintiffs allege that State Farm manipulates or fakes the survey results, producing bogus "market rates" that are below the rates actually prevailing in the marketplace.   (FAC at 30-34).   State Farm insists that it is only willing to pay these bogus market rates, and the other Defendants insist on paying no more than State Farm pays. (FAC at 33).

In addition, the Plaintiffs allege that the Defendants have a list of repair procedures for which they all refuse to pay, even when that particular procedure is recommended by the industry's leading repair-estimating databases, (FAC at 38-44), and that the Defendants insist that the shops use cheaper (and lower-quality) parts when performing repairs, (FAC at 46-48).   Finally, the Plaintiffs contend that when repair shops balk at any of this, such as by trying to raise their hourly rates or utilize higher-quality parts, they are subject to boycotts in the form of having the Defendants' insureds "steered" away from their shops to compliant shops.   (FAC at 51).

### A. Count I – Price Fixing

In Count One, the Plaintiffs allege that the Defendants and unnamed co-conspirators have entered into an agreement "to control and suppress automobile damage repair costs [and] automobile material repair costs through coercion and intimidation" of the Plaintiffs, all in violation of the Sherman Act, 15 U.S.C. §1 *et seq.* (FAC at 83). Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." While § 1 could be interpreted to bar every agreement in restraint of trade, the Supreme Court has long recognized that Congress intended to outlaw only unreasonable restraints. *See*, *e.g.*, *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 342-43, 102 S.Ct. 2466, 2472-73, 73 L.Ed.2d 48 (1982) (citing *United States v. Joint Traffic Assn.*, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898)). Even where a restraint of trade is unreasonable, it is only prohibited if it was effected by a contract, combination or conspiracy. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775, 104 S.Ct. 2731, 2743, 81 L.Ed.2d 628 (1984). Because of this, the "crucial question" in § 1 cases is whether the challenged anticompetitive conduct "stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553, 127 S.Ct. at 1964 (alterations and citations omitted).

<u>Conscious Parallelism</u>

As is the norm in antitrust cases, the Plaintiffs here offer no direct evidence that the Defendants have entered into a price-fixing agreement, instead relying on allegations of parallel behavior. A showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, but it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense. *Twombly*, 550 U.S. at 553, 127 S.Ct. at 1964 (citations omitted). Because of this, stating a claim under Section 1 of the Sherman Act requires "a

complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965.

The actions allegedly taken by the Defendants in this case, such as paying the same labor rates, refusing to pay for the same list of procedures, and requiring the use of lower-quality parts, are not enough, on their own, to constitute a violation of Section 1 of the Sherman Act.  Evidence of conscious parallelism[2] alone does not permit an inference of conspiracy unless the Plaintiff either (1) establishes that, assuming there is no conspiracy, each defendant engaging in the parallel action acted contrary to its economic self-interest or (2) offers other "plus factors" tending to establish that the defendants were not engaging merely in oligopolistic price maintenance or price leadership but rather in a collusive agreement to fix prices or otherwise restrain trade.  *Harcros Chemicals*, 158 F.3d at 570-71.

In *Twombly*, the Supreme Court noted a number of "plus factors," identified by commentators (and the parties in that case) that could support a plausible inference of such a collusive agreement, including: "parallel behavior that would probably not result from chance,

---

[2] The Supreme Court has defined conscious parallelism as a "process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227, 113 S.Ct. 2578, 2590, 125 L.Ed.2d 168 (1993).  In other words, conscious parallelism is the practice of interdependent pricing in an oligopolistic market by competitor firms that realize that attempts to cut prices usually reduce revenue without increasing any firm's market share, but that simple price leadership in such a market can readily increase all competitors' revenues.

*City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 570 (11th Cir. 1998).

coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties;" conduct indicating "restricted freedom of action and sense of obligation that one generally associates with agreement;" or "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Twombly*, 550 U.S. at 556 n.4, 127 S. Ct. at 1965 n. 4 (internal citations omitted).

Thus, in addition to setting out the Defendants' uniform conduct, the Plaintiffs must provide enough factual matter, taken as true, to show that the Defendants took steps that would otherwise have been against their economic self-interest or that tends to show collusion.

> The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.

*Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966.

### Acting Against Self-Interest

The Plaintiffs contend that they have satisfied the requirement of pleading facts that show that a collusive agreement exists among the Defendants because they have alleged that, in addition to engaging in parallel behavior, the Defendants have taken actions that would have been against their economic self-interest in the absence of a conspiracy. Specifically, the Plaintiffs argue that

> If only a single Defendant took the position [of] underpaying for repairs, compelling use of substandard and/or dangerous replacement parts, failing and refusing to pay for repairs that will return a vehicle to pre-accident condition and similar actions, that Defendant would find itself losing customers [to] insurers who do pay for full and proper repairs utilizing safe and appropriate parts.

- 8 -

(Doc. 92 at 26).

This argument is simply not plausible. The "underpaying" which is seen by the Plaintiffs as ultimately harmful to the self-interest of the Defendants is simply the buyer-side version of the profit-maximizing behavior described approvingly by the Supreme Court in the *Brooke Group* case and by the Eleventh Circuit in *Harcros Chemicals*. (See note 2, *supra*.) If the oligopoly has market power – as alleged in this case – then it is consistent with that power for its members to observe price parity. The possible eventual loss of customers resulting from such a practice is nothing more than speculation. *See Twombly*, 550 U.S. at 567-68 (rejecting argument that defendants' failure to compete in each other's geographic areas was suggestive of conspiracy to restrain trade where plaintiff had no support for allegation that such competition would have proven lucrative and reluctance to expand beyond existing areas could be explained by legitimate concerns). *Compare Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33 (1st Cir. 2013) (finding that plaintiff successfully pled that defendants acted against their own interests in refusing to do business with plaintiff, where successful pilot programs showed that participation in plaintiff's recycling enterprise would have been cost-neutral to defendants and would have increased sales to defendants' customers).

### Plus Factors

The Plaintiffs also argue that the First Amended Complaint contains numerous allegations that, taken as true, establish the existence of "plus factors" that support a plausible conclusion that the Defendants have entered into a collusive agreement. For brevity's sake, the Court quotes the Plaintiff's assertions as to each purported plus factor and then addresses each assertion:

> Market Power: Collectively, the named Defendants hold over eighty-three percent (83%) of the private passenger insurance market within the State of Tennessee.

(Doc. 92 at 23).

The Plaintiffs offer no explanation as to how the possession of market power itself can constitute a "plus factor."   The fact that a group of alleged price-fixers possess power in a particular market does not, standing alone, make it more likely that the members of that group have entered into an agreement to fix prices.   While such an agreement would likely be pointless if the participants lacked the muscle to enforce it, the mere (collective) possession of market share is not suggestive of collusion.

> Motive: The Defendants shared a motive to conspire, profit. As the profit in this case reaches the billions of dollars, the motive is substantial.   Additionally, the Defendants substantially benefit through their combination or conspiracy as they jointly profit through their mutual investments through BlackRock, Inc., in the same companies to which they steer business, provide materials at deep discount and otherwise coordinate and act in concert by agreement. Defendants would be unable to achieve the record profits reported without the coordinated and agreed upon actions.

(Doc. 92 at 23).

The mere desire to make a profit cannot constitute a "plus factor," because conscious parallelism is itself a profit-maximizing behavior.   *See Jacobs v. Tempur-Pedic Int'l, Inc*., 626 F.3d 1327, 1342 (11th Cir. 2010) ("Jacobs had the burden to present allegations showing why it is more plausible that TPX and its distributors . . . would enter into an illegal price-fixing agreement . . . to reach the same result realized by purely rational profit-maximizing behavior.").

In addition, because the motive behind most (if not all) price-fixing agreements is to increase profits among the participants, adopting "profit motive" as a plus factor would effectively eliminate any pleading requirements regarding such agreements.   If the existence of a profit motive was enough to make it plausible that the defendants had colluded to fix prices, then essentially every alleged price-fixing agreement would survive a motion to dismiss.

The Plaintiffs' second argument on this point – involving "BlackRock, Inc." (henceforth, "BlackRock") – is difficult to follow.   It appears that the Plaintiffs are arguing (1) that some Defendants

are invested in BlackRock, (2) that BlackRock owns some businesses to which the Defendants steer their insureds and to which they provide discounted materials, and (3) that somehow this contributes to the Defendants earning billions in profits.   (FAC at 70-76).   This argument fails for numerous reasons.  First, it appears to be another version of the profit-motive-as-plus-factor argument, which fails for the reasons set forth above.   Second, the details of the financial relationship between the Defendants and BlackRock – an asset management firm – are mostly incomprehensible, especially in regard to how the Defendants might profit from that arrangement.

The Plaintiffs allege that "Defendants State Farm, Allstate, Nationwide, USAA, SAFECO, and GEICO are all invested in or through BlackRock".[3]   (FAC at 71).   The Plaintiffs allege that Blackrock owns shares in PPG Industries (henceforth, "PPG"), which manufactures paint used in auto repairs, and that PPG offers a significant price break to repair shops that have an affiliation with one or more of the Defendants but not to unaffiliated shops, such as those operated by the Plaintiffs.[4]   (FAC at 73-74).  However, the Plaintiffs do not allege that the affiliated shop passes this discount along to the insurer by way of reduced prices for repairs.   Rather, the Plaintiffs allege that the discount allows at least some Defendants to

> refuse or reduce payment to Plaintiff shops for paint, stating the charges [sought by the Plaintiffs] are excessive because other shops, *i.e.* [affiliated] shops, are able to perform paint tasks for less money and the [paint price] cap imposed is therefore reasonable.

(FAC at 73.)   In other words, the discounted cost for PPG paint lets the affiliated shops who receive the discount keep their asking price for reimbursements low, which in turn lets the

---

[3] The Plaintiffs also state, based on information and belief, that "discovery is likely to reveal the remaining defendants similarly hold investment through BlackRock".   (FAC at 73).

[4] The Plaintiffs make similar allegations regarding LKQ Corporation, a Blackrock-owned business that supplies aftermarket parts.   (FAC at 74-75).   As the allegations regarding LKG raise essentially the same issues as the allegations regarding PPG, for brevity's sake the Court will omit discussion of them.

Defendant insurers keep the market price for paint reimbursements low.[5]   (What this has to do with Blackrock and/or an agreement in restraint of trade is left unexplained.)   The Plaintiffs also allege that

> [o]n the back end, Defendants who invest with or through BlackRock profit through increased sales of the products manufactured and sold by the company in which they have invested, PPG. Therefore claims payments made to [affiliated shops] for paint and paint materials are, in essence, financially a wash, as dollars spent on claims paid return to the insurance investors as investment profit.

(FAC at 74).   It is not apparent how an entity that has invested *through* BlackRock would profit just because a company partially owned by BlackRock has increased its sales.   Assuming *arguendo* that at least some Defendants have an ownership interest in BlackRock (and therefore would share in the profits of a business partially owned by Blackrock, such as PPG), sending customers to repair shops supplied by PPG would be in those Defendants' self-interest, even in the absence of any agreement with other Defendants to do so.[6]   The Court also notes that, although the Plaintiffs include a number of incidents of alleged (or at least attempted) "steering" in the FAC, the vast majority of those incidents did not involve a BlackRock-owned business or one allegedly supplied by a BlackRock-owned business such as PPG, and none are alleged to have been done for the purpose of improving BlackRock's bottom line.   *See* FAC at 53-57.   Thus the Plaintiffs' allegations regarding Blackrock, accepted as true, do not make it any more likely that the Defendants entered into an agreement in violation of Section I of the Sherman Act.

---

[5] The Court notes that this assertion is at odds with the Plaintiffs' overriding theme in its pleadings that the "market rates" paid by the Defendants bear no relationship to the actual rates prevailing in the market.   For example, the Plaintiffs assert that they were told by an (unidentified) State Farm employee that State Farm "deliberately suppresses labor rates" and that the purported market price is actually "whatever State Farm wants it to be".   (FAC at 32).

[6] The Plaintiffs also do not offer an explanation as to why Defendants without an ownership interest in Blackrock would agree to send their insureds and claimants to PPG-supplied shops or try to encourage this behavior by Defendants with such an ownership interest.

> Opportunity to conspire: The Defendants have numerous opportunities to conspire through their membership in trade associations (which, in turn, regularly work together), involvement with purported beneficent organizations (e.g., IIHS) and similar organizations.

(Doc. 92 at 23-24).

It is not clear from the allegations of the First Amended Complaint that all of the Defendants belong to any of the trade associations or beneficent organizations referred to in that document, much less that all of them belong to the same association or organization.   Regardless, participation in trade associations and similar organizations provides no indication of a conspiracy.  *See American Dental Association v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010).

> Actions that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties:
>
> (A) The State Farm labor rate survey is created from manipulated information, sometimes created out of whole cloth, then "calculated" utilizing a formula which bears no indicia of mathematical/statistical legitimacy.
>
> (B) State Farm does not publish or make publicly available its purported survey results, even going so far as seal such information in other litigation, calling it proprietary, confidential and/or trade secret information.   This is set out in several sections of the SAC, but Defendants continue to argue that competitors are free to make changes in their prices based upon prices offered by the competition. This argument continues to be made despite the fact that the prices in question are considered secret and not published, and are not reflective of competition as the defendant insurers are not in competition with the plaintiff body shops, whose prices are controlled not by a free market but by an entirely separate industry.
>
> (C) None of the Defendants except State Farm even allege they conduct a market survey to determine the purported "market rate," yet each Defendant pays the same rate, claiming it is the "market rate" and that "market rate" is the rate State Farm has created through its manipulated and unpublished "survey" results.

- 13 -

> (D) Despite conducting no independent fact gathering or analysis of their own, the Defendants quickly conform to rate changes set by State Farm.
>
> (E) The Defendants rely upon the exact same excuses for refusing to pay for necessary processes and procedures, though those reasons are demonstrably false (e.g., assertions that a particular plaintiff is "the only one" to perform a particular procedure or to bill for that procedure when numerous plaintiffs have performed and/or billed for those same procedures), the reasons are contradicted by the databases the Defendants themselves use.

(Doc. 92 at 24-35).

Again, the cited allegations do not suggest collusion on the part of the Defendants. For example, if one assumes that State Farm's survey and the resulting "market rates" are entirely bogus, this would not suggest that the other Defendants entered into a conspiracy to pay no more than State Farm pays. The Plaintiffs also argue that the fact that the other Defendants know the prices paid by State Farm indicates collusion, because State Farm's survey results are "purportedly confidential". (Doc. 92 at 25). However, there are no allegations in the First Amended Complaint that State Farm tries to keep the prices themselves secret.[7] The Plaintiffs offer no explanation as to why State Farm would have any incentive to try to keep the rates it pays for repairs secret from its competitors. And given that those rates would be known by, *inter alia*, every repair shop in the state, it would not appear likely that State Farm could keep them secret, even if it had a reason to do so.

Finally, the Plaintiffs attempt to rely on their allegations that the Defendants, when refusing to pay for certain recommended procedures, uniformly utilize the same explanations. For example, the Plaintiffs have alleged in the First Amended Complaint that a number of Defendants refuse to pay separately for a painting-related procedure known as "denib and finesse," claiming that it is

---

[7] The Plaintiffs do allege that State Farm tries to keep information such as "training manuals, policies and procedures" secret, FAC at 33, but not prices.

included as part of the paint job, even though industry repair databases identify it as a separate procedure. (FAC at 44). But the Plaintiffs fail to offer any explanation as to how this indicates collusion on the part of the Defendants, and no such rationale is apparent to the Court. Even if one assumes that the Defendants have agreed to refuse to pay for certain procedures, it defies logic that they would also agree to use the same bogus excuses to justify their refusal.

In light of the foregoing, the Court finds that the Plaintiffs have again failed to state a claim for price-fixing in violation of Section 1 of the Sherman Act.

### B.     Count Two – Boycott

In Count II, the Plaintiffs assert that the Defendants have attempted to coerce auto repair shops into going along with their price-fixing scheme by

> multiple forms of illegal boycott activity including, *inter alia*, steering actual and potential customers away from Plaintiffs through knowing dissemination of false and misleading statements about Plaintiffs; manipulating delays and obstacles in approving, obtaining and paying for repairs obtained from Plaintiffs; economically coercive threats that use of Plaintiffs' services will incur additional and greater out-of-pocket costs to customers; alteration and manipulation of the Defendants' referral and rating systems to limit or otherwise influence customer access to service providers.

(FAC at 89-90).

The generic concept of "boycott" refers to a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target. *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978). The Defendants argue, *inter alia*, that the Plaintiffs' boycott claim must be dismissed because the Plaintiffs have again failed to allege conduct that would constitute a concerted refusal to deal – the same reason their previous boycott claim was dismissed. *See*, *e.g.*, Doc. 86 at 14. At best, the Defendants argue, the Plaintiffs have included in the First Amended Complaint some allegations of a particular insurer attempting to steer its insured from a shop operated by one of the Plaintiffs to a different shop that had a relationship

- 15 -

with the insurer, and some instances where a Plaintiff ceased its participation in a DRP and, subsequently, received less business from some Defendants.  (Doc. 86 at 15-16).

The Plaintiffs do not directly respond to these arguments.  Rather, they argue that 1) the Defendants are not free to refuse to deal with the Plaintiffs, because the choice of repair facilities lies with the insured, not the insurer; 2) the insurers are not sellers, they are only payers; and 3) "refusal to deal" considerations only apply to monopoly claims under Section 2 of the Sherman Act, and the Plaintiffs have not asserted such a claim.  (Doc. 92 at 28-29).

The Plaintiffs' first two points are unresponsive.  As for the third, it is incorrect.  In the antitrust context, group boycotts, or concerted refusals to deal, may run afoul of Section 1 of the Sherman Act. *See, e.g., Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 625 (1953) *and see F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 422 (1990) (finding that boycott by criminal defense lawyers, who refused to represent indigent clients until government increased compensation for doing so, constituted "a classic restraint of trade within the meaning of Section 1 of the Sherman Act").

The Court also notes that there are no allegations in the First Amended Complaint that any Defendant (much less all of them) has ever refused to do business with any of the Plaintiffs.  The Plaintiffs do include allegations that a number of Defendants, on different occasions, had attempted to steer one of their insureds away from one of the Plaintiff's shops to another shop that had some sort of relationship with the insurer.  (FAC at 53-57).  Only a handful are alleged to have succeeded.  *Id.*  None of them aid the Plaintiffs in stating a boycott claim, however, as none of the efforts are alleged to have involved more than a single Defendant, and there are no allegations that any of the attempted steering occurred because the repair shop originally chosen by the insured was attempting to obtain a higher reimbursement rate or anything of that nature.

The Plaintiffs have again failed to allege facts suggesting a concerted refusal to deal, as required to state a boycott claim under Section 1 of the Sherman Act.

## IV.     Conclusion

The Plaintiffs have had multiple attempts to state an antitrust claim. Based upon a review of the pleadings in this and the other 20-odd consolidated cases – the vast majority of which share the same shortcomings – the Court finds that giving the Plaintiffs another opportunity to state a claim would be an exercise in futility.   Accordingly, both antitrust claims will be dismissed with prejudice.   In consideration of the foregoing, it is hereby

**ORDERED** that the motions to dismiss (Doc. 86-88) are **GRANTED** as to the antitrust claims, and Counts I and II are **DISMISSED WITH PREJUDICE.**

**DONE** and **ORDERED** in Chambers, Orlando, Florida on March 7, 2016.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party